**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DINA HOROWITZ, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SUNEDISON, INC., AHMAD CHATILA, and BRIAN WUEBBELS,<br><br>Defendants. | Cause No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dina Horowitz ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation, review and analysis of Securities and Exchange Commission ("SEC") filings, press releases and media reports issued by and disseminated by SunEdison, Inc. ("SunEdison" or the "Company") and review of other publicly available information concerning SunEdison. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of purchasers of publicly traded common stock of SunEdison between June 16, 2015 and October 6, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against SunEdison and executives Ahmad Chatila and Brian Wuebbels (collectively, the "Defendants").

2. SunEdison is a diversified developer of wind and solar energy projects, having developed over 1,300 solar and wind projects in 20 countries. Defendants misled investors by creating the picture that the Company had the financial wherewithal to sustain continued growth. However, as the Company continued its acquisition binge, it was revealed that the entire scheme was nothing more than a house of cards.

3. The price of SunEdison stock began its decline on July 20, 2015, after the Company had announced yet another acquisition it did not have the cash to support. On October 5, 2015, when the Company revealed that it was laying off a 15% of its workforce, however, the Company could no longer hide its prior misstatements.

4. Once the truth was revealed, SunEdison's stock dropped to $8.69 from a high of $30.96 at the start of the class period on June 16, 2015 – a whopping 72% price fall.

5. As a direct result of Defendants false statements and omissions, shareholders invested in SunEdison believing that it had the ability to sustain growth and successfully execute its business plan. All the while the Company was mounting debt and failing to achieve any sustainable goals.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District, and SunEdison is headquartered in the this District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone and electronic communications, and the facilities of a national securities exchange.

## THE PARTIES

10. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff Dina Horowitz purchased SunEdison stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11. Defendant SunEdison is a Delaware corporation headquartered at 13736 Riverport Drive, Maryland Heights, Missouri 63043. SunEdison stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SUNE."

12. Defendant Ahmad Chatila ("Chatila") has been President and CEO of SunEdison since March 2009.

13. Defendant Brian Wuebbels ("Wuebbels") has been Executive Vice President, Chief Administration Officer, and Chief Financial Officer of SunEdison since 2012.

14. Defendants Chatila and Wuebbels are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company and its subsidiaries, possessed the power and authority to control and did control the contents of SunEdison's public reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. These Defendants were quoted in and/or provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were intentionally being concealed from, the public, and that the positive representations, which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### ***Background***

15. SunEdison finances, builds, owns and operates various solar and wind power plants. In the operation of its business, SunEdison is dependent upon the use of so-called "YieldCos.," which have become popular as a means of financing various types of clean energy production. YieldCos. are dividend growth-oriented public companies, created by a parent company, such as SunEdison, that bundle long-term contracted operating assets in order to

generate predictable cash flows. The parent company acquires assets such as power-generating plants, and then sells those assets and their customer contracts for power purchasing to the YieldCo. The contracts then generate ongoing cash flows, which are meant to be distributed to the YieldCo.'s shareholders in the form of dividends. In order for a YieldCo. to obtain capital to finance its acquisitions from its parent company, it frequently turns to an initial public offering ("IPO").

16. The Company seemed poised for great things, offering a business plan designed to build growth in the alluring alternative energy market.

17. On May 29, 2014 the Company announced in a press release that TerraForm Power, Inc. ("Terra Power"), a YeildCo. subsidiary of SunEdison had filed a registration statement with the SEC for a proposed IPO, and on July 17, 2014, Terra Power began trading on the NASDAQ at $33.85 per share – 33% above its IPO price. Terra Power offered 20.1 million shares and raised about $500 million in its IPO, valuing the company at around $2.4 billion. SunEdison retained nearly 95% of the voting power in the company.

18. Throughout the next year the Company issued quarterly financial statements showing the Company was increasing net sales and was poised for growth.

19. The Company also continued its acquisition strategy, announcing its acquisition of First Wind Holdings, LLC ("First Wind") for $2.4 billion in a transaction that was completed on January 29, 2015.

20. To fund these acquisitions, SunEdison raised $190 million through a secondary offering of shares in Singapore-based SunEdison Semiconductor Ltd, secured a $400 million credit commitment from several financial institutions, offered $350 million of convertible senior

notes due 2022, and offered $375 million aggregate principal amount of convertible senior notes due 2023 and $375 million aggregate principal amount of convertible senior notes due 2025.

21. On May 7, 2015, SunEdison announced that a second of its YieldCo's TerraForm Global, Inc. ("Terra Global") had filed a registration statement in preparation for its IPO.

***<u>The Company Misleads Investors</u>***

22. The Company continued to take on new debt to fund growth. On June 16, 2015, SunEdison announced in a press release that it has signed a definitive agreement to acquire 100 percent of Globeleq Mesoamerica Energy ("GME"), a renewable energy company based in Central America. In the press release, Chatila touted the expansion of SunEdison, encouraging investors to buy into the big lie that the Company was building a plan of sustainable growth:

> The acquisition of GME strengthens SunEdison's leadership position in the global wind energy market and significantly expands our presence in Central America, a region that offers growth opportunities for our emerging markets development platform. With this acquisition we not only gain an experienced and talented management team with a proven track record in the region, but also position ourselves to accelerate our performance and deliver attractive returns to our shareholders.

23. However, without shareholders knowledge, this acquisition surge was funded on a house of cards being propped up by false statements and omissions.

24. Rather than address known needs to increase revenues and lower debt, the Company again jumped into another acquisition. On July 20, 2015, SunEdison announced in a press release that it had entered into a merger agreement with Vivint Solar, a provider of residential solar systems in the United States, for $2.2 billion in cash, stock and convertible notes. Chatila was quoted in the press release:

> SunEdison's acquisition of Vivint Solar is a logical next step in the transformation of our platform after the successful execution of our First Wind acquisition in January 2015. We expect the Vivint Solar transaction to create significant value for our stockholders through the accretion in our TerraForm Power ownership, the

> acceleration of our Incentive Distribution Rights and an immediate expansion of our capacity and bandwidth to grow our residential business in the U.S. and globally. As of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy more than 1 gigawatt per quarter.
>
> ***
>
> With Vivint Solar, we're tripling our value.

25. *Forbes* reported in a July 20, 2015 article "SunEdison Buys Vivint to Overcome Weakness in Residential Solar" that purchasing Vivint "will turn SunEdison into a formidable player in the residential market, the one segment in which it hasn't been a key player."

26. However, unbeknownst to investors and despite Chatila's assurances, SunEdison's acquisition plan was not sustainable.

27. Rather than pulling back, the Company again charged ahead. On July 31, 2015, Terra Global launched its IPO.

28. Originally, Terra Global intended to offer 56.6 million shares for between $19 and $21 each to raise a total of $1 billion. However, SunEdison was ultimately only able to raise $675 million, selling only 45 million shares at a price of $15 per share.

29. Following the disappointing IPO, SunEdison's prices began to fall. However, Defendants continued to mislead investors into believing that the Company was on the right path.

30. On August 6, 2015, SunEdison issued a press release announcing its financial results for the 2015 second quarter, reporting a loss of $263 million on $455 million of revenue. It had a net loss of $0.93 per share compared to estimates of a net loss of $0.55 per share. According to its financials, SunEdison's debt now stood at $11 billion, which included debt from several recent multi-billion dollar deals to acquire new wind and solar assets. Once again in the face of increasing debt, Chantila told investors:

> During the second quarter, we continued to balance operational execution while meeting our strategic objectives. On the operations front, our leading organic development engine continues to execute as we exceeded our megawatt (MW) and Retained Cash Available for Distribution (CAFD) guidance, delivering 404 MW and $63 million, respectively. In addition, TerraForm Power delivered $65 million of CAFD and continues to create value for shareholders with its leading DPS growth. Finally, we have largely completed our platform transformation with the agreement to acquire Vivint Solar, a leader in residential solar, as well as the IPO of our Emerging Markets-focused asset ownership platform, TerraForm Global.

31. While the market seemingly started to understand that SunEdison's plan might not be sustainable, the full extent of the Company's misrepresentations had not yet become known.

32. On September 6, 2015, *Seeking Alpha* reported in an article entitled "The Case Against SunEdison" that there was good reason for investors to believe in the Company despite its recent losses:

> In spite of disappointing numbers in 2013 and 2014, the market had given SunEdison the benefit of the doubt. It has been given the benefit of the doubt because SunEdison continues to rapidly grow. Even though it continues to burn through capital, it has made some smart moves like the creation of its YieldCos and the acquisition of First Wind. The market continued to be bullish on SunEdison for these reasons and for just cause. After all, SunEdison is attempting to aggressively grow and expand and become the top renewable energy company in the world.

33. It was not until October 5, 2015, when SunEdison filed an 8-K with the SEC announcing layoffs of 15% of its workforce and restructuring charges of $30 to $40 million for Q3 2015 through Q1 2016, that the market saw the truth.

34. The 8-K reported that on September 29, 2015, the Board of Directors of SunEdison approved management's plan to reorganize. The 8-K misrepresented the purpose of these layoffs as a vehicle to "optimize business operations in alignment with current and future

market opportunities, and accelerate cash flow positive operations." In reality the Company did not have the cash flow to sustain its operations.

35. The next day, the *Wall Street Journal* reported in an article entitle "SunEdison Won't Complete $700 Million Buyout of Latin America Power" that as its "woes mount[ed]," SunEdison failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition of Latin American Power ("LAP"). The article reported that attorneys for LAP stated that SunEdison was in breach of its obligations under the deal.

36. On October 6, 2015 the stock closed at $8.69 from a high of $30.96 at the start of the class period on June 16, 2015 – a whopping 72% price fall.

37. After investors finally saw the full picture, SunEdison's stock price continued its spiral downward.

38. On October 7, 2015 SunEdison lowered its 2016 projections and announced in a press release that it would not sell any projects to Terra Power or Terra Global that year. Chatila announced on a call with analysts that SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a yieldco." Even worse, Chatila announced that SunEdison planned to reduce expansion plans in Latin America and other emerging markets, which were the YieldCo.'s geographic focus. Chatila explained that SunEdison "de-emphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market." In other words, the project acquisition strategy upon which the YieldCos. depended to effectuate its business plan would not be carried out.

39. On October 8, 2015, *SeekingAlph*a issued another report "SunEdison: Is Bankruptcy Possible" noting that SunEdison's cash expenditures are "clearly unsustainable" with

the Company burning "around $3.5 billion in the last four quarters." The article also noted that "SunEdison is over-leveraged" with "shareholders equity of only $632 million and total liabilities of $16,925 million, it is possible to calculate a debt to equity ratio of 26.78."

40. Once the smoke and mirrors cleared investors quickly abandoned the marketplace with several prominent hedge funds, such as Daniel Loeb's Third Point, selling their positions.

41. Particularly troubling, Vivint Solar did not meet analysts' expectations causing a stock drop. The results "severely call into question the health of the Vivint Solar organization (especially in the context of strong results from Sunrun and SolarCity)" wrote Credit Suisse's Patrick Jobin. Jobin wrote that SunEdison investors should be concerned about what the Company is likely to be acquiring at this point:

> The decline in volumes and likely guidance miss, in addition to the weakening financial position (debt raises challenged recently), indicates troubles either organizationally or as a consequence of the pending acquisition by SunEdison which is supposed to close Q4-Q1. While no shareholder vote has been scheduled to approve the merger, it appears financial underperformance is not a MAC to get out of the deal. While TerraForm is actively trying to sell the operating assets upon acquisition, one must ask further questions about the strength of the development engine SunEdison is acquiring.

42. Also Deutsche Bank's Visual Shah cut his price target on SunEdison to $16 from $28, noting that his reading of the company's formal 10-Q included "language around SUNE debt financing" that "could concern some investors who are focused on the balance sheet, while opex needs could complicate SUNE's ~$150M/Q Guidance."

43. Defendants made numerous materially false and misleading statements and omissions to investors during the Class Period regarding the Company's operations, and its business and financial results and outlook.

44. These statements were knowingly false when made. Defendants knew, but concealed from the investing public during the Class Period that SunEdison was not in a position to continue to grow without reaching a point of insurmountable debt.

45. The timing and magnitude of the declines in the price of SunEdison stock negates any interference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to defendants' fraudulent conduct.

**NO SAFE HARBOR**

46. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SunEdison who knew that those statements were false when made.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

47. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired

SunEdison common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the SunEdison, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48. The members of the Class are so numerous that joinder of all members is impracticable. The stock was actively traded on the NYSE during the Class Period. As of November 2, 2015 there were over 315 million shares of SunEdison common stock outstanding and not owned by Defendants or other corporate insiders. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believe that there are at least thousands of members in the proposed Class.

49. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act as complained of herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SunEdison;

c. whether the Individual Defendants caused SunEdison to issue false and misleading statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the price of SunEdison stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, in what amount.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a Class action.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: <u>FRAUD ON THE MARKET</u>

53. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. SunEdison stock were traded in an efficient market during the Class Period;

d. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of SunEdison stock; and

e. Plaintiff and members of the Class purchased, acquired and/or sold SunEdison stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5

56. Plaintiff repeats the allegations set forth above as if fully set forth herein.

57. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

58. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business, which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SunEdison stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SunEdison stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

59. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SunEdison stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SunEdison's operations.

60. By virtue of their positions at SunEdison, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of SunEdison, the Individual Defendants had knowledge of the details of SunEdison's internal affairs.

62. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SunEdison. The Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SunEdison's operations. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SunEdison stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SunEdison's operations, Plaintiff and the other members of the Class purchased or otherwise acquired SunEdison stock at artificially inflated prices, and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

63. During the Class Period, SunEdison stock were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SunEdison stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise

acquired those securities, or would not have purchased or otherwise acquired them at the inflated prices they paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SunEdison stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of SunEdison stock declined sharply upon public disclosure of the facts alleged herein, resulting in injury to Plaintiff and Class members.

64. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of SunEdison stock during the Class Period, upon the disclosure that the Company had been disseminating false statements to the investing public.

## COUNT II

### Against The Individual Defendants For Control Person Liability Under Section 20(a) of the Exchange Act

66. Plaintiff repeats the allegations set forth above as if fully set forth herein.

67. During the Class Period, the Individual Defendants participated in the operation and management of SunEdison, and conducted and participated, directly and indirectly, in the conduct of SunEdison's business affairs. Because of their senior positions at the Company, they knew the adverse non-public information about SunEdison's misstatement of income and expenses and false financial statements.

68. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to

SunEdison's financial condition and results of operations, and to correct promptly any public statements issued by SunEdison, which had become materially false or misleading.

69. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings, which SunEdison disseminated in the marketplace during the Class Period concerning SunEdison's results of operations.

70. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SunEdison to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of SunEdison within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of SunEdison stock. Each of the Individual Defendants, therefore, acted as a controlling person of SunEdison.

71. By reason of their positions as senior management and/or directors of SunEdison, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SunEdison to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of SunEdison and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff and the other members of the Class complaint.

72. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SunEdison.

WHEREFORE, Plaintiff demands judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief in Plaintiff's favor as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff demands a trial by jury for all claims so triable.

Dated: November 30, 2015

**CAREY DANIS & LOWE**

By: /s/ James J. Rosemergy____________
James J. Rosemergy #50166
8235 Forsyth, Suite 1100
Saint Louis, MO 63105
314-725-7700
314-721-0905 (fax)
jrosemergy@careydanis.com

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Jennifer Sarnelli

Tower 56
126 East 56th Street, 8th Floor
New York, NY 10024
Tel: 212-905-0509
Fax: 212-905-0508

*Counsel for Plaintiff*