UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DINA HOROWITZ, on behalf of herself and all others similarly situated,<br><br>           Plaintiff,<br><br>    v.<br><br>SUNEDISON, INC., AHMAD CHATILA, and BRIAN WUEBBELS,<br><br>           Defendants. | Case No. 4:15-cv-01769-RWS<br><br><br>JURY TRIAL DEMANDED |

**AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

### TABLE OF CONTENTS

I.  Nature Of Action................................................................................................... 1

II.  Parties.................................................................................................................... 8

    **A.**  Plaintiffs ................................................................................................... 8

    **B.**  Executive Defendants ............................................................................... 9

    **C.**  Other Defendants .................................................................................... 10

III.  Background To The Scheme ................................................................................ 10

    **A.**  SunEdison And The YieldCo Business Model ....................................... 10

    **B.**  SunEdison Takes On Billions Of Dollars In Debt – Including A Massive Margin Loan – As It Transforms Itself Into A Renewable Energy Project Developer ................................................................................. 13

    **C.**  The Executive Defendants Reassured Investors That The Margin Loan And The Exchangeable Notes Were Non-Recourse ............................... 15

    **D.**  SunEdison Incurs Billions Of Dollars In Debt And Obligations To Acquire Projects To Drop Down To TERP And Global And The Executive Defendants Misrepresent That SunEdison Has Ample Liquidity To Do So ....... 17

    **E.**  Defendants Chatila And Wuebbels Were Incentivized To Dramatically Expand The Company's "Foregone Margins" Through Acquisitions ................. 19

    **F.**  At The Same Time That The Executive Defendants Reassured Investors That They Were Comfortable With SunEdison's Cash Position, SunEdison Secretly Could Not Pay Its Bills ........................................................ 22

    **G.**  SunEdison Suffered From Material Weaknesses In Its Internal Controls Over Financial Reporting Such That The Company Had No Reliable Way To Account For Its Available Cash ................................................. 33

        **1.**  SunEdison's Internal Controls Were So Flawed That There Were Effectively No "Controls" Over Much Of The Company's Reporting ................................................................................ 35

        **2.**  SunEdison And The YieldCos Eventually Admit To Fundamental Undisclosed Weaknesses In Internal Controls .......................... 50

    **H.**  SunEdison's Next "Transformational" Transaction Raises Doubt Concerning SunEdison's Ability To Execute On Its Growth Plan ...................... 52

i

**I.**    SunEdison Secretly Borrows $169 Million From Goldman Sachs At An Exorbitant 15% Interest Rate ................................................................ 54

**J.**    The Executive Defendants Falsely Represent To Investors That SunEdison's Liquidity Remains Strong Even As They Internally Recognize That They Can No Longer Paper Over SunEdison's Cash Shortfalls ................................................................ 55

**K.**    The Executive Defendants Fail To Disclose A Breach Of The Debt Covenants On The Margin Loan Or The Use Of The Goldman Loan To Satisfy Its Obligations Under The Margin Loan .................................... 60

**L.**    SunEdison Sells $650 Million In Preferred Stock Without Disclosing The 15% Goldman Loan, Goldman's Resulting Conflict Of Interest, The Breach Of The Margin Loan And Worsening Liquidity Risks To Investors ....... 62

**IV.**   Partial Disclosures, Further Misleading Statements, And The Gradual Emergence Of The Full Impact Of The Fraud ................................................ 63

**A.**    SunEdison Admits To A Margin Call ........................................... 63

**B.**    Defendant Chatila Falsely Reassures The Market That "The Cash Is Coming" ................................................................................... 65

**C.**    Unbeknownst To Investors, The Margin Loan Becomes "Mandatorily Prepayable" And "Fundamentally Changes" SunEdison's Financial Outlook ................................................................................... 65

**D.**    SunEdison Announces A Significant Change In Business Model And The Executive Defendants Make Additional False Statements ................. 66

**E.**    YieldCo Senior Executives Raise Internal Concerns About "The Accuracy Of SunEdison's Public Statements Regarding Its Financial Condition" ............. 70

**F.**    The Executive Defendants Disclose The Goldman Sachs Loan, Previous Payments Under The Margin Loan, And Re-Classifies Over $700 Million Of SunEdison's Debt From Non-Recourse To Recourse Debt ......................... 71

**G.**    The Executive Defendants Issue False Statements During A Deutsche Bank Investor Meeting ............................................................. 75

**H.**    To Avoid Default, SunEdison Overthrows The Board And Management Of Its YieldCos In Order To Loot TerraForm Global Of The Funds Necessary To Pay Off The Margin Loan ........................................ 77

**I.**    Due To Its Liquidity Shortfall, SunEdison Fails To Make Payments and Abandons Or Delays Projects, The Executive Defendants Mislead Investors And Lenders About The Company's Cash In a Company Presentation, And The Company Issues Additional Debt ................... 86

ii

**J.**     Latin American Power Sues SunEdison And The Court Determines That Latin American Power's Claims Established A Likelihood Of Success On The Merits ............................................................................................ 89

**K.**     SunEdison And TerraForm Power Delay Filing Their Financial Results ........... 91

**L.**     SunEdison Suspends Dividend Payments On Preferred Stock ............................ 94

**M.**     Defendant Wuebbels Resigns, SunEdison And TERP Once Again Delay Filing Their 2015 Financial Results And Admit To Suffering From Weaknesses In Internal Controls In Financial Reporting, And SunEdison Enters DIP Financing For Its Imminent Bankruptcy ............................................ 95

**N.**     The SEC Begins Investigating SunEdison Concerning Its Liquidity Representations ................................................................................................ 97

**O.**     The DOJ Begins Investigating SunEdison ........................................................... 98

**P.**     TerraForm Global Sues SunEdison, Its Own Parent Company, For Fraud .......... 99

**V.**     Post–Class Period Events .......................................................................................... 100

**VI.**     The Executive Defendants' Materially False And Misleading Statements And Omissions During The Class Period ......................................................................... 101

**A.**     Second Quarter Of 2014 ........................................................................................ 101

    **1.**     Adequacy Of SunEdison's Liquidity ...................................................... 101

    **2.**     Effectiveness Of Internal Controls ........................................................ 103

    **3.**     Item 303 Omissions .............................................................................. 107

**B.**     Third Quarter Of 2014 .......................................................................................... 110

    **1.**     Adequacy Of SunEdison's Liquidity ...................................................... 110

    **2.**     Effectiveness Of Internal Controls ........................................................ 111

    **3.**     Item 303 Omissions .............................................................................. 112

**C.**     Fourth Quarter Of And Full Year 2014 ................................................................ 114

    **1.**     Adequacy Of SunEdison's Liquidity ...................................................... 114

    **2.**     Effectiveness Of Internal Controls ........................................................ 115

    **3.**     Item 303 Omissions .............................................................................. 116

**D.**     First Quarter Of 2015 ........................................................................................... 117

|  | 1. | Adequacy Of SunEdison's Liquidity .................................................... 117 |
|--|----|-----|
|  | 2. | Misclassification Of The Company's Debt.............................................. 119 |
|  | 3. | Effectiveness Of Internal Controls........................................................ 122 |
|  | 4. | Item 303 Omissions ............................................................................... 123 |
| E. | Second Quarter Of 2015 ........................................................................ 124 |
|  | 1. | Adequacy Of SunEdison's Liquidity .................................................... 124 |
|  | 2. | Misleading Statements Concerning The Margin Loan ........................... 129 |
|  | 3. | Misleading Statements Concerning The Goldman Sachs Loan............... 130 |
|  | 4. | Misclassification Of The Company's Debt.............................................. 130 |
|  | 5. | Effectiveness Of Internal Controls........................................................ 133 |
|  | 6. | Item 303 Omissions ............................................................................... 134 |
| F. | August 18, 2015 Preferred Offering ..................................................... 135 |
|  | 1. | Misleading Statements Concerning The Goldman Sachs Loan............... 136 |
| G. | Defendant Chatila's September 2, 2015 Statements To The Press.................... 138 |
| H. | October 7, 2015 Conference Call And Business Update .................................... 139 |
|  | 1. | Adequacy Of SunEdison's Liquidity .................................................... 139 |
|  | 2. | Reasons For Terminating The LAP Deal................................................ 143 |
| I. | Third Quarter Of 2015 .......................................................................... 144 |
|  | 1. | Adequacy Of SunEdison's Liquidity .................................................... 144 |
|  | 2. | False And Misleading Reasons For Terminating The LAP Deal .......... 148 |
|  | 3. | Effectiveness Of Internal Controls........................................................ 149 |
|  | 4. | Item 303 Omissions ............................................................................... 150 |
| J. | November 18, 2015 Deutsche Bank Investor Meeting...................................... 151 |
| K. | November 23 And 24, 2015 Forms 8-K And Press Releases ........................... 153 |
| L. | December 29, 2015 Business Update ................................................................. 155 |

VII.   Summary Of Scienter Allegations ................................................................... 157

VIII.  Loss Causation ............................................................................................... 163

IX.    Presumption Of Reliance ............................................................................... 165

X.     Inapplicability Of Statutory Safe Harbor ...................................................... 167

XI.    Claims Brought Pursuant To The Exchange Act ............................................ 168

XII.   Securities Act Claims .................................................................................... 173

      A.    Securities Act Defendants .................................................................... 175

           1.    The SunEdison Defendants ..................................................... 175

           2.    The Underwriter Defendants ................................................... 178

           3.    The Auditor Defendant ........................................................... 180

      B.    The Offering Documents Included Material Misstatements And Omissions ..... 180

           1.    Adequacy Of SunEdison's Liquidity ....................................... 181

           2.    Material Misstatements Concerning The Goldman Sachs Loan ............ 184

           3.    Material Misstatements Concerning The Margin Loan ......................... 186

           4.    Misclassification Of The Company's Debt ............................... 187

           5.    Effectiveness Of Internal Controls .......................................... 189

           6.    Item 303 Misstatements .......................................................... 194

      C.    Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering ............................ 195

      D.    KPMG's 2014 Audit Report And Failure To Comply With GAAS ................. 198

XIII.  Class Action Allegations ................................................................................ 210

XIV.  Jurisdiction And Venue .................................................................................. 212

XV.   Prayer For Relief .......................................................................................... 213

XVI.  Jury Demand ................................................................................................. 213

1.      Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff" or "MERS"), by and through its counsel, brings this action individually and on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock or preferred stock of SunEdison, Inc. ("SunEdison" or the "Company"), or purchased or otherwise acquired publicly traded call options on SunEdison common stock, or sold publicly traded put options on SunEdison common stock, during the period from August 7, 2014 through April 4, 2016 (the "Class Period") and were damaged thereby (the "Class").  Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief are based upon counsel's investigation, which included review and analysis of, *inter alia*: (i) regulatory filings made by SunEdison with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning SunEdison; (iv) interviews with former SunEdison employees; (v) court filings and transcripts from in *In re SunEdison, Inc. et al.*, No. 16-10992-SMB (Bankr. S.D.N.Y.) (the "Bankruptcy Proceeding"); and (vi) other public information regarding the Company.  Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    Nature Of Action

2.      This case is about the rapid ascent and fall of SunEdison, which was briefly one of the world's largest renewable energy developers propelled by aggressive and expensive project acquisition.  SunEdison's success was driven by the false statements issued by the Company's Chief Executive Officer ("CEO"), Defendant Ahmad Chatila, and Chief Financial Officer

("CFO"), Defendant Brian Wuebbels (collectively, the "Executive Defendants"), who each repeatedly misrepresented the Company's true liquidity position and debt burden.  Remarkably, as set forth herein, the Company's own executives and directors have now accused the Company of misrepresenting and omitting material facts concerning the Company's liquidity during the Class Period.  For example, in late October 2015, unbeknownst to investors, executives from the Company's controlled yieldco subsidiaries TerraForm Power ("TERP") and TerraForm Global ("Global") (collectively, the "YieldCos") internally "raised concerns with SunEdison's Board [of Directors] about the extent of SunEdison's liquidity and the <u>accuracy of SunEdison's public statements regarding its financial condition</u>."[1]  Then, SunEdison's senior officials internally raised concerns to the SunEdison Board of Directors ("Board") with concerns that "<u>SunEdison was running out of money and wasn't being honest with investors about its financial problems</u>."  Finally, on April 4, 2016, the last day of the Class Period, news emerged that Global (with the authorization of longstanding SunEdison Director Defendant Peter Blackmore) filed a lawsuit accusing the SunEdison Executive Defendants of "<u>misrepresenting SunEdison's liquidity</u>" and looting Global to cover up SunEdison's own financial weakness.  Directly after the end of the Class Period, as a direct result of the facts that the Executive Defendants concealed from investors throughout the Class Period and discussed herein, SunEdison filed for bankruptcy.  The Company has since publicly declared that the public investors in SunEdison equity securities – the Class members in this Action – should expect to receive nothing in the Bankruptcy Proceeding.

3.     By way of background, from the beginning of the Class Period in August 2014, the Executive Defendants consistently reassured investors that, despite SunEdison's aggressive acquisitions and rapid growth, they were "comfortable" with the Company's "solid" liquidity

---

[1] All emphasis herein is added unless otherwise indicated.

position, and repeatedly reported hundreds of millions of dollars in purportedly available cash.  In reality, as the Executive Defendants well knew and internally discussed with SunEdison employees, SunEdison's liquidity was already seriously constrained by the beginning of the Class Period.  SunEdison, at the direction of the Executive Defendants and as a matter of undisclosed practice, routinely refused to pay critical vendors even when those vendors threatened to cease all services.  As SunEdison later admitted in its Bankruptcy Proceeding, SunEdison's "[v]endors [we]re generally not interchangeable, and the risk of nonpayment could delay construction, risking significant loss in the value for SunEdison stakeholders."  The Executive Defendants never disclosed, and actively concealed, that they "risk[ed] significant loss in the value for SunEdison stakeholders" throughout the Class Period.  The Executive Defendants also repeatedly and falsely assured investors that they had "evaluated" the Company's controls over financial reporting, and that these controls were adequate to ensure the accuracy of the Company's financial reports to investors.  The consistent reports of SunEdison's former employees reveal this to be false – instead, the Company's reporting was a "nightmare" mishmash of disparate systems with insufficient controls over access or content.

4.     SunEdison and the Executive Defendants continued to mislead investors through 2015 and claim "solid liquidity," even as (as they later admitted to the Bankruptcy Court but hid from investors at the time) the Company's "liquidity challenges" grew far more severe.  Moreover, as SunEdison's "liquidity challenges" worsened, the Executive Defendants deceived investors concerning the amount and kind of debt the Company had.  Specifically, in the spring of 2015, the Company took on massive debt consisting of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan") in order to fund a new massive acquisition.  In repeated presentations and SEC

filings, the Executive Defendants categorized the Exchangeable Notes and the Margin Loan as "non-recourse" debt, meaning among other things that the lenders could not resort to the Company for repayment of the debt.  In reality, as investors learned months later in November 2015 when the Company abruptly re-categorized the debt in its public filings, this $750 million in debt was actually recourse debt, with highly significant repercussions for the Company's financial position.

5.     The Executive Defendants also resorted to outright falsifying the amount of available cash the Company had on hand.  Specifically, Defendants Chatila and Wuebbels reassured investors in August 2015 that SunEdison had "greater than $1 billion" available, leading analysts to comment positively that any liquidity concerns "appear [] more of a perception than a reality."  In fact, as investors learned after the end of the Class Period, that $1 billion included a $500 million credit facility that "SunEdison couldn't access" and should never have been included in the presentations of the Company's liquidity, which meant that the Executive Defendants overstated the Company's liquidity by 50%.

6.     At the same time, Defendant Wuebbels reassured investors that "we don't see any additional financings to be able to achieve this [expected] growth."  But the Company had already been secretly negotiating with Goldman Sachs to take out a second lien one-year loan of $169 million, with an effective interest rate (including fees) of 15% (the "Goldman Sachs Loan").  The Company closed the Goldman Sachs Loan just four days after Defendant Wuebbels claimed the Company did not require "additional financings."  When investors learned – months later – that the Company had been forced to take out this extraordinarily onerous loan, analysts stated that the "unusual" loan pointed to "emergency cash needs," as no borrower would be forced to take out a loan on such terms other than a "distressed company."

4

7.     Then, still without disclosing the Company's true cash position or the Goldman Sachs Loan, SunEdison conducted a $650 million offering of Preferred Stock on August 18, 2015 (the "Preferred Offering").  The failure to disclose the Goldman Sachs Loan was all the more egregious given that Goldman Sachs actually acted as a lead underwriter for the Preferred Offering. Goldman Sachs thus suffered from a massive conflict of interest between its interests as a second-lien lender that needed SunEdison to remain afloat and an underwriter charged with the responsibility of ensuring that SunEdison accurately presented its financial condition to the public. By the end of the Class Period, after SunEdison's true financial condition had been revealed to the market, the price of these preferred shares dropped from $1,000 per share to $23 per share – a 98% decline in just over six months.

8.     Throughout the fall, the Executive Defendants continued their fraud on investors. On September 2, 2015, in an interview published in *Bloomberg*, Defendant Chatila reassured investors that SunEdison would "start generating cash for a living . . . . probably early 2016 or late 2015."  As investors learned after the close of the Class Period, just "[d]ays earlier, an internal presentation to SunEdison's board showed the company wouldn't have positive cash flow until at least the second quarter of 2016.  Senior [SunEdison] executives read the Bloomberg story agape." (emphasis added).

9.     Shortly thereafter, although investors were not told this at the time, SunEdison later admitted to the Bankruptcy Court on April 21, 2016 that:

> [I]n October 2015 the entire Margin Loan became mandatorily prepayable.  This Prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook.

10.     As a result, unbeknownst to investors, SunEdison told Global's CFO Alex Hernandez ("Hernandez") "that SunEdison had a short-term need for cash" and asked Global (which was ostensibly an independent yieldco company, albeit one controlled by SunEdison) to

purchase certain projects in India (the "India Projects") to smooth over SunEdison's liquidity crisis. Global refused because the purchase was not in its shareholders' best interests. At the same time, given the Executive Defendants' repeated reassuring public statements to investors, Hernandez and Global's other senior executives internally "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition."

11.     The executives' concerns were justified. Just a few weeks later – without disclosing the "fundamental change" in the Company's financial condition – Defendants Chatila and Wuebbels claimed to investors in a November 9, 2015 call that the company had $1.4 billion in liquidity at the end of the third quarter. The *Wall Street Journal* ("*WSJ*") later reported on April 14, 2016 that, at the same time that the Executive Defendants claimed that SunEdison had $1.4 billion in available liquidity, an internal non-public report circulated within SunEdison that day showed that the Company had only $90 million in available cash. According to the *WSJ*, discrepancies between the Company's public statements about its liquidity and its internal figures so troubled senior SunEdison officials that they raised these concerns directly to the Company's Board of Directors. They told the Board that "SunEdison was running out of money and wasn't being honest with investors about its financial problems."

12.     Indeed, SunEdison's cash shortages were so severe that there was no way it could pay off the Margin Loan – as it was now required to do or risk cross default on $8 billion in debt – without drastic action. In what was later termed the "Friday Night Massacre," Defendants Chatila and Wuebbels exercised SunEdison's power to fire the YieldCo's senior executives (who had raised disclosure concerns just weeks earlier), appoint Defendant Wuebbels as CEO to the YieldCos, and reconstitute the YieldCo's Board-level conflicts committees to approve the

purchase of the India Projects.  This allowed SunEdison to take the money from YieldCo coffers – ostensibly for the India Projects – and pay off the Margin Loan with just minutes to spare.  As Global later detailed in a sworn complaint filed against its own parent, SunEdison, on the last day of the Class Period, the Executive Defendants deceived Global's new Conflicts Committee (including Director Defendant Blackmore) by "misrepresenting SunEdison's liquidity," "omitting to disclose to Global and its Conflicts Committee material information known to them about SunEdison's liquidity," and "failing to correct material misstatements made to Global and its Conflicts Committee with respect to SunEdison's liquidity."  At the time, however, the Executive Defendants issued a press release touting the new "streamlined" management and the acquisition of the India Projects as a "win-win" for both SunEdison and Global shareholders.

13.     Paying off the Margin Loan only delayed the inevitable results of SunEdison's longstanding cash shortages.  In December, SunEdison went back to the banks in an effort to fund the Company's continuing operations.  Even there, the Executive Defendants continued to mislead both the lenders and its investors.  In a presentation to the lenders that was also posted to the Company's website, the Executive Defendants massively overstated the expected profit margins for one of its key sectors by over <u>230</u>%.

14.     Beginning in February 2016 and through the end of the Class Period, investors suffered from a string of bad news as the full scope of the facts and risks that the Executive Defendants had concealed throughout the Class Period emerged.  Among other things, the Company had to delay the filing of its audited financial statements due to an ongoing Audit Committee investigation into "the accuracy of the Company's anticipated financial condition."  Then, investors learned that the SEC had opened an investigation "into whether SunEdison

overstated its liquidity [in the fall of 2015]" and that the Department of Justice ("DOJ") had opened a broad investigation into the Company's activities and public statements.

15.    Finally, on the final day of the Class Period, investors learned the shocking facts underlying the "Friday Night Massacre" takeover of the YieldCos when Global took the extraordinary step of suing its parent company for fraud (the "Global Complaint").  In short, Global – as authorized by Director Defendant Blackmore – alleged that SunEdison, Chatila, Wuebbels, and Martin H. Truong ("Truong"), the Company's Senior Vice President, General Counsel and Corporate Secretary, breached their fiduciary duties by, among other things, (i) "misrepresenting SunEdison's liquidity"; (ii) "omitting to disclose to Global and its Conflicts Committee material information known to them about SunEdison's liquidity"; and (iii) "failing to correct material misstatements made to Global and its Conflicts Committee with respect to SunEdison's liquidity."

16.    As a result of the fraud alleged herein, the price of SunEdison's common stock fell from $21.59 on August 7, 2014 to just $0.21 on April 4, 2016 – a decline of nearly 1000%.

## II.    Parties

### A.    Plaintiffs

17.    Lead Plaintiff the Municipal Employees' Retirement System of Michigan ("Lead Plaintiff" or "MERS") is an independent statutory public non-profit organization that provides retirement plans and benefits to employees of participating Michigan municipalities and courts. MERS administers over 2,000 plans represented by 800 Michigan municipal members – over 80% of Michigan municipalities – and represents nearly 100,000 participants.  As of March 31, 2016, MERS had $9.3 billion in total assets.  As set forth in the accompanying certification, MERS purchased SunEdison common stock during the Class Period and suffered damages as a result of the conduct complained of herein.  On March 24, 2016, this Court appointed MERS as Lead Plaintiff for this litigation.

18.     Plaintiff Arkansas Teacher Retirement System ("ATRS") is a public pension system that has been providing retirement benefits to Arkansas's public school and education employees since 1937.  As of June 30, 2014, ATRS managed over $15.5 billion in assets for the benefit of its members.  As set forth in the accompanying certification, ATRS purchased SunEdison preferred stock in the Preferred Offering and suffered damages as a result of the conduct complained of herein.

19.     Plaintiffs MERS and ATRS are collectively referred to herein as the "Plaintiffs."

**B.     Executive Defendants**

20.     Defendant Ahmad Chatila ("Chatila") was, at all relevant times, the President, CEO and a Director of SunEdison, a director and Chairman of the Board of TERP, and a director and Chairman of the Board of Global. Chatila became President and CEO of SunEdison and a member of the Board of Directors in March 2009.  Chatila oversaw the acquisition of SunEdison LLC in 2009 and, during the Class Period, developed SunEdison's solar strategy.  Chatila signed the Company's September 9, 2013 Shelf Registration Statement and was a Director of SunEdison on August 18, 2015, the date of the Preferred Offering.  On May 26, 2016, after the close of the Class Period, Chatila resigned as director and Chairman of the Board of both TERP and Global.  On June 22, 2016, Chatila resigned as President and CEO of SunEdison.

21.     Defendant Brian Wuebbels ("Wuebbels") was, at all relevant times, the Executive Vice President, Chief Administrative Officer ("CAO"), and CFO of SunEdison. Beginning at SunEdison in 2007, Wuebbels held numerous positions with the Company before being appointed Executive Vice President and CFO of SunEdison in May 2012 and its CAO in December 2014. Following the events described herein, Wuebbels was appointed as the CEO and President of TERP and Global in November 2015.  On March 30, 2016, Wuebbels resigned as TERP's and

Global's President and CEO.  On May 10, 2016, SunEdison announced that Wuebbels would be resigning as CFO and CAO of SunEdison, with his last day of employment being on June 9, 2016.

22.     Defendants Chatila and Wuebbels are collectively referred to herein as the "Executive Defendants."

## C.     Other Defendants

23.     Additional defendants, defined below as the "Securities Act Defendants," including the "SunEdison Defendants," the "Underwriter Defendants," and the "Auditor Defendant" are named in Section VII below.  Furthermore, although SunEdison had been named as a defendant in the original complaint that commenced this action (ECF No. 1), by virtue of the automatic stay provision pursuant to Section 362 of the United States Bankruptcy Code, it is not named as a defendant in this amended complaint.  Lead Plaintiff reserves all rights with respect to its claims against SunEdison.  Not naming SunEdison as a defendant in this action due to the restrictions of the Automatic Stay shall not constitute a waiver of any and all rights or claims of Lead Plaintiff and the Class as against SunEdison, all of which are specifically reserved.

## III.     Background To The Scheme

### A.     SunEdison And The YieldCo Business Model

24.     During the relevant time period, SunEdison briefly was one of the largest renewable energy companies in the world.  Beginning in 2014, SunEdison launched a campaign to acquire solar energy projects primarily built by others to take advantage of the significant tax benefits that were meant to encourage the development of renewable solar energy systems.   SunEdison's primary business activities were divided into separate business segments: (i) Renewable Energy Development ("DevCo") and (ii) the TerraForm Companies, TERP and Global (collectively the "YieldCos").

25.     SunEdison's DevCo segment was created to develop renewable energy services, including the design, installation, and financing of new developments.  In addition, as part of the DevCo, SunEdison maintained its Services Business, a sub-division devoted to operations and maintenance, asset management, and monitoring services to renewable energy projects.

26.     In 2014 and 2015, SunEdison spun off two separate entities, TERP and Global, called "yieldcos."  Similar to real estate investment trusts ("REITS"), yieldcos are separate publicly traded companies that are formed to own and hold operating assets that produce a predictable cash flow and issue steady dividends to investors.  As the parent DevCo, SunEdison took on the risk of underwriting and developing new renewable energy project construction, and negotiated long-term "power purchase agreements" ("PPAs") with utility companies to provide electricity generated from the projects.  These PPAs were typically for 15-to-20 year terms.  Once the project was constructed, the project would be sold (or "dropped down") to a YieldCo, which would then receive the stable cash flows of operating assets from the long-term PPAs, which benefited its shareholders with consistent dividend payouts.

27.     SunEdison launched its first YieldCo, TERP, in July 2014, shortly before the Class Period began.  TERP focused on projects in more developed markets, primarily the United States and select other countries.  SunEdison launched its second YieldCo, Global, in July 2015.  Global was initially intended to focus on acquiring and operating solar and other renewable energy assets in developing countries like Brazil, India, China, and other emerging markets.  SunEdison controlled both YieldCos by owning more than 90% of the voting power of the YieldCos. Under management services agreements, SunEdison was responsible for carrying out all day-to-day management, accounting, banking, treasury, administrative, and regulatory functions and obligations of the YieldCos.

11

28.     Defendant Chatila represented to investors in a November 6, 2014 earnings call that selling projects to a YieldCo provided SunEdison "two to three times more value" than "selling to third-parties."  Indeed, according to a September 30, 2014 article in the *St. Louis Business Journal* titled "SunEdison Plans Second Yieldco," Defendant Wuebbels told the Business Journal that the TERP IPO was "transformational" for SunEdison, because:

> [I]t immediately shifted investors from worrying about where we were going to get capital and how would we grow the business to saying, 'Oh my gosh, this thing is now creating annuity for SunEdison to keep growing. . . . with [TERP], we effectively created a model where we got our cake and got to eat it, too.

29.     The Executive Defendants told investors that SunEdison would generate these favorable returns in two ways.  First, at the DevCo, SunEdison realized cash flow on the margin on the sale of the projects it dropped down to the YieldCos.  By going public, a YieldCo could use the stock markets to raise money to support further acquisitions from the DevCo and, given the lack of volatility in its business, it could raise these funds at significantly less cost than what SunEdison could borrow from a bank.  By having a captive buyer for its energy projects in the form of its YieldCos, SunEdison claimed that it was able to reduce the financing costs of a project sale and get superior value for those projects.  Second, SunEdison received a share of the cash flow from the operational assets that were dropped down in the YieldCos in the form of dividends (as a principal Yieldco shareholder) and Incentive Distribution Rights ("IDRs").[2]  SunEdison's senior management consistently claimed that this structure would optimize the cost of capital for both the DevCo and the YieldCo in a "virtuous cycle of value creation."

30.     The ability of the YieldCos to access equity and debt markets at attractive terms to fund project acquisitions from their parent was thus critical for SunEdison given its highly

---

[2] IDRs provided SunEdison, as the sponsor company, preferential economic benefits in an increasing share in the incremental dividends as the YieldCos' dividends grew.

leveraged balance sheet. The inability of the YieldCos to do so, or the inability of SunEdison to drop projects down at high enough IDRs, would necessarily result in insufficient cash generated to fund expected dividend growth, stalling SunEdison's growth, tying up its liquidity, and giving rise to the risk of default on its borrowing arrangements. Thus, SunEdison's balance sheet, capital structure, liquidity and financial strength were critical to investors.  Accordingly, on repeated conference calls throughout the Class Period, the Executive Defendants maintained that they held "appropriate level[s] of cash and liquidity to support our growth" and the Company was "comfortable with [its] balance sheet and [its] liquidity position."

**B.    SunEdison Takes On Billions Of Dollars In Debt – Including A Massive Margin Loan – As It Transforms Itself Into A Renewable Energy Project Developer**

31.    The Company took on enormous debt to fund the development and construction of renewable energy projects that would eventually be dropped down to the YieldCos. In the year leading up to the beginning of the Class Period in August 2014, SunEdison's debt climbed from $2.6 billion to $5.4 billion – an increase of over 100%.  By the end of the second quarter of 2015, SunEdison's debt had escalated to $10.7 billion, an increase of another 100%.

32.    On November 18, 2014, SunEdison announced its first major Class Period acquisition, of First Wind LLC ("First Wind").  The Executive Defendants touted the transaction as transformational for the Company, diversifying its renewable energy assets into wind energy and turning SunEdison into "the world's largest renewable energy development company." SunEdison, along with TERP, agreed to pay $2.4 billion for First Wind.  SunEdison's share was made up of a $1 billion upfront payment and $510 million to be paid out later in "earnout" payments as First Wind completed projects.  As SunEdison later explained in a February 3, 2015 SEC filing, SunEdison funded its share of the upfront payments for First Wind in part through the sale of $337 million 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the

"Exchangeable Notes").  SunEdison funded the remainder of its share of payments through a $410 million two-year loan (the "Margin Loan") from Goldman Sachs Lending Partners LLC, Deutsche Bank AG, Barclays Bank plc, Morgan Stanley Bank, N.A. and Mall LLC.  Goldman Sachs also served as a broker on the deal.

33.      The Margin Loan Agreement contained provisions requiring prepayment or additional collateral to be posted under several circumstances that were dependent on the price of TERP common stock.  First, if TERP's common stock price fell below a certain undisclosed price (the "TERP Stock Price Trigger") SunEdison would be required to prepay, in full, all outstanding indebtedness due on the loan the next business day.  Second, if the loan-to-value ratio of the collateral SunEdison offered as collateral relative to the total borrowings fell below an undisclosed level (the "Loan-To-Value Trigger"), SunEdison was required to either prepay the loan in full <u>or</u> provide additional cash collateral to bring the Loan-To-Value Trigger down to the permitted level by 5 p.m. on the second business day after the limit was exceeded.  According to the Margin Loan Agreement, SunEdison provided as collateral 32.2 million TERP shares, as well as additional IDR interests in TERP that did not have a publicly disclosed market value.

34.      Both the TERP Stock Price Trigger and the Loan-To-Value Trigger were defined in a side letter agreement that was not publicly disclosed.  However, SunEdison's Form 10-Q filed with the SEC on May 7, 2015 stated that the Margin Loan required SunEdison to maintain a loan-to-value ratio not to exceed 50% – in other words, SunEdison had to post at least $2 in collateral for each $1 borrowed under the agreement.  Based only on the 32.2 million TERP shares originally pledged on the Margin Loan agreement (but not including the additional unspecified IDR collateral), the required ratio of 50%, and the $410 million loan balance, the Loan-To-Value Trigger would be exceeded if TERP's stock price fell to $25.24.  At the time that the parties entered

into the Margin Loan Agreement on January 29, 2015, TERP's stock price was $32.58.  TERP's stock price would not reach the $25.24 price until August 7, 2015.  As SunEdison later informed the Bankruptcy Court on April 22, 2016, "[t]he terms of the Margin Loan incurred in connection with the First Wind acquisition were integral to SunEdison's liquidity position."

    **C.**    **The Executive Defendants Reassured Investors That The Margin Loan And The Exchangeable Notes Were Non-Recourse**

    35.    Notably, both the Margin Loan and the Exchangeable Notes were classified in SunEdison's public filings and statements as "non-recourse" to SunEdison.  In fact, SunEdison repeatedly reassured investors throughout the Class Period that its debt burden was manageable because either (i) the debt financing for the projects SunEdison developed had only recourse to the specific projects themselves, and not to the parent Company, SunEdison, *i.e.*, was "non-recourse" debt; and that (ii) the Company had dedicated cash flows for any "recourse" debt that it took on.  For example, in numerous investor presentations throughout the first six months of 2015, SunEdison provided a clear chart of "recourse" versus "non-recourse" loans, as set forth below in the Company's Investor Presentation for its First Quarter 2015 conference call with investors, dated May 7, 2015 (including the Margin Loan and the Exchangeable Notes as "Non-Recourse Obligations" as indicated):

# SunEdison's Consolidated Debt Overview



**Recourse Obligations**
- $565mm Letter of Credit Facility*
- $492mm 2018 Convertible Senior Notes
- $438mm 2020 Convertible Senior Notes
- $435mm 2021 Convertible Senior Notes
- $334mm 2022 Convertible Senior Notes
- $8mm Pre-, Construction, and Term-debt
- $32mm Financing Leaseback Obligations
- $284 Other Credit Facilities

Total = $2,588mm

**Non- Recourse Obligations**
- $410mm 2017 Margin Loan
- $336mm 2020 Exchangeable Notes
- $150mm Acquisition Facility
- $366mm SMP Ltd. Credit Facility
- $2,056mm Pre-, Construction, and Term-debt
- $80mm Capital leaseback obligation
- $1,355mm Financing Leaseback
- $190mm Other Credit Facilities

Total = $4,943

36.     The distinction between recourse and non-recourse debt was critical to the Company and highly material to investors.  First, as Defendant Wuebbels stated repeatedly on calls with investors both before and during the Class Period, "[f]or the purposes of our debt covenant calculations, nonrecourse debt is not included."  Accordingly, for the debt covenants contained in the Company's credit facilities – which required for most of the Class Period that the Company maintain a consolidated leverage debt-to-EBITDA ratio of 3.0 to 1.0 – the Company's non-recourse debt (as well as its convertible notes) was not included in that ratio.  Given the fact that the Company's non-recourse debt was <u>twice</u> that of its recourse debt, including the non-recourse debt in that ratio would have had a significant negative impact on the Company's ability to access liquidity through its credit facilities.

37.     Second, as Defendant Wuebbels made clear to investors, non-recourse debt was typically tied to sale leaseback projects that had already "sold, and are generating energy revenue at or in excess of the debt service requirements."  Thus, the debt was essentially self-servicing and payments on the debt did not constitute a drain on the Company's cash.

38.     Finally, as Defendant Wuebbels said at the outset of the Class Period on August 7, 2014:

> Unlike the corresponding asset, this [non-recourse] debt is non-amortizing. And the full balance is extinguished upon the last lease payment, typically 20 years after the project is sold, at which time a large GAAP gain will be realized. Accordingly, the non-recourse debt will always exceed the corresponding asset balance.

In other words, the balance of the non-recourse debt would never decrease on the balance sheet (as a non-amortizing loan) until the loan was extinguished in its entirety, but the large amount of non-recourse debt did not put SunEdison at risk because it was not "really" the Company's debt.

39.     As investors later learned, SunEdison falsely categorized both the Margin Loan and the Exchangeable Notes in its SEC filings and other public statements for the first two quarters of the Class Period, escalating the amount of recourse debt carried by the Company dramatically. Had the Company properly categorized this debt, it would have increased the amount of debt applicable to its credit facility covenants in the first and second quarters of 2015 by <u>119%</u> and <u>131%</u>, respectively.

**D.     SunEdison Incurs Billions Of Dollars In Debt And Obligations To Acquire Projects To Drop Down To TERP And Global And The Executive Defendants Misrepresent That SunEdison Has Ample Liquidity To Do So**

40.     As SunEdison later admitted to the Bankruptcy Court on April 22, 2016, the Company began to experience a "liquidity challenge" by no later than the spring of 2015. Notwithstanding this "liquidity challenge," after the close of the First Wind acquisition, SunEdison announced a dizzying array of large-scale expensive projects it agreed to acquire in order to drop down the projects to TERP or Global.

41.     For example, on May 19, 2015, SunEdison entered into a share repurchase agreement with the shareholders of Latin America Power Holding, B.V. ("LAP") to acquire the shares of LAP.  This transaction included, among other things, SunEdison acquiring six operating

hydro-electric projects located in Peru with a combined generation capacity of 73 megawatts ("MWs") per year, which SunEdison would drop down to Global after acquisition.  With one MW enough to power 750-1,000 average American homes according to the Electric Power Supply Association, the LAP projects alone could potentially power more than 70,000 homes.

42.    SunEdison also purchased (or agreed to purchase) the following projects, just in the months of June and July 2015:

- On June 16, 2015, SunEdison announced it had signed an agreement to acquire Continuum Wind Energy Limited, which owned 412 MW of wind power projects operating and under development in India and 1000 MW of wind projects under development.

- Also on June 16, 2015, SunEdison announced that it would acquire Globeleq Mesoamerica Energy, owner of 405 MW of wind and solar projects operating or under development in Central America and 246 MW of wind projects under development.

- On June 25, 2015, SunEdison and TERP announced the acquisition of a 9 MW net ownership stake in a portfolio of operating and distributed solar power plants from Duke Energy Renewables, a commercial business unit of Duke Energy.

- On June 29, 2015, SunEdison announced that it had acquired 521 MW of wind power plants located in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse financing facility to hold the assets pending dropping them down to TERP.

- On July 1, 2015, SunEdison announced that it had secured financing and started construction on the Bingham Wind project in Maine, a 185 MW wind project.  The financing facility for the project was $360 million, and the total construction cost was estimated to be $420 million.

- On July 2, 2015, SunEdison announced that it had signed a memorandum of understanding with Gamesa, a wind turbine and wind farm manufacturer based out of Spain, to develop up to 1 GW of wind power plants by 2018.  Under the memorandum of understanding, SunEdison would acquire the projects upon the start of construction and, once those projects were operational, would drop the projects down to TERP.

- On July 6, 2015, SunEdison announced a $2 billion agreement to acquire 930 MW of wind power plants from Invenergy Wind LLC.

- On July 15, 2015, Global entered into an agreement to acquire the rights to three wind and hydropower projects in Brazil from Renova Energia, S.A. ("Renova"), for cash and Global common stock upon the completion of Global's IPO.

- On July 15, 2015 SunEdison announced the closing of its agreement to finance and deliver 50 MW of energy storage for Southern California Edison. Once operational, these projects were expected to be acquired by TERP.

- On July 15, 2015, SunEdison completed the acquisition of Mark Group, a U.K. based solar panel installer, for $24 million in cash, plus deferred consideration of $14 million.

43.     As a result of the First Wind and ensuing acquisitions, in just six months, SunEdison's overall corporate debt shot up from $7.2 billion at the end of 2014 to $10.7 billion by the end of the second quarter of 2015.

44.     At the same time, the Executive Defendants maintained that SunEdison had sufficient capital to continue and in fact grow the business.  For example, during an August 6, 2015 conference call discussing the results of the Company's second quarter 2015, Defendant Wuebbels stated: "If you look at the capital and the liquidity that's in the business, as well as the dividend forbearance that the parent has done through 2016 on that, there's sufficient capital within the vehicle to be able to grow that business for the first 12 to 18 months at its 20% stated dividend rate."   On that same conference call, Defendant Wuebbels stated: "We currently have $1.3 billion of liquidity, which is more than sufficient to support our growth needed to reach 2016 targets."

**E.     Defendants Chatila And Wuebbels Were Incentivized To Dramatically Expand The Company's "Foregone Margins" Through Acquisitions**

45.     The Company's rapid growth occurred because the Executive Defendants were financially incentivized to acquire additional projects.  Specifically, SunEdison's executive compensation plan incentivized Defendants Chatila and Wuebbels to dramatically build up SunEdison's pipeline, even at the cost of the Company's long-term profitability.  In March 2014 – months before the beginning of the Class Period – SunEdison altered its executive compensation

program to focus on the Company's "foregone margins" ("Foregone Margin"), rather than more typical measures of corporate profitability like operating income, cash flow, or liquidity that had previously controlled the Company's executive incentive plans.

46.     According to the Company's 2014 annual proxy statement (filed April 15, 2014), the Foregone Margin is "a measure which tracks margin foregone [due] to the strategic decision to hold projects on the balance sheet vs. selling them."   The Company offered a more detailed description of Foregone Margins in its 2014 Form 10-K, stating that the Foregone Margin "means the net income (or loss) in connection with the Disposition or planned Disposition of any Solar Energy System (or any Person owning such Solar Energy System) by the Borrower[.]"  SunEdison calculated the Foregone Margin by multiplying (i) the difference between the total revenue "earned or projected to be earned" from a project and the "total projected costs" to construct the project by (ii) the estimated percentage completion of the project, and then subtracting any previous Foregone Margin previously included in the calculation.  In March 2014, for purposes of the Company's executive compensation plan, SunEdison's Board of Directors:

> [M]odif[ied] the specific measures of corporate performance to 70% profitability, as measured by the sum of EBITDA and foregone margin (a measure which tracks margin foregone done to the strategic decision to hold projects on the balance sheet vs. selling them) and 30% megawatts completed to better reflect key 2014 areas of focus.

47.     In other words, SunEdison changed its executive compensation plans to allow SunEdison's executives to benefit from "projected" earnings, rather than actual earnings as SunEdison's projects began to generate cash.  Over the course of the Class Period, particularly directly after SunEdison instituted this new compensation model, SunEdison's Foregone Margins escalated dramatically:

| | 2014 | | | | 2015 | | |
|---|---|---|---|---|---|---|---|
| | Q1* | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| Foregone Margin | $25m | $145m | $180m | $130m | $31m | $94m | $138m |
| *pre Class Period* | | | | | | | |

48.     As a result, in 2014 Chatila received Annual Incentive Awards that likely far exceeded the compensation the Executive Defendants would receive under the 2013 executive incentive plan, which was based upon measurements of total cash flow and operating income. Indeed, the Company's total operating income declined from a loss of $313 million in 2013 to a loss of $536 million in 2014 – a 70% decline.  Similarly, on a non-GAAP basis, the Company's free cash flow plummeted from a loss of $107.1 million in 2013 to a loss of $562.1 million in 2014 – a decline of over 425%.  Accordingly, the Executive Defendants would have received far less in personal compensation under the prior, more typical, measures of corporate profitability.[3]

49.     SunEdison also relied on the Foregone Margin measurement to expand its access to credit.  The Company's February 2014 credit agreement for its letter of credit facility (which was critical to providing SunEdison with operating capital) had, at the time it was entered into, a liquidity covenant requiring SunEdison to maintain a "Consolidated Leverage Ratio" of the Company's indebtedness to EBITDA (Earnings Before Interest, Taxes, Depreciation, & Amortization).  On January 20, 2015, SunEdison amended the credit agreement to materially change the liquidity covenant to include Foregone Margins, rather than just net income.  This allowed the Company to comply with the credit agreement covenants, while still expanding the Company at a breakneck speed.

---

[3] Because of the Company's bankruptcy, it never filed a 2015 proxy revealing the results of its executive compensation plan for 2015.

**F.    At The Same Time That The Executive Defendants Reassured Investors That They Were Comfortable With SunEdison's Cash Position, SunEdison Secretly Could Not Pay Its Bills**

50.    Contrary to the Executive Defendants' statements during the Class Period that SunEdison was a company with "sufficient" capital, a "solid" liquidity position and "appropriate level[s] of cash and liquidity," numerous former employees of SunEdison – and SunEdison itself – have since confirmed the opposite.  Indeed, former SunEdison employees have explained that, even before the beginning of the Class Period and existing through the end of the Class Period, SunEdison was suffering from ongoing significant liquidity shortfalls, which became a full-blown liquidity crisis beginning in the first quarter of 2015.  This liquidity crisis manifested itself in the Company's systemic inability, or a concerted effort to delay or refuse, to pay SunEdison's critical vendors and accounts payable.  Moreover, when SunEdison did pay its critical vendors, because its liquidity was so poor, the Company often took cash specifically earmarked for construction on one project and inappropriately used it to pay vendors associated with unrelated projects.  These practices allowed Defendants, including the Executive Defendants, to maintain the appearance that SunEdison had sufficient funds to drive its acquisition-fueled growth.

51.    As SunEdison's counsel later explained to the Bankruptcy Court on April 22, 2016, when pleading for permission to pay part of its $357 million in then-outstanding vendor invoices:

> I'd like to talk a little bit about the debtors' business of developing renewable energy projects. As set forth in the motion and Mr. Cook's [referring to SunEdison Vice President, Capital Markets and Corporate Finance] declaration, the debtors develop large-scale solar and wind projects that involve highly individualized site-specific construction. It's fair to say no two projects are alike.
>
> Each project requires customized design and engineering, not only for construction, but also for the components utilized in each project.  Vendors are generally not interchangeable, and the risk of nonpayment could delay construction, risking significant loss in the value for SunEdison stakeholders.

Accordingly, SunEdison's financial success was dependent on its access to reliable vendors in the highly specific fields in which SunEdison operated.

52.     Notwithstanding the critical and unique nature of SunEdison's vendors, from at least the beginning of the Class Period in August 2014, SunEdison routinely delayed or refused to pay its vendors in order to disguise its liquidity shortfalls and maximize the publicly reported cash on its balance sheet.  SunEdison's former employees and vendors worldwide and at every level of the Company hierarchy confirmed that this was SunEdison's Class Period practice.  For example, this practice was confirmed by the Project Coordinator & A/P Analyst, who worked at SunEdison from May 2013 to May 2016 and who reported directly to Justin Tomljanovic, the CFO of SunEdison North America, who in turn reported directly to Defendant Wuebbels (the "Project Coordinator & A/P Analyst").  The Project Coordinator & A/P Analyst had access to SunEdison's financial records and was directly involved in paying vendors and other invoices on projects.  The Project Coordinator & A/P Analyst explained that SunEdison "never had cash."  According to the Project Coordinator & A/P Analyst, within the Company, SunEdison's liquidity problem was so obvious that "even the janitor" knew the Company didn't have sufficient cash on hand and that, on a daily basis, she received calls from vendors demanding payment for unpaid invoices.  When it came to paying vendors, the Project Coordinator & A/P Analyst constantly "had to beg" for money and fight with Zach Groves, SunEdison's Director of Finance, for cash.  She explained that SunEdison's corporate practice was to pay vendors in the priority of which vendor's refusing to work would cause greatest harm to SunEdison's ability to generate revenue or effectively shut down the Company's projects, when SunEdison refused to pay it.  As a result, SunEdison's shuffling cash from Accounts Payable to the most critical vendor was just a "shell game."  Likewise, a former Director of Global Financial Planning and Analysis at both SunEdison and

TERP from August 2014 to May 2015 (the "Director of Global Financial Planning"), explained that SunEdison's liquidity problems existed from the beginning of his time with the Company and that SunEdison "owed everyone tons of money." Similarly, a Director for Inverter Development at the Company from September 2011 to September 2014 (the "Director for Inverter Development"), expressed that when it came to paying vendors, SunEdison was "always late" and that, by the summer of 2014, delinquent payments to vendors was "common practice" at the Company. As explained by a former Senior Director of Operations at SunEdison from November 2012 to September 2014 (the "Senior Director of Operations"), SunEdison's cash levels, even at the beginning of the Class Period, were always problematic, and the Senior Director of Operations was specifically instructed by his supervisors to delay payments to various contractors.

53. By the beginning of the Class Period, in the summer and fall of 2014, SunEdison's cash position was already so weak that that it routinely failed to pay its core vendors responsible for supplying the company with basic utilities and necessary services. For example, a former Senior Auditor and Senior Accountant at SunEdison from September 2012 to September 2014 (the "Senior Auditor & Accountant") recalled in the summer of 2014 receiving calls from AT&T, the Company's telephone provider for its nationwide-network of project contractors, threatening to cancel telephone service for the Company because of SunEdison's failure to pay delinquent invoices. Similarly, the Senior Auditor & Accountant explained that in August and September of 2014, the Senior Auditor & Accountant recalled receiving calls from Portland General Electric ("PGE"), the electric provider for SunEdison's solar crystal growth facility in Portland, Oregon, threatening to shut off power as a result of non-payment for invoices owed. As numerous former SunEdison employees, including a former supply chain buyer for SunEdison's crystal growth facility in Portland, Oregon from June 2013 to November 2014  (the "Supply Chain Buyer"), have

explained, a steady supply of electricity is critical for solar projects, and particularly for growing crystals used in equipment to be used in solar projects. Any interruption in electricity to the plant would ruin an entire batch, and the Supply Chain Buyer stated that it would be "catastrophic" for the Company. As explained by the Supply Chain Buyer, PGE attempted to contact SunEdison to obtain payment, but were unsuccessful. According to the Supply Chain Buyer, it got to the point where a representative from PGE showed up at the Portland plant to attempt to resolve the issue. In the end, PGE put a sign on the door of the plant, indicating that the power would be shut off soon. Despite the financial risks associated with losing electrical power at the Portland plant, SunEdison's liquidity position (and, as discussed below, its internal controls over accounts payable) was so poor that these risks were unavoidable.

54.     Indeed, throughout the entirety of the Class Period, SunEdison delayed paying its electric bills for as long as possible – even though any interruption in power supply would be devastating to the Company's projects. Numerous former SunEdison employees have explained, including a former Project Control and Procurement Manager at SunEdison from January 2015 to April 2016 (the "Project Control and Procurement Manager"), that an uninterrupted supply of electricity was "critical" to SunEdison's renewable energy projects because any solar or wind project depended on a consistent power supply. Pursuant to SunEdison's power purchase agreements ("PPAs"), the Company was selling power to electric companies. If SunEdison's projects had to be shut down as a result of power interruptions, or if SunEdison's projects did not produce the amount of power called for by the PPAs because of supply interruptions, SunEdison would not only not be able to produce electricity to sell to its customers but would also be fined by these electric companies for late delivery and lost revenue. Despite the critical nature of a steady power supply to its renewable energy projects, the Project Control and Procurement

Manager recounted SunEdison's failure to pay the power bill on numerous projects, resulting in actual or threatened power shutdowns.  For example, on or about August 4, 2015, Pacific Gas & Electric ("PG&E") threatened to shut down the Company's power for SunEdison's Vega Solar project based out of Los Vanos, California, as SunEdison owed the utility $7,553.17 for electric services for May through July 2015.  Likewise, on October 27, 2015, the Project Control and Procurement Manager received another email from a SunEdison Asset Management Analyst requesting that the Project Control and Procurement Manager pay PG&E $2,436.56 for an electricity bill also issued in connection with the Vega Solar project, as PG&E had threatened to shut down power the following day if SunEdison did not remit payment.  In both instances, the Project Control and Procurement Manager paid the invoices on a company-issued Visa card. During the Project Control and Procurement Manager's tenure with SunEdison, this former employee was forced to pay SunEdison's electric bills on the Company Visa card at least five separate times.  The Project Control and Procurement Manager also recounted unpaid invoices to Rocky Mountain Power, owed by SunEdison in connection with the Company's Seven Sisters project in Utah in amounts of $653, $439, $607, $635, and $216, all of which accounted for two months of unpaid invoices.  As was the case with PG&E, Rocky Mountain Power had threatened to shut down the power at the Seven Sisters Project if payment was not remitted.

55.     Throughout the Class Period, SunEdison also failed to timely pay its core vendors that supplied the Company with necessary safety and compliance testing for its equipment.  For example, by the summer of 2014, the Director for Inverter Development reported that one vendor he worked with directly, Reliant Labs, a product testing service based in California which performed quality testing required by the Federal Communications Commission on SunEdison's inverter devices, had stopped working for SunEdison because SunEdison had failed to pay the

vendor.  Likewise, the former Vice President of SunEdison's Micro-Inverter division from August 2011 to December 2015 (the "VP of Micro-Inverters"), explained that "there was never a time at the Company that vendors got paid promptly" and that he personally received calls from unpaid vendors "in any quarter you could name."  Indeed, the VP of Micro-Inverters explained that during the summer of 2015, he would get weekly calls from Intertek Testing Services, a vendor which provided necessary compliance safety testing for SunEdison, requesting payment of invoices totaling $20,000.  As the VP of Micro-Inverters explained, despite the fact that he pled with SunEdison's Accounts Payable department to pay Intertek because Intertek had threatened to stop working for SunEdison and because of SunEdison needed Intertek's services in order to keep its projects alive, "nine times out of ten" the invoices were never paid on anything close to a timely basis.

56.     Likewise, by the summer of 2014, SunEdison was also failing to pay its essential equipment and industrial supplies providers.  As the Supply Chain Buyer reported, in 2014, SunEdison was delinquently paying Toyo Tanso USA and Tokai Carbon, vendors responsible for manufacturing the carbon-based parts used for SunEdison's crystal growth operations, critical parts for SunEdison's growth operations at the Portland, Oregon growth facility where the Supply Chain Buyer worked.  Indeed, Toyo Tanso USA put SunEdison on a credit hold because SunEdison owed Toyo Tanso USA less than $10,000 in unpaid invoices.  Similarly, the Supply Chain Buyer recalled unpaid invoices at this time totaling less than $100,000 to West Coast Paper, an industrial supplies company that provided SunEdison with safety products, including latex gloves, face masks and safety glasses.

57.     From the beginning of the Class Period, SunEdison even failed to pay government entities, including the Federal Government, for fees issued in connection with permits and licenses

necessary for SunEdison's solar and wind projects.  For example, the Project Control and Procurement Manager, explained that an internal email dated August 6, 2015, detailed how the San Joaquin Valley Air Pollution Control District, threatened to sue SunEdison because SunEdison owed the San Joaquin Valley Air Pollution Control District $8,624.73 in connection with air quality district permits and fees for the Orion Solar 1 project in San Joaquin, California.  This fee was originally issued to SunEdison in an invoice dated November 29, 2012, an outstanding payment nearly three years old.  As the Project Control and Procurement Manager explained, SunEdison did not pay the bill; the invoice was paid out of the available cash of a SunEdison subsidiary.  Likewise, the Project Control and Procurement Manager recalled receiving a permit fee of $100 from the U.S. Fish and Wildlife Service, which was also three years past due.  As a result of the delinquent payment, the U.S. Fish and Wildlife Service put a lien on the SunEdison project for which the permit was issued.

58.     The Company's former employees report that the Company's systemic and routine inability to pay its vendors continued and in fact worsened in early-mid 2015.  For example, a former contractor and project manager for SunEdison from March 2015 to October 2015 (the "Contractor/Project Manager"), recalled that during his tenure SunEdison consistently paid its bills late and that the Company's own contract agents were not receiving payments.  By July 2015, the Contractor/Project Manager recalled that the Company's liquidity situation was so bad that that the Company was in a hiring freeze, notwithstanding its ostensible growth.  The former Executive Assistant to Alejandro Hernandez (former CFO of TERP) from February 2015 to August 2015 (the "Executive Assistant to the CFO of TERP"), explained that during her tenure there was always a problem paying vendors.  Indeed, the temp agency which initially got her the job with TERP reached out to her personally to inform her that SunEdison had failed to pay it its fee of

approximately $3,000 and that the temp agency was unable to obtain the money SunEdison owed it.  When SunEdison needed additional employees, the Company had to reach out to five separate staffing agencies because SunEdison owed unpaid fees to all of the larger ones.  As the Executive Assistant to the CFO of TERP experienced dealing with the Accounts Payable department, almost every bill to vendors was overdue – some by as much as 180 days.

59.     Remarkably, notwithstanding the fact that SunEdison's financial health depended on maintaining a strong pipeline of new developments to drop down to the YieldCos, SunEdison's cash shortages were so severe that the Company placed that entire developmental model at risk by refusing to pay business partners that were integral to acquiring new developments.  As the Project Control and Procurement Manager explained, SunEdison, in the midst of its dizzying acquisition spree, failed to pay the very company it hired to do due diligence on its acquisitions.   This company, Garrad Hassan, was "the world's largest wind-energy consulting group" and was critical to the Company's efforts to develop future projects.  In the summer of 2015, the Project Control and Procurement Manager learned that SunEdison owed Garrad Hassan $1.5 million, an amount which SunEdison was over a year delinquent in paying.  The situation with Garrad Hassan became so contentious that, when SunEdison solicited Garrad Hassan for additional work with an estimate of approximately $50,000, Garrad Hassan refused to work with SunEdison on any new acquisitions unless SunEdison paid 50% upfront, with the rest to be paid prior to the deliverables on all future projects.  According to the Project Control and Procurement Manager, SunEdison did not pay this vendor; the First Wind subsidiary (which was not yet fully integrated into SunEdison's operations) footed SunEdison's bill.

60.     By the winter of 2015, SunEdison's cash position was so weak that it simply could not afford to pay vendors providing the most basic and critical services.  For example, the Project

Control and Procurement Manager explained that SunEdison's liquidity was so bad by December 2015, in the middle of the winter, that SunEdison could not even afford to pay the snow plow operator, LDR Construction, for clearing the snow at a wind farm project in Maine, Evergreen Wind Power III.  As the Project Control and Procurement Manager explained, "you can't stop snow plowing in Maine" because any obstruction to the wind turbines would put the entire operation at risk. SunEdison had no choice but to put the entire operation at risk because, by that time, it did not have the $18,200 it owed to LDR Construction for two month of service.

61.    Moreover, even when SunEdison did pay its vendors, albeit delinquently, the Company used funds earmarked for other projects in its attempt to shuffle around funds and mask its true liquidity condition.  A former Project Coordinator and Accounts Payable Analyst at SunEdison from May 2013 to May 2016 (the "Project Coordinator & A/P Analyst"), who experienced this first-hand, described the situation as "robbing Peter to pay Paul."  The Project Coordinator & A/P Analyst recalled this occurring in March 2016 when SunEdison owed money to Helix Electric and used funds earmarked for another project to pay Helix Electric.

62.    SunEdison's former vendors have substantiated the accounts of these former Company employees through their own formal litigation against the Company for unpaid bills. For example, Aerotek, Inc. ("Aerotek"), a Maryland-based staffing firm, entered into an agreement with SunEdison in May 2013 whereby Aerotek agreed to place temporary contract employees with SunEdison in exchange for SunEdison's paying Aerotek a multiplier of these employees' approved hourly billing rates.  Pursuant to the agreement, Aerotek sent SunEdison weekly invoices that reflected the money SunEdison owed to Aerotek.  According to a lawsuit Aerotek filed against SunEdison for breach of contract and unjust enrichment in the United States District Court for the Eastern District of Missouri (captioned *Aerotek, Inc. v. SunEdison, Inc.*, 16-cv-00453-CDP (E.D.

Mo. Apr. 1, 2016)), SunEdison failed to pay Aerotek at least approximately $1.02 million, with numerous invoices being over 180 days late and even more being over 90 days late. Similarly, Paragon Partners, Ltd. ("Paragon Partners"), a California-based construction services company, entered into an agreement with SunEdison in August 2013 for Paragon Partners to perform various right of way services for SunEdison. As Paragon Partners has alleged in its complaint filed in California Superior Court, Orange County, on April 21, 2016, since January 31, 2014, SunEdison has failed to pay Paragon Partners invoices totaling approximately $69,529.

63. The Executive Defendants knew about SunEdison's endemic inability to timely pay its vendors. A former Senior Internal Auditor at SunEdison from August 2014 to December 2015 (the "Senior Internal Auditor"), explained that in April 2015, Defendant Wuebbels ordered an accounts payable audit (the "A/P Audit"). The Senior Internal Auditor was assigned to the A/P audit by her supervisor, Martha Hernandez, SunEdison's Internal Audit Manager. The A/P audit was completed in July 2015 and identified multiple duplicate A/P issues, when it was given to the Audit Committee of SunEdison's Board of Directors. However, as the Senior Internal Auditor explained, within only two weeks of beginning the audit, the Senior Internal Auditor discovered that the core underlying issue concerning the Company's inability to timely pay its vendor invoices was, in reality, the Company's cash flow limitations. As a result, the Senior Internal Auditor also recommended to Hernandez a "scoping change," meaning she wanted to change the scope of the audit from an A/P examination to a cash flow audit. Management refused the Senior Internal Auditor's request. However, the Senior Internal Auditor conducted her own informal investigation instead. As a result of her investigation, the Senior Internal Auditor discovered that SunEdison's revenues could not cover its liabilities and that "the Company [would] die from that." Based on the Senior Internal Auditor investigation, SunEdison was "in huge trouble" and the core problem

was SunEdison's insufficient cash-flow.  Indeed, the Senior Internal Auditor explained that, by this time, SunEdison was using or had already used all of its available cash for M&A activity and had no money to pay its vendors.

64.     Moreover, Defendants Chatila and Wuebbels knew about the Company's systemic and repeated failure to pay its vendors based on regular finance calls in which this issue was explicitly addressed.  As the Senior Auditor & Accountant explained, Wuebbels "wanted to know about everything" and payments to vendors were discussed during weekly meetings and monthly finance meetings, both of which Wuebbels either personally attended or the results of which were brought to his direct attention by Marcie Washburn, SunEdison Controller, Jenny Cooper, SunEdison's CFO of Global Operations, or SunEdison's Director of Accounting.  During these weekly "cash calls," which occurred at 9AM PST on Tuesday or Wednesday of every week, the CFOs of each region and their respective teams would take turns explaining the status of their projects and their cash needs in order to get SunEdison's Finance Department to issue the cash necessary to pay vendors and thus continue to projects' operations.  The Project Coordinator & A/P Analyst, who was on these calls from 2014 to 2016, explained that Zach Groves, SunEdison's Director of Finance would lead the calls and distribute the cash, but it was Wuebbels who had to "sign off" on the decisions.  Similarly, the former Director of Asset Management and Operations at SunEdison from December 2014 to December 2015 (the "Director of Asset Management and Operations"), recalled a January 2015 "all-hands" conference call led by Defendant Chatila, in which a SunEdison employee announced that they had been warned three times by a utility provider that they would turn off phone service because SunEdison had not paid its bills, and that suppliers were "breathing down their necks" and wanted escrow for lines of credit with SunEdison.  According to the Director of Asset Management and Operations, the message on the call was that

this situation was embarrassing for SunEdison.  In response, Defendant Chatila went on a "very concerted rant" on this call, telling the SunEdison employees that they could work for a company that grew slowly (and thus had the cash to timely pay its vendors), or they could work for SunEdison, which was a big, fast growth company.  Defendant Chatila announced that these were the sacrifices that SunEdison would make for growth and to become the next major company

65.    Throughout the Class Period, Defendant Chatila also directly addressed the Company's delayed payments to its vendors during quarterly live-casts to SunEdison employees during which Chatila would give his "state of the union" on SunEdison.  During these live-casts, as the VP of Micro-Inverters explained, Chatila acknowledged that SunEdison's problems paying its vendors was a "broken system" which he promised to fix – in fact, during one of these live-casts, Chatila vowed not to give himself a bonus until the Company sorted out its problems paying its vendors.  As a result of Chatila's repeating this message over the course of multiple quarterly live-casts, the VP of Micro-Inverters realized that SunEdison was really just a "house of cards." Indeed, Chatila's oft-repeated promise to resolve SunEdison's vendor-payment issue had become such a joke within the Company that during these live-casts, as the Project Coordinator & A/P Analyst explained, a group of SunEdison employees played a game called "Ahmad Bingo," in which employees would get points if Chatila made what had then come to be recognized as hackneyed and empty promises.

G.    **SunEdison Suffered From Material Weaknesses In Its Internal Controls Over Financial Reporting Such That The Company Had No Reliable Way To Account For Its Available Cash**

66.    Throughout the Class Period, Defendants Chatila and Wuebbels certified in the Company's quarterly and annual SEC filings that they had "carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures," as required by the Sarbanes-Oxley Act of 2002.  These "internal controls" certifications reassured investors

that SunEdison's controls were adequate to ensure that the Executive Defendants' repeated disclosures about SunEdison's financial condition were accurate, transparent, and fairly presented the financial condition of the Company. However, contrary to the Executive Defendants' certifications concerning their "evaluations" of SunEdison's internal controls, numerous former SunEdison employees have explained – and SunEdison itself has now admitted – that during the Class Period, SunEdison's internal controls over financial reporting in fact suffered from numerous widespread material weaknesses. These material weaknesses were directly related to, and significantly impacted, SunEdison's ability to accurately represent its liquidity and available cash, as well as its ability to represent and track the money the Company owed to its critical vendors and creditors.

67.     Numerous former SunEdison employees have described the state of the Company's internal controls over financial reporting during the Class Period to be completely ineffective. For example, and as described in detail herein, the Senior Auditor & Accountant, who worked at SunEdison from September 2012 to September 2014 and who evaluated the Company's internal controls "every single day," explained that SunEdison never had an effective system for internal controls. The Head of Global Field Operations for SunEdison from April 2015 to November 2015 (the "Head of Global Field Operations"), who prior to joining SunEdison ran one of the SunEdison's largest solar dealer programs, by which he sold SunEdison products and services to homeowners and end users, explained that "everyone at the entire company knew it was the worst part of the business." He stated that, as a result of SunEdison's woefully ineffective internal controls, SunEdison was "the most dysfunctional company [he] ever worked for" with "unexplainably bad" accounting systems, no security on data, no checks and balances on data access and data input, and, overall, an utter lack of internal controls in place. Likewise, the Project

34

Coordinator & A/P Analyst, who worked at SunEdison from May 2013 to May 2016, explained that while the Company purported itself to be "the biggest renewable energy company in the world," SunEdison, in part because of its woefully ineffective system of internal controls over financial reporting, was in reality "the biggest joke in the world."

> ### 1. SunEdison's Internal Controls Were So Flawed That There Were Effectively No "Controls" Over Much Of The Company's Reporting

68.     SunEdison's former employees described a number of fundamental flaws in the Company's internal controls, any one of which rendered the Executive Defendants' certifications false – collectively, they paint a picture of a Company whose growth had spiraled out of control, leaving its internal controls utterly deficient.

69.     First, at the heart of SunEdison's ineffective internal controls over financial reporting was the fact that SunEdison, as a result of its business strategy of acquiring renewable energy companies and then developing and managing these companies' projects, never integrated the acquired companies' accounting systems with its own and thus never created a single, effective and accurate reporting system.  Prior to the beginning of the Class Period, for example, in July 2013, SunEdison acquired EchoFirst and, as explained by the Head of Global Field Operations at SunEdison from April 2015 to May 2015 (the "Head of Global Field Operations"), never integrated EchoFirst's "massive" accounting system, NetSuite, into SunEdison's own systems.  Indeed, the Head of Global Field Operations was told in his job interview that SunEdison knew how terrible its accounting systems were and he was recruited, in part, to help fix those problems.  As the Head of Global Field Operations explained, SunEdison's failure to integrate NetSuite into its own accounting platform resulted in the systems in Residential Small Commercial ("RSC"), the division of SunEdison in which he worked that used NetSuite, not effectively speaking with the Company's other systems and RSC "never connected dots to anything else at SUNE." As a result,

RSC was "living on its own platform."  Accordingly, monitoring and updating SunEdison's financial data was a "clunky and broken process" and a "poorly built system" such that there was always a "massive disconnect" between RSC and the corporate/accounting systems.

70.    SunEdison's reliance on its other accounting systems, platforms purchased and tacked onto SunEdison's own accounting platform as a result of the Company's other acquisitions, fared no better. For example, the Senior Auditor & Accountant explained that in 2009 when MEMC, SunEdison's predecessor and legacy company, acquired SunEdison, MEMC continued using its own system, SAP, while not integrating SunEdison's accounting systems, including Timberline and Oracle.  As a result, SunEdison's various business divisions were segregated by their respective accounting systems; while MEMC divisions, including the semiconductor business, ran on SAP, the solar divisions ran on their own differing platforms.

71.    Attempting to use all of SunEdison's accounting systems to consolidate the Company's financial statements and ensure the efficacy of the Company's internal controls, was, as the Senior Auditor & Accountant explained it, "a cluster of different accounting systems that made it a nightmare for any sort of internal controls to be functional."  When the Company acquired Lightwing, a "solar platform solution company" in May 2015, Lightwing's accounting system "was another system bolted onto NetSuite," but, as the Head of Global Field Operations explained, it did not connect to NetSuite.  When SunEdison tried to move Lightwing's data to NetSuite, the resulting data was not accurately reconciled and it added "more layers of complexity."

72.    Rather than forming a coherent system of financial reporting in which SunEdison employees could input project costs and revenues into a unified system – and to which SunEdison accountants and auditors could accurately refer – SunEdison's piecemeal system of financial

reporting made it impossible for anyone at the Company to ever know how much money SunEdison had and what it owed to its creditors.  The Project Coordinator & A/P Analyst explained that because of SunEdison's "shopping spree," SunEdison used multiple enterprise resource planning (defined above as "ERP") systems, including Timberline, Oracle, Paramount, SAP, as well as SAM, SunEdison's project information database, and SunEdison never integrated any of these systems into a single accounting platform.   As the Senior Auditor & Accountant described the state of the Company's accounting platforms, as a result of the Company's using these multiple systems, "there [were] no controls over M&A" and "no one at the organization had the knowledge or capacity to design those controls."

73.     SunEdison's internal control problems only became more severe throughout the course of the Class Period, when SunEdison continued to acquire other companies.  The Senior Auditor & Accountant explained the internal controls problem: "If you continually acquire companies, you have to continually worry about it . . . . [It's one thing] to acquire a single company and try to integrate it; then to try to do two or three at a time, it's never going to happen."

74.     Not only did SunEdison rely on numerous accounting platforms to report its revenue and costs, but none of these accounting systems worked together.  In other words, if a SunEdison employee adjusted a line item on a project, that same adjustment would have to be manually entered across every accounting system in order to accurately reflect the change. As a result, as the Senior Auditor & Accountant described it, "it was a nightmare to consolidate," and, as the Head of Global Field Operations described it, such manual inputting of data across platforms led to "bastardized" financial results so there was "never a true version of the truth."  Moreover, as SunEdison continued to acquire companies throughout the Class Period, the Company continued to introduce more accounting systems and processes and was so disorganized that

SunEdison could not even accurately keep track of how many projects or employees it had – much less its available cash and debts it owed to its creditors.  As the Head of Global Field Operations explained the situation with SunEdison's many accounting systems, "every division was off in their own world" and accurate consolidation and representation was impossible.

75.     The process for manually entering SunEdison's financial data was labyrinthine and prone to creating and perpetuating accounting errors.  The Senior Auditor & Accountant described the process by which the Company's financial data was consolidated into a single source: all of the entities using one system, for example Timberline, had to input their financial data into the system, close out, and those entries were passed to SunEdison's Finance Department; each SunEdison project or acquisition would then have to go through this process on its own; the controller for each group would go through the line items for each project; after this was done for each project in each accounting system, SunEdison's Finance Department would then consolidate each project from each accounting system into a massive Excel spreadsheet document, done manually.  The Senior Auditor & Accountant explained that SunEdison had been using this practice and manually consolidating its financial data into an Excel spreadsheet since 2009, and continued to do so from the time he left.  Moreover, other former SunEdison Employees, including the Head of Global Field Operations and the Project Coordinator & A/P Analyst confirmed that SunEdison continued to use its Excel spreadsheet as its method of consolidating its financials throughout the end of the Class Period.  This process was so complicated and so time-consuming, that the Head of Global Field Operations explained that this consolidated Excel spreadsheet was "literally the most complicated spreadsheet" he had ever seen and was known internally as the "Brain Damage" spreadsheet.  As a result of this process, the Head of Global Field Operations recalled that SunEdison's internal controls were a "web of chaos and confusion" and "the biggest

mess ever" and that SunEdison's system of financial reporting was so "mind bogglingly" poor that the Head of Global Field Operations thought it had to have been "intentional" because it inevitably led to "massive underpayment" to SunEdison's creditors.  Indeed, the Company's internal control systems were so unnecessarily complicated, that the Head of Global Field Operations, in his resignation email to his supervisor, Gokul Krishnan, dated October 5, 2015, took the time to express just how flawed SunEdison's internal controls were and were part of the reason he could not effectively do his job, thus forcing him to resign:

> Complicated systems and process- this is probably the biggest weakness at SunEdison currently and there was never a true focus on getting them fixed. There were a lot of meetings and a lot of discussions on it but in the end not much would change and the hard part of this was me and my team ended up being the brunt of most of the gaps in the systems and having to explain these to partners or other internal teams …

The Head of Global Field Operations reported similar issues to Krishnan earlier in the Class Period, in an email dated May 30, 2015, when he wrote that:

> Reporting- this is a tough one for me because I know the value of the reporting and it is absolutely crucial for us to be able to know where we are and measure progress. The problem is there are no tools in place to help with this and the data is so choppy you need to have a PHD in NetSuite to even be able to decipher the code. This is the first company I have ever worked at that does not have a sequel or python reporting system that gives the ability to tie into the data without having to do it with the built in report function of the CRM. I know there is progress being made here, we just need to make sure that the data behind the reporting is correct and consistent.

76.     Moreover, SunEdison management, including the Executive Defendants, actively avoided resolving these issues.  As the Senior Auditor & Accountant explained it, "To say that what management was looking at [the financials] was complete and accurate was false."  This is because properly reconciling financial data from SunEdison's myriad accounting platforms would have required greater scrutiny from the Company's internal auditors – or inquiries from SunEdison's outside auditor, KPMG LLP ("KPMG"), which the Company and the Executive

Defendants sought to avoid.  As the Senior Auditor & Accountant described the situation: "If management attempted to consolidate the [accounting] systems, I think it would [have] become apparent how many issues and things had been swept under the rug, and I think that would trigger much more investigation because it would become obvious to us [in Internal Audit]."

77.   Second, SunEdison's use of an Excel spreadsheet was a profoundly flawed method for accounting for the Company's complex financial transactions because Excel – particularly as SunEdison used it – is not a proper accounting platform.  As the Senior Auditor & Accountant explained, "Basically, consolidation [was] done in Excel, which is a huge problem because Excel has very little security around it" and, as SunEdison used it, lacks "any sort of IT controls."  Unlike proper accounting software like SAP or Oracle, which have built-in controls, Excel has no "input controls."  Input controls ensure data is entered correctly by code and category.   For example, a date field has to be entered with a particular sequence and formatting; a line item for "electricity cost" has to be entered with a specific numerical code to ensure that the dollar value is associated with the correct category of expense.  In accepted and functional accounting software platforms, entering data without the proper formatting and coding requirements will generate an error message, which the enterer of the data will have to correct.  Excel has no such input controls, and line items that are incorrectly entered can go unnoticed and generate a domino effect of errors, false attributions and miscalculations.  As a result, as the Senior Auditor & Accountant explained, "huge categories" of data was misclassified and financial information was misreported, such that amounts of $200,000 per project were often lost in the reconciliation process for any given project at any given time, resulting in, as explained by the Head of Global Field Operations, multi-million dollar swings on any project at any given time.  As a result, costs were "never uniform, never reconciled," as the Senior Auditor & Accountant pointed out.  As the Head of Global Field

Operations explained, hundreds of millions of dollars was impacted and the numbers were "insanely inaccurate."  For example, in late 2015, SunEdison engaged the solar contracting company Bright Planet Solar, for which the Head of Global Field Operations worked after he left SunEdison, and SunEdison, based on its accounting, claimed that it owed Bright Planet only $800,000.  In reality, based on emails exchanged between Bright Planet and SunEdison, dated May 6, 2016 and June 6, 2016, SunEdison owed Bright Planet over $2 million.  The Senior Auditor & Accountant discovered massive payment swings such as these in his first month with the Company, in September 2012, and it persisted throughout the entirety of his tenure with the Company through in September 2014.

78.     In another profound violation of basic internal controls principles, SunEdison had no "access controls" to its massive Excel spreadsheets – and thus anyone with even minimal security clearance had access to, and could make changes to, the Company's central reporting system.  Access controls regulate and restrict users' ability to make certain data entries unless users provide the appropriate clearance.  As the Senior Auditor & Accountant explained, in SAP, a common accounting platform, a SunEdison controller had specific access rights that were not conferred to junior accountants or administrative assistants; if there was an entry for $500,000 – an amount that would require the controller's authorization – it would have to be entered using the controller's user identification code and a junior accountant's user identification code was not authorized to make that entry.  Excel, on the other hand, does not have these access controls, so, as the Senior Auditor & Accountant explained, "anyone who has access to the spreadsheet can enter a $500,000 entry or adjustment."  Because the consolidated spreadsheet was on a shared drive, a junior accountant who hypothetically might want to conceal that $25,000 was missing from the entity s/he is responsible for, could change that line item in the spreadsheet without

anyone detecting the change.  Indeed, the Senior Auditor & Accountant recalled multiple times in 2013 when accountants changed numbers in order to cover disappeared funds of approximately $25,000 involving bank reconciliations amounts.  Likewise, the Head of Global Field Operations described the situation with SunEdison's access controls as "they gave authority to the lowest level employee, like call center people, who could go in and change the economics of any deal."  During the Class Period, SunEdison's access controls were so woefully defective with such "insanely bad data integrity" that, to this day, the Head of Global Field Operations, using his installer/partner credentials, can access SunEdison's consolidated financial data and makes changes to what he is owed for job.  The Head of Global Field Operations is far from the only former SunEdison employee, who, months after having left the Company, still has access – and in fact could change (though he did not) – SunEdison's consolidated financial information.  The Project Coordinator & A/P Analyst explained that she also still had access to SunEdison's financial data and could review project line items weeks after she left the Company.

79.    While numerous former employees of SunEdison have explained that SunEdison's financial statements were misreported because employees manually entered data incorrectly by mistake, other former employees have reported that this data was also entered incorrectly on purpose – to burnish the value of SunEdison's projects. For example, the Head of Global Field Operations reported that there was always "massive pressure" from Company executives to show progress on all projects and accounts.  Every month, as the Head of Global Field Operations reported, there would be meetings to update the sales and operations executives on the status and finances of SunEdison's projects.  In preparation for these meetings, in order to show purported project progress, sales employees engaged in "massive cleanups" – which included account managers improperly changing the numbers on projects to make a project look more favorable.

As the Head of Global Field Operations explained, "anyone with access could change the economics of a deal," and, prior to the monthly meetings, there was a "mad dash" to get the numbers updated and show progress.

80.     Third, related to both the Company's utter lack of effective input and access controls, former employees have discussed that SunEdison employees' intentional exploitation of the Company's flawed internal controls in order to increase the number of projects that Company kept on its books.  For example, the Head of Global Field Operations explained that in the residential solar energy business, there is a cancellation rate of projects of around 50%.  At SunEdison, during the Head of Global Field Operations' tenure with the Company, the cancellation rate was significantly higher, approximately 75-80%.  However, this higher rate was not the rate which SunEdison kept on its books.  This is because SunEdison would receive project payments upon various project milestones, which included the customer's initial acceptance of the project and then the Operations team's budget and estimate of the project.  Notably, as the Head of Global Field Operations explained, SunEdison intentionally refused to cancel jobs on its books, even where that was "indisputable evidence" that there was a cancellation, or when a job was in limbo, in order to show that a job was still active and thus continue to receive milestone payments on those projects, an issue which the Head of Global Field Operations discovered only a month into his employment with SunEdison in May 2015.  Indeed, the Head of Global Field Operations reported that SunEdison's Director of Global Sales and Operation, who was responsible for job cancellations, would routinely fail to record projects as "cancelled" in order to improve the Company's sales statistics.  He felt this was intentional so the sales team would get their bonuses.  Accordingly, every project that was in the RSC system was perceived as active, and SunEdison would continue to receive milestone payments on those projects.  Because SunEdison intentionally

43

kept away from cancelled projects on its books in order to continue to receive payments on those projects, the Head of Global Field Operations described the Company as a "Ponzi scheme" and a "house of cards" just waiting to collapse.

81.     Fourth, in addition to the acquisition-related and platform problems plaguing the Company's internal controls over financial reporting, SunEdison's extremely high turnover of personnel exacerbated SunEdison's internal control problems.   As the Senior Auditor & Accountant explained, accountants were constantly leaving SunEdison, with accountants sometimes staying for only a week.   The Senior Auditor & Accountant confirmed that because of SunEdison's high turnover of accountants, new employees were not familiar with the accounts, with particular coding requirements, the projects, and the transferring of codes from the each project's accounting software to Excel – and all of these factors exacerbated the existing problems with SunEdison's internal controls.   As the Senior Auditor & Accountant explained, in addition to the problems of having to learn how to navigate SunEdison's labyrinthine consolidation process, "there may be an accountant working on a particular group of projects one month, and the next month it's a completely different person who has no idea these bills or line items are miscoded, so they never find it."   As a result, line items which were initially miscoded were left uncorrected. Moreover, SunEdison never adequately invested in teaching its employees how to use its accounting systems. As the Senior Auditor & Accountant described the situation, "there was no formal or even informational training for new people that came into finance."  The philosophy of the controllers was basically if you spent some time in accounting at all, you should be able to come in and pick it up immediately, which was not the case."

82.     Fifth, SunEdison also allowed its employees unfettered use of the Company's American Express card for outrageous personal expenses.  For example, the Head of Global Field

Operations explained that in or around February 2016, a Field Operations Manager with SunEdison used his company-issued American Express card to purchase for himself a boat, and also had charged an additional $180,000 of personal expenses.  As such, the Head of Global Field Operations described that Company as a place of "massive misappropriation of funds."   Likewise, the Senior Auditor & Accountant discovered in late 2013 that a Company employee had bought airfare, hotel rooms, and tickets to the 2010 World Cup in South Africa for himself and his friends on SunEdison-issued American Express card, expenses which were clearly not business related.

83.     The Senior Auditor & Accountant explained that companies should have a travel & expense ("T&E") policy dictating how corporate credit cards may be used.  At SunEdison, employees were allowed to use the corporate cards for personal expenses, but they had to mark those expenses as "personal" on their expense reports.   However, as the Senior Auditor & Accountant explained, employees marked many expenses business were which in reality personal and that would have "brought up a lot of red flags if we reviewed all of management's T&E."  In fact, Internal Audit would normally review management's T&E, a review which was done periodically throughout the fiscal year.  However, in 2014 the T&E audit "just disappeared.  When 2014 rolled around and we were to look at expenses for 2013, somehow the [T&E] audit was removed from our list of projects for the year."  The Senior Auditor & Accountant explained that the T&E audit was stopped by management because management did not want to invite greater scrutiny from the Company's auditors.

84.     Taking advantage of SunEdison's materially flawed internal controls, manager and top level executives at SunEdison also issued multiple purchase orders for their expenses in order to avoid triggering scrutiny on the amounts these employees requested from SunEdison's Finance Department.  As the Senior Auditor & Accountant explained, every level of management has a

45

spending threshold, called a "delegation of authority" by which that level employee could request funds without drawing scrutiny or raising red flags to the Company's auditors or the Finance Department. For example, hypothetically, the CFO could spend $10 million a month while a corporate controller could spend $1 million. If the employee spends more than her delegated amount, that employee needs approval from her supervisor or someone with a higher spending limit. In order to circumvent this process, as the Senior Auditor & Accountant explained, employees would often split purchase orders – circumventing the delegation of authority controls and avoiding triggering audit scrutiny by splitting requested sums into multiple purchase orders. The Senior Auditor & Accountant recalled an experience in late 2013 and early 2014 when this happened: he was reviewing purchase orders from Manu Sial, then SunEdison's CFO of Solar Energy (and later the Company's Senior Vice President of Finance and Interim Chief Financial Officer) who reported directly to Defendant Wuebbels, and discovered that Sial had issued multiple purchase orders for the same invoice, a flagrant circumvention of the Company's delegation of authority controls. Moreover, this circumvention of SunEdison's authority controls existed at all levels of the Company, as the Senior Auditor & Accountant explained that: "If you know someone at [Sial's] level, who reports to the CFO, is circumventing the controls or splitting a PO to circumvent delegation of authority, what's to prevent a person reporting to him from doing the same thing? If management sets a specific tone, who's to say people who report to management are not going to do the same thing? If management is doing certain things, then without a doubt, people who report to management are doing the same thing, if not worse."

85. Sixth, in addition to these fundamental failures of data integrity and employee training, SunEdison suffered from multiple "significant deficiencies" in its internal controls prior to the Class Period that were not corrected in the Class Period. The Senior Auditor & Accountant

was responsible for detecting and investigating these significant deficiencies, and explained that anything having to do with SOX or financial reporting which did or could cause a $500,000 gap in the Company's finances would trigger a significant deficiency – for which an investigation would be conducted, an internal report would be generated, and that report would be circulated to SunEdison's Board and top management, including Defendants Chatila and Wuebbels.  Once identified as a significant deficiency, and if the significant deficiency was also identified by SunEdison's outside auditor, KPMG, the Company was responsible for reporting the deficiency, and continuing to do so until the deficiency was remediated and report when that remediation was effective.   The Senior Auditor & Accountant was responsible for investigating numerous significant deficiencies, all of which were brought to the attention of the Executive Defendants.

86.   One such significant deficiency involved the fact that Company employees or subsidiary entities, without the permission or knowledge of SunEdison's accountants, could open up bank accounts and draw money directly from SunEdison.  For example, in late 2013, the Senior Auditor & Accountant discovered that individuals and affiliated entities had opened bank accounts and were withdrawing cash of over $500,000.  Because the amount drawn from SunEdison was over $500,000, the amount triggered the significant deficiency threshold, and the Senior Auditor & Accountant issued a report which was distributed to the Executive Defendants and the Board of Directors.  As a result of the inquiry initiated by this $500,000 bank account draw, the Senior Auditor & Accountant discovered that the opening of bank accounts for the purpose of withdrawing Company funds "happened a lot" while he was at the Company.  In response to this $500,000 draw on SunEdison, the Senior Auditor & Accountant wrote the significant deficiency report, which was passed on directly to Jenny Cooper, CFO of Global Operations and Director of Accounting and Solar Energy Controller, and Marcie Washburn, SunEdison Controller and Global

Services Controller.  As the Senior Auditor & Accountant explained the discovery, "When we learned it was possible that there were bank accounts all across the globe, and cash could be flowing through, and [the Assistant Director of Financial Reporting] had no idea what that cash position was …We were trying to wrap our minds around, okay, how big could this issue be? And once we'd passed the $500,000 threshold it was a significant deficiency. We were freaked out." the Senior Auditor & Accountant continued, "This is basic: cash. Not left to any judgment or guesswork, this is just cash in the bank. If you have no control over that, you have problems overall." While the Senior Auditor & Accountant investigated and generated his report on this significant deficiency in the fourth quarter of 2013, by the third quarter of 2014, the Company had failed to remediate the issue.  Moreover, SunEdison failed to disclose this issue in <u>any</u> public filings.

87.     The Senior Auditor & Accountant identified another pre-Class Period significant deficiency that was not corrected before the beginning of the Class Period,  In connection with the filing of SunEdison's 2012 10-K, the Senior Auditor & Accountant explained that KPMG identified a significant deficiency involving the cost of solar components in its inventory sold, such that, as SunEdison disclosed in its 2012 10-K, SunEdison was forced to revise its revenue for the first three quarters of 2012 by increasing the Company's net loss by $45 million.  Specifically, while accounting rules dictate that when a Company such as SunEdison buys back its own inventory from its affiliates, it has to include a mark-up on that inventory repurchased.  SunEdison failed to do so because, as the Senior Auditor & Accountant explained, SunEdison's internal controls were so bad that SunEdison "had no idea how many units its [affiliates] had, so they didn't know how much they needed to include in their inventory."  SunEdison disclosed this significant deficiency in the Company's 2012 10-K, filed with the SEC on March 1, 2013, however, according

to the Senior Auditor & Accountant, who was responsible for creating the new internal controls to remediate this significant deficiency, the problem was never solved. While the Senior Auditor & Accountant drafted the new controls to remediate the issue in the first quarter of 2013, he was later told in the second quarter of 2013 that, even though the significant deficiency was still ongoing, management was "no longer performing this control."

*    *    *

88.    Numerous former employees of SunEdison have explained that Defendants Chatila and Wuebbels knew of SunEdison's flawed internal controls over financial reporting. As to the problems associated with having multiple accounting systems which did not effectively integrate the Company's financial information, the Head of Global Field Operations explained that he attended meetings focused on integration issues beginning in May or June 2015 in SunEdison's Belmont office, and that he remembered Defendant Wuebbels attended at least one of those meetings. The Head of Global Field Operations also recalled Wuebbels' direct report, Rajiv Krishnan, SunEdison's CFO of RSC, routinely attended these meetings, during which this integration issue was specifically discussed and internal reports concerning these issues were distributed.

89.    As to the problems associated with consolidating the Company's financial data into Excel, these problems were so long-standing, so obvious, and so detrimental that the Senior Auditor & Accountant noted that the Executive Defendants were, "of course" aware of the inconsistencies and incorrect data that was represented and that "everyone" within the Company knew about it because "it had been going on for years," that "it's hard to imagine [Wuebbels] not knowing about it" and that he would "challenge anyone" who might claimed the Executive Defendants did know of these problems. Similarly, the Head of Global Field Operations explained

49

that he reported these issues to his supervisors, Gokul Krishnan, the COO, Global Residential & Small Commercial Solar, who reported directly to Vikas Desai, the Senior Vice-President and Global General Manager for the Residential and Small Commercial Business.  Desai reported directly to Defendant Chatila.  The Head of Global Field Operations would report these issues in meetings three to four times a month with Krisnan and was told that resolving SunEdison's internal controls problems was "priority number 1" and that the executive team, including Defendant Wuebbels, was in the process of dealing with it.

       **2.**     **SunEdison And The YieldCos Eventually Admit To Fundamental Undisclosed Weaknesses In Internal Controls**

90.     As discussed further below, near the end of the Class Period, SunEdison admitted that its internal controls over financial reporting suffered from material undisclosed weaknesses. On March 16, 2016, in a Form 8-K filed with the SEC that day, SunEdison announced that it would be delaying the filing of its 2015 Form 10-K because it had identified material weaknesses in its internal controls over financial reporting.  Specifically, SunEdison stated that "[t]he scope of work required to finalize the Company's financial statements included in the 2015 Annual Report on Form 10-K has expanded due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems."  As a result, the Company would not be able to file its annual Form 10-K with the SEC in a timely manner.  That same day, TERP also announced that it would be delaying the filing of its 2015 Form 10-K because it relied on SunEdison's flawed internal controls over financial reporting which were "primarily due to ineffective controls in relation to our Enterprise Resource Planning (ERP) systems and processes for validating revenue recognition."  Then on March 29, 2016, Global admitted that it suffered from material weaknesses in its internal controls, stating that: "We currently have identified a

material weakness in internal controls over financial reporting primarily due to SunEdison, Inc.'s ineffective controls over accounting consolidation and reporting system that we rely upon." Accordingly, the Company has admitted that its ERP system, SunEdison's accounting platform, suffered from material weaknesses during the Class Period.

91.     Then, on April 14, 2016, the Company revealed far more detail concerning the poor state of its internal controls over financial reporting.  Specifically, the Company admitted that an internal investigation had "identified several specific issues regarding the Company's cash forecasting and liquidity management practices," including "extensions of accounts payable" and the "use of cash committed for projects."  Among other things, the Company admitted that:

- "the Company's cash forecasting efforts lack sufficient controls and processes";

- "certain assumptions underlying the cash forecasts provided to the Board by the Company's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted";

- "the Company's management has not responded appropriately when forecasted targets were not met"; and

- "the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

92.     On May 12, 2016 – in one of the Company's final SEC filings before filing for bankruptcy – the Company admitted:

> [The filing of SunEdison's Form 10-K for 2015] continues to be delayed due to the previously disclosed identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems. Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the finalization of the audit of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.

93.     Then, on May 17, 2016, Global admitted that because of its reliance on SunEdison's ineffective internal controls over financial reporting, Global too suffered from:

- "ineffective controls in the area of security and access to an accounting consolidation and reporting system implemented by SunEdison … specifically the design and maintenance of user access controls to ensure that access to the financial applications and data is adequately restricted to appropriate personnel";

- "inadequate controls over general and administrative expenses as well as acquisition, formation and related costs, specifically completeness, accuracy and timely recording of expenses and equity contributions in the appropriate reporting period"; and

- "inadequate controls over regional reporting, specifically timely identification and resolution of complex transactions and appropriate application of policy or U.S. generally accepted accounting principles."

These admissions further corroborate the reports from SunEdison's former employees concerning the true disastrous state of the Company's internal controls.

94.     In sum, unbeknownst to investors at the time, SunEdison's internal reporting systems were a morass of easily-manipulated reports that resulted in the Executive Defendants or the Company being incapable of producing accurate financial records or having any reasonably accurate presentation of the amount of cash the Company actually had, while allowing the Executive Defendants and numerous other employees to delay the payment of overdue bills and raid cash supposedly committed to specific projects.

### H.     SunEdison's Next "Transformational" Transaction Raises Doubt Concerning SunEdison's Ability To Execute On Its Growth Plan

95.     On July 20, 2015, SunEdison and TERP announced a series of transactions by which SunEdison would acquire the residential rooftop solar company Vivint Solar for $2.2 billion in cash and stock (the "Vivint Transaction").  In the press release announcing the deal, SunEdison declared that the Vivint Transaction would "[a]ccelerate[] SunEdison's expansion to become the leading global residential and commercial solar provider."

52

96.     SunEdison announced that TERP would contribute the majority of the cash necessary to complete the Vivint Transaction by purchasing from SunEdison a portion of the assets the Company was acquiring from Vivint.  However, TERP's agreement to purchase the Vivint assets was inadequate to make up for SunEdison's cash shortfalls, and SunEdison was still short by hundreds of millions of dollars.  Goldman Sachs was willing to loan the $500 million difference, but only on a secured basis.  In exchange, SunEdison offered as collateral the <u>future</u> Vivint projects it expected to develop, but that were not yet developed.  Further, SunEdison instituted a "Take/Pay Arrangement" whereby TERP agreed in advance to buy all those future projects, sight unseen.   On that basis, Goldman agreed to provide the additional $500 million SunEdison needed to close the deal.

97.     The July 20, 2015 announcement of the Vivint Transaction described the substantial financing that was required to permit the merger to go forward, causing some investors to question whether SunEdison had the ability to raise the capital needed to both complete the merger and also to continue to fund the acquisition and development of new projects necessary to meet the high-growth expectations SunEdison had set.  Investors were also concerned about the increased risks associated with residential solar, which was a significant shift in SunEdison's existing business model that had principally targeted commercial and industrial projects that had stronger counterparties and less risk.  These and other concerns over the deal caused the price of both SunEdison and TERP shares to decline significantly following the July 20, 2015 announcement of the Vivint Transaction.

98.     Indeed, the price of TERP shares fell from $37.20 the day before the Vivint Transaction was announced to $29.18 by the close of trading on August 5, 2015.  Unbeknownst to

investors, this dramatic decline triggered – or caused an imminent risk of triggering – a substantial margin call on the Margin Loan, which was publicly described by SunEdison as non-recourse.

99.     At the same time, in late July, SunEdison completed Global's IPO, selling 45 million shares for $15 each.  Global had initially stated that it planned to offer 56.6 million shares for $19 to $21 each.  However, there was insufficient demand to close the Global IPO on its offered terms.  Thus, SunEdison agreed to acquire $30 million of Global's Class A common stock that had been expected to be purchased by public shareholders.

**I.     SunEdison Secretly Borrows $169 Million From Goldman Sachs At An Exorbitant 15% Interest Rate**

100.     Unbeknownst to investors until months later, in July 2015 (as TERP's stock price declined and a margin call loomed) SunEdison secretly negotiated with Goldman Sachs to borrow a second lien loan of  $169 million at a rate of 9.25%, with an origination fee of $9 million (5.3%), equating to an effective interest rate of 15% (the "Goldman Sachs Loan").  This effective 15% interest rate far exceeded the 2.68% weighted average annual interest rate of SunEdison's other debt reported in its second quarter Form 10-Q by <u>nearly 500%</u>.  This enormously high rate meant that SunEdison would pay Goldman Sachs $25 million over the one-year life of the loan, just in fees and interest.  The fact that it was a second lien loan meant that the Company did not have any assets that did not already have a first lien loan against them, and was so cash-strapped that it agreed to pay this extraordinary interest rate to Goldman Sachs to offset the risk to the bank.

101.     The loan was finalized on August 11, 2015, but was not disclosed until November 10, 2015.  As analysts commented when the loan later became public in November, the onerous terms of the Goldman Sachs Loan made it clear that SunEdison had no other options available to it and was in fact a "distressed" company.  If the Company had disclosed the fact that it had taken

out this loan, investors would have understood that its liquidity position was far more dire in July and early August 2015 than the Company had indicated.

### J. The Executive Defendants Falsely Represent To Investors That SunEdison's Liquidity Remains Strong Even As They Internally Recognize That They Can No Longer Paper Over SunEdison's Cash Shortfalls

102.    On August 6, 2015, SunEdison issued its second quarter 2015 financial results and held its first conference call with investors following the announcement of the Vivint Transaction. During the call, Defendants Chatila and Wuebbels sought to reassure investors concerning SunEdison's supposed robust liquidity.

103.    For example, the Executive Defendants claimed in an investor presentation that SunEdison had "Greater than $1 Billion of Cash at DevCo … Sufficient Liquidity to Grow Platform."   In other words, the Executive Defendants claimed that SunEdison had $1 billion in available cash, not including cash held at TERP and Global.   According to the "Cash Walk" included in SunEdison's presentation, that $1 Billion included a $673 Million "warehouse" facility.  Defendant Wuebbels claimed during the conference call that day that the warehouse credit facility "offset" certain "organic construction expenses" that would otherwise decrease SunEdison's cash balance, "further illustrating the strong liquidity position in SunEdison."

104.    By way of background, in May 2015, SunEdison had set up its warehouse structure through agreements with First Reserve Corp. for a total of $1.5 billion.  As SunEdison's Senior Vice President And Chief Strategy Officer, Julie Blunden, explained in an August 25, 2015 article in *Solar Industry Magazine*,

> [A warehouse is] essentially a storage location where you have a set of parameters that are pre-negotiated with your equity providers and lenders.  The parameters are a checklist, and if the project meets all of the required characteristics, then you may proceed with financing without having to re-negotiate with all parties.

In other words, a warehouse credit facility was essentially an open line of credit that SunEdison could access for specific projects when those projects developed to the point where they met certain pre-determined guidelines.  All of the projects in the same warehouse had to be similar enough for a common checklist to be applicable to all of them.  Defendant Wuebbels' statement that the warehouse facility "offset" construction expenses incurred during the quarter meant that certain SunEdison projects had met the checklist of parameters set by the warehouse facility, and that the warehouse had thus released cash to cover those costs.

105.   However, Defendant Wuebbels' statement about the warehouse facility "offsetting" expenses – and the supposed $1 billion in cash held at the DevCo – was false.  As investors only later learned in an March 28, 2016 *Wall Street Journal* ("*WSJ*") article titled "SEC Investigating SunEdison's Disclosures To Investors About Its Liquidity," that "$1 Billion of Cash at DevCo" consisted "largely of cash that SunEdison couldn't access" including an approximately $500 million warehouse credit facility "whose funds could only be accessed by delivering projects that met certain criteria," but of which SunEdison "had few" (the "Inaccessible Warehouse Facility").  According to the *WSJ*, Defendants, including the Executive Defendants, improperly included in their third quarter 2015 cash balance (disclosed in November 2015) the Inaccessible Warehouse Facility.  In fact, as the Company's own quarterly investor presentations and the facts revealed by the *WSJ* now show, SunEdison actually improperly included the Inaccessible Warehouse Facility in its calculations of available cash as early as the second quarter 2015 (disclosed August 2015), not just the third quarter 2015 (disclosed November 2015).

106.   Each quarter, in order to reassure investors that the Company had ample liquidity on hand, SunEdison would provide a cash walk to analysts and investors in its earnings presentations (the "Cash Walks").  These Cash Walks were bar graphs that presented the quarter's

beginning cash balance, and then the material events that purportedly increased or decreased the cash balance over the course of the quarter to result in the final cash balance.  The Cash Walk from the second quarter of 2015 (the "Second Quarter Cash Walk") is set forth below:



In the chart above, SunEdison disclosed that the Company purportedly began the second quarter with $919 million in cash (on a consolidated basis, including TERP and Global) and, over the course of the quarter, deducted $455 million and $590 million for acquisitions and project construction, respectively.  At the same time, the Company's consolidated cash balance was increased by, among other things, raising $487 million through Global private placement offerings and $673 million in cash supposedly released from SunEdison's warehouse facility.  As a result,

the Company's cash supposedly ended at $1,998 million (on a consolidated basis), with "Greater than $1 Billion of Cash at DevCo."

107.    As set forth below, SunEdison's Cash Walks for the second and third quarters of 2015 now make clear that the Inaccessible Warehouse Facility was improperly incorporated into the Company's calculations of available cash in the second quarter – not just the third quarter.  It was then improperly incorporated into the beginning cash balance for the third quarter 2015.

108.    The Inaccessible Warehouse Facility is highlighted below in the Company's Second Quarter 2015 Cash Walk:



109.    The Cash Walk for the third quarter of 2015 disclosed on November 10, 2015 (the "Third Quarter 2015 Cash Walk") was, unlike the Second Quarter Cash Walk, limited to

SunEdison or the DevCo (*i.e.*, did not include cash from TERP or Global).  As shown below in the Third Quarter 2015 Cash Walk, the Company did not add <u>any</u> additional warehouse funds to its cash balance in the third quarter of 2015:



If, as SunEdison insiders later told the *WSJ*, $500 million of the Inaccessible Warehouse Facility was not available to SunEdison in November 2015 because it did not have the projects that met the warehouse's pre-determined standards, SunEdison's projects certainly did not meet those standards three months earlier, in August 2015.  Without including the $500 million from the Inaccessible Warehouse Facility, the Company's cash at DevCo at the end of the second quarter of 2015 was almost <u>half</u> what the Company claimed in August 2015 and again in November 2015.

110.     In addition to misrepresenting the Company's available cash, Defendant Wuebbels also misrepresented the Company's plans to add more debt to its balance sheet.  During the August 6, 2015 conference call, after repeated questioning by analysts as to whether SunEdison would need to issue additional debt or take out further loans to meet forecast growth, Wuebbels did not disclose the Goldman Sachs Loan, which the Company would close just four days later.  Instead, Defendant Wuebbels claimed that the Company would not require any additional corporate financing, noting that "we don't see any additional financings to be able to achieve this growth."

111.     The Executive Defendants' representations concerning SunEdison's liquidity and capital resources reassured analysts that the Company's recent stock price decline was not the result of any fundamental issues with SunEdison's financial strength.  For example, in an August 6, 2015 report, UBS wrote that the Company's cash balance indicated that "Management can fully execute on plan as it stands.  Given concerns over cash funding . . . Management appears able to persist as a developer for quite some time should equity market appear depressed."  The next day, UBS wrote in a second report that liquidity concerns "appear [] more of a perception than a reality" and that "liquidity build in 2Q helps dramatically."

**K.      The Executive Defendants Fail To Disclose A Breach Of The Debt Covenants On The Margin Loan Or The Use Of The Goldman Loan To Satisfy Its Obligations Under The Margin Loan**

112.     Notwithstanding the Executive Defendants' statements concerning SunEdison's purportedly strong liquidity position, the Executive Defendants knew that SunEdison expected to face a significant margin call on the Margin Loan, which would tax SunEdison's limited sources of liquidity still further.  Specifically, the falling price of TERP shares following the July announcement of the Vivint Transaction prompted margin calls on the Margin Loan in August 2015.  By August 6, 2015, the day of the conference call discussed above, TERP's stock price had dropped to $25.97 – hovering just above the $25.24 threshold for tripping the Loan-To-Value

Trigger based on the value of the TERP stock collateral.  On August 7, 2015, following the conference call, TERP's stock price fell to $24.24, activating the Loan-To-Value Trigger.  Under the terms of the Margin Loan Agreement, once the Loan-To-Value trigger was hit, SunEdison was required to either prepay the loan in full, or contribute additional collateral sufficient to bring the loan back into compliance by the second business day after the Loan-To-Value Trigger was exceeded.

113.    While the Executive Defendants did not disclose the margin call(s) at the time, the Company did confirm (three months later) that SunEdison was required to post additional collateral to the Margin Loan in the amount of $152 million during the third quarter of 2015. Further, as discussed below, on August 25, 2015, the Company admitted that a margin call had taken place by that date.

114.    The evidence strongly supports an inference that SunEdison employed the proceeds from the undisclosed Goldman Loan to pay down the $152 margin call.  Goldman Sachs was one of the five banks that operated as lenders for the Margin Loan.  Thus, Goldman Sachs knew about the margin call and SunEdison's need to satisfy it.  Further, the Goldman Loan closed on August 11, 2015, the same day that the margin call payment was due if the breach occurred on August 7 as the evidence indicates.  The amounts of the loan net of fees ($169 million before origination fees) and the margin call ($152 million) are roughly equivalent.

115.    However, SunEdison has never admitted that it relied on the Goldman Loan to pay the margin call, and for good reason – if investors had known that SunEdison could not pay off the margin call without taking out this exorbitant "emergency" loan they would have never believed the Executive Defendants' statements about the company's liquidity, or the Executive Defendants' bullish outlook for the business.

**L.      SunEdison Sells $650 Million In Preferred Stock Without Disclosing The 15%
Goldman Loan, Goldman's Resulting Conflict Of Interest, The Breach Of The
Margin Loan And Worsening Liquidity Risks To Investors**

116.      On August 17, 2015, SunEdison announced that it intended to conduct an offering
of 500,000 shares of convertible preferred securities to raise funds "for general corporate
purposes," including "funding working capital and growth initiatives." (defined above as the
"Preferred Offering").  Just one day later, on August 18, the Company announced that it had
increased the Preferred Offering to 650,000 shares, priced at $1,000 per share, to raise $650 million
in total.  That day, SunEdison filed a prospectus supplement (the "Offering Prospectus") to its
September 9, 2013 shelf registration statement filed on Form S-3 (the "Shelf Registration," and
together with the Preferred Offering Prospectus, the "Offering Documents") for the offering of
series A perpetual convertible preferred stock ("Preferred Stock").  The Preferred Offering was
underwritten by investment banks Goldman Sachs, Merrill Lynch, Deutsche Bank, Morgan
Stanley, JP Morgan, Macquarie, and MCS (the "Underwriter Defendants").

117.      The Offering Documents included numerous misstatements concerning the
Company's cash and liquidity position.  Significantly, the Offering Documents did not disclose
the Goldman Sachs Loan that was finalized on August 11, 2015 or its onerous terms.  The
Executive Defendants' (and the Underwriter Defendants') failure to disclose the Goldman Sachs
Loan is all the more alarming given that Goldman Sachs itself served as one of the lead
underwriters of the Preferred  Offering.  Indeed, Goldman Sachs undertook to sell the largest
number of shares of Preferred Stock of all of the Underwriter Defendants and received over $5
million in fees for its services.  The $169 million Goldman Sachs Loan was a "second lien" loan,
meaning that Goldman did not have a first lien on SunEdison's assets to repay the loan and would
only be repaid through the Company's ongoing operations.  Goldman Sachs was thus motivated
to induce public investors to fund SunEdison's ongoing operations in order for SunEdison to repay

62

this enormous loan.  However, notwithstanding the fact that the Offering Documents discussed numerous "Recent Developments" – including an August 17, 2015 warehouse financing agreement and an August 12, 2015 joint venture agreement with Dominion Resources – the Offering Documents did not disclose anything concerning the August 11, 2015 Goldman Sachs Loan or Goldman Sachs' conflict of interest in underwriting the offering while SunEdison was so indebted to the bank.

118.    As discussed further at Section XII below, the Preferred Offering Documents also (i) omitted to disclose the breach of the Margin Loan debt covenants that apparently occurred beginning on August 7, 2015, notwithstanding the fact that the Margin Loan was discussed at numerous points in the Offering Documents and (ii) represented that SunEdison had approximately $1 billion in cash at the DevCo, overstating SunEdison's liquidity by at least $500 million.

## IV.    Partial Disclosures, Further Misleading Statements, And The Gradual Emergence Of The Full Impact Of The Fraud

119.    Beginning on August 25, 2015 through the end of the Class Period in April 2016, the true facts concerning the financial condition of SunEdison, specifically the Company's liquidity position and debt obligations, were revealed to investors and the public.

### A.    SunEdison Admits To A Margin Call

120.    On August 25, 2015, UBS issued an analyst report downgrading SunEdison from "Buy" to "Neutral," disclosing that, in discussions with SunEdison management, Company management had admitted that a margin call had been made on the Margin Loan (the "UBS Report"). The UBS Report did not identify the size of the call, disclose the Goldman Loan, or explain how the call had been satisfied.  According to the UBS Report, SunEdison management informed UBS that it had "taken steps to restructure the loan . . . which it believes will prevent any disruptions to the business going forward."  UBS noted that investors were lacking clarity of

"simple items" such as "(1) the cash balance at the SunEdison level; . . . and (3) how much debt is actually recourse to SunEdison." UBS added, "More broadly, we see characterization of debt between recourse and non-recourse in recent disclosures as potentially reducing mgmt. credibility."

121. After UBS's downgrade, SunEdison's stock price declined 18% that day, declining from a closing price of $10.73 on August 24, 2015 to close at $8.80 on August 25, 2015.

122. At the same time, however, the UBS Report demonstrated that SunEdison had successfully reassured UBS concerning the Company's liquidity, stating that "the liquidity scare has been largely cured" and that "liquidity concerns" had been "eas[ed] for now." Indeed, the Company's statements on its previous August 6, 2015 conference call and subsequently to analysts were highly successful in mitigating any possible concerns analysts had concerning the Company's liquidity. For example, on August 31, 2015, Macquarie and JP Morgan initiated coverage on SunEdison with positive ratings. Both analysts recognized questions about SunEdison's liquidity, but concluded, based specifically on management's statements concerning the amount of cash available at the parent company, that the liquidity risks were overblown. JP Morgan stated that "[a]mid liquidity concerns, we are buyers." That same day, S&P Capital IQ issued a report maintaining its "Strong Buy" rating, noting SunEdison's "ample liquidity." On September 8, 2015, Oppenheimer also initiated coverage with a positive "Outperform" rating, stating that, "from a liquidity standpoint," SunEdison would "have the necessary powder" to close the Vivint Transaction, with "approximately $1B in parent-level cash at end-2Q[.]" Thereafter, on September 9, 2015, Janney initiated coverage with a "Buy" rating. Janney's analysis focused on "anticipated cash on the balance sheet for 2017 as the primary metric for determining DevCo value," noting that "SUNE's long term debt is largely non-recourse, making the calculation fairly simple."

**B.      Defendant Chatila Falsely Reassures The Market That "The Cash Is Coming"**

123.    On September 2, 2015, Defendant Chatila spoke with *Bloomberg* to reassure investors concerning SunEdison's positive cash-generating abilities.  The *Bloomberg* article, titled "SunEdison CEO Promises Cash Flows to Calm Investors by 2016," stated that "concerns that continuing losses will limit SunEdison's ability to raise cash for future projects helped drive the shares down 55 percent in August."  In response, Defendant Chatila was quoted as stating:

> "The most important question for investors is when do we start generating cash for a living," Chatila said at SunEdison's office in Belmont, California.  "I have said it's at the end of 2016 or early 2017.  But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015.

124.    In response to Defendant Chatila's reassurances, the price of SunEdison stock surged 11% to close at $11.94 on September 3.

125.    Defendant Chatila's statement was false.  As the *WSJ* reported on April 14, 2016, "Days earlier, an internal presentation to SunEdison's board showed the company wouldn't have positive cash flow until at least the second quarter of 2016.  Senior [SunEdison] executives read the Bloomberg story agape." (emphasis added).

**C.      Unbeknownst To Investors, The Margin Loan Becomes "Mandatorily Prepayable" And "Fundamentally Changes" SunEdison's Financial Outlook**

126.    As SunEdison only later admitted to the Bankruptcy Court on April 21, 2016, the Margin Loan was "integral to SunEdison's liquidity position" and margin calls and prepayments on the Margin Loan decimated what little cash the Company had on hand.  Specifically, and as discussed above, the Margin Loan "included provisions requiring cash collateralization and/or prepayment if the share price of TERP dropped below certain thresholds."  Although investors were not told this at the time, SunEdison later admitted to the Bankruptcy Court on April 21, 2016 that:

Beginning in September 2015, the share price of TERP fell below <u>all</u> of these thresholds, and in October 2015 the entire Margin Loan became mandatorily prepayable. This Prepayment, which amounted to $439 million, <u>drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook</u>.

127.  Under the Margin Loan agreement, if TERP stock price fell below the undisclosed TERP Stock Price Trigger in September 2015 (as SunEdison later admitted it did), SunEdison was obligated to prepay the entirety of the Margin Loan the next business day. TERP reached its then all-time low on September 29, 2015 when it closed at $14.86 – less than 50% of TERP's stock price on January 29, 2015, when the Margin Loan agreement was signed. On September 28, 2015, the parties to the Margin Agreement amended the agreement in some undisclosed fashion. However, as the Company later admitted, notwithstanding this amendment, the Margin Loan still became "mandatorily prepayable" in October. Under the terms of the Margin Loan Agreement, once the price of TERP stock tripped the TERP Stock Price Trigger, SunEdison was required to prepay "all Loans then outstanding, on or prior to the Business Day immediately following the date as of which such Common Stock Price is determined."

128.  However, as discussed below, SunEdison managed to delay full prepayment of the Margin Loan until November 20. In the meantime, on two separate critical calls with investors discussing concerns about the Margin Loan, on October 7 and November 10, Defendants Chatila and Wuebbels never disclosed this mandatory prepayment obligation, that the Company's cash reserves were (or soon would be) "drained," or that its financial outlook was "fundamentally changed."

**D.  SunEdison Announces A Significant Change In Business Model And The Executive Defendants Make Additional False Statements**

129.  On October 5, 2015, the Company issued a press release titled "SunEdison Announces Global Initiative To Optimally Position The Company For Long Term Profitable

66

Growth," and announced that the Company was embarking on a restructuring effort "to optimize business operations" and "accelerate cash flow positive operations." The Company's "restructuring" entailed "a workforce reduction of approximately 15% of the Company's global workforce." Defendants Chatila and Wuebbels held a conference call with investors on October 7, before the market opened, to discuss the Company's new plan. On that call, Defendant Chatila stated that "<u>our business fundamentals remain strong</u>" and SunEdison "remains <u>well capitalized with adequate liquidity</u> and the new optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the business, including acquisitions and converts."

130. During the call, the Executive Defendants made a number of specific – and false – statements to reassure investors concerning SunEdison's financial position.

131. <u>First</u>, Defendant Wuebbels addressed concerns regarding the Margin Loan, disclosing that the Company had suffered a margin call during the third quarter and that the Company had placed $152 million in cash in escrow to satisfy the margin call. However, Defendant Wuebbels reassured investors that there would not be a further margin call forthcoming, stating that "we did complete an amendment with the existing bank group on the loan to adjust the triggers to a point that is significantly below the current market price [of TERP stock]." This statement was false. As an initial matter, as investors later learned in November, SunEdison suffered (at least) another margin call of $91 million in October 2015. However, between the time that Defendant Wuebbels made his claim and before the Company admitted to a further margin call on November 10, the price of TERP stock price never dipped below the price of $17.88 that TERP had closed at on October 6 (with the single negligible exception of October 27, 2015, when it closed at $17.64). Indeed, the low of TERP's stock before the conference call occurred on September 29, 2015, seven days before the call, when TERP's stock closed at $14.16 per share.

Thus, either the Company did not "adjust the triggers to a point that is significantly below the current market price [of TERP stock]" or it had already suffered the second margin call and failed to disclose that fact on the October 7, 2015 call.

132.   Even more significantly, as discussed above, and as SunEdison later admitted to the Bankruptcy Court, by this time all of the covenants in the Margin Loan agreement had been tripped, including the TERP Stock Price Trigger, which required immediate mandatory prepayment.  However, the Executive Defendants did not disclose that the Margin Loan had come fully due and that the Company's financial outlook had "fundamentally changed" as a result.

133.   Second, Defendant Wuebbels sought to reassure investors regarding the Company's cash position, providing a "preliminary flash view" of the Company's cash positions at the end of the third quarter for the DevCo.  According to Wuebbels, the DevCo held $1.4 billion at the end of the quarter, an increase of $900 million from the end of the second quarter, due in part to the $650 million Preferred Offering in August 2015.  As discussed above, as the *WSJ* later reported, this number was materially misleading as it consisted in part of a $500 million credit facility that SunEdison could not access.

134.   Third, analysts questioned Defendant Chatila on October 7, 2015 concerning an article published in the *WSJ* the day before disclosing that SunEdison had called off the acquisition of LAP that had been announced months before.  The *WSJ* article contained a claim from "people familiar with the matter" that SunEdison had failed to make a $400 million upfront cash payment necessary to close the deal.  Defendant Chatila rejected that claim, stating instead that "we're really disappointed with the result. We're still committed to Latin America … The seller there did not satisfy the condition's precedent, the closing of the share purchase agreement. So instead of trying to fix it, remedying it, we're saying that the agreement is terminated."  As discussed below,

investors later learned that this, too, was false – SunEdison's undisclosed inability to make the upfront cash payments was the reason the LAP deal fell through.

135.    Again, analysts reacted favorably to the false and misleading remarks made by the Executive Defendants on the October 7 conference call.  Deutsche Bank wrote in an October 7, 2015 note that the "Update Call Provides Key Details/Path Forward … Margin Loan has been restructured following a margin call of ~$152M of cash …  Margin call triggers are now well below current TERP trading levels."  That same day, Oppenheimer wrote that the call "addresse[d] key concerns" and that they "ongoing cash flow and bankruptcy concern looks overblown to us. With $1.38B in cash on hand exiting 3Q:15 . . . we believe the company is well positioned to manage its debt load."  JP Morgan repeated its initial reaction that the restructuring was "positive," and specifically noted Defendant Wuebbels' statements concerning the $1.4 billion of liquidity. RBC Capital Markets noted that the Company supposedly provided "[c]lear visibility into capital requirement" with its announcement of "~$1.4B cash at the end of Q3."  That same day, S&P Capital IQ explained its "Strong Buy" recommendation for SunEdison in part by noting, "[w]e believe capital needs through 2016 are met, note cash of $1.38 billion, and positively view operating expense reductions."  SunEdison's stock price shot up following the conference call, from a close of $8.69 on October 6, 2015, to close at $9.72 on October 7, 2015 – an increase of over 11%.

136.    Defendant Chatila acknowledged on the call that SunEdison had been criticized for a lack of transparency, admitting that "SunEdison's P&L and balance sheet are hard to read and we fully recognize that," and stating that the company would "improve our investor disclosure, reporting and transparency to shed light on the quality of our business."

**E.**   **YieldCo Senior Executives Raise Internal Concerns About "The Accuracy Of SunEdison's Public Statements Regarding Its Financial Condition"**

137.   As only later divulged in the Global Complaint, in late October, SunEdison told Global's CFO Alex Hernandez ("Hernandez") "that <u>SunEdison had a short-term need for additional cash.</u>"  As a result, SunEdison asked its yieldco Global to agree to pre-pay for the acquisition of certain solar projects in India (the "India Projects") in order to help smooth over SunEdison's cash flow difficulties.  After consideration, Global refused because the projects were not ready to be dropped down to Global.

138.   In light of the significant contrast between the Executive Defendants' positive, public statements regarding SunEdison's cash position and this internal admission that SunEdison was experiencing a cash shortage, Hernandez, along with Global's CEO Carlos Domenech Zornoza ("Domenech") and Global's Chief Operation Officer Perez Gundin ("Gundin") immediately "<u>raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition</u>."  As discussed below, these concerns forced SunEdison's Board to initiate an internal Audit Committee investigation into SunEdison's and the Executive Defendants' public statements, which was not disclosed until months later.

139.   At the same time, Defendant Chatila was secretly seeking assistance in obtaining funding necessary to close the Vivint Transaction.  According to a complaint Vivint later filed in March 2016 in the Delaware Chancery Court seeking damages from SunEdison for failing to close the Vivint Transaction (the "Vivint Suit"), by "late October" SunEdison had failed to satisfy the SEC filing requirements contemplated under the Vivint Transaction.  At that time, Defendant Chatila "asked [Vivint's CEO] for help in seeking financing from the Blackstone Group to help redress some of SunEdison's own capital issues."

**F.     The Executive Defendants Disclose The Goldman Sachs Loan, Previous Payments Under The Margin Loan, And Re-Classifies Over $700 Million Of SunEdison's Debt From Non-Recourse To Recourse Debt**

140.    On November 9, 2015, after the close of markets, SunEdison filed its third quarter 2015 financial results on Form 10-Q (the "November 9, 2015 10-Q").  The November 9, 2015 Form 10-Q revealed a number of devastating facts concerning SunEdison's financial condition, while at the same time continuing to conceal the full extent of the truth through the issuance of additional materially false and misleading statements and omissions.  First, the Company, for the first time, revealed the terms of the Goldman Sachs Loan to investors.  Specifically, the Company disclosed:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs"), providing for a term loan maturing on August 11, 2016, in an aggregate principal amount of $169 million.  As of September 30, 2015, the current interest rate on the Term Loan is 9.25% … We paid fees of $9 million upon entry into the Second Lien Term Loan which were recognized as deferred financing costs.

141.    This admission directly contradicted the Company's previous statements made in SunEdison's August 6, 2015 10-Q that the company's "liquidity will be sufficient to support our operations for the next twelve months" and that the company's available "cash on hand" would "meet [SunEdison's] capital needs for the remainder of 2015" as well Defendant Wuebbels' statement made during the August 6, 2015 conference call with investors, when he stated that "we don't see any additional financings to be able to achieve this growth."   The fact that just five days after that August call SunEdison was forced to borrow money from Goldman Sachs to pay down the Margin Loan at an exorbitant rate of over 15% establishes that the Company's existing liquidity was not sufficient to support its operations for the next twelve months and meet its capital needs for the remainder of 2015.

142.  <u>Second</u>, SunEdison disclosed that it had been required to deposit an <u>additional</u> $91 million in cash collateral on the Margin Loan in October 2015.  In other words, SunEdison disclosed a second margin call, over and above the $152 million call that was revealed on October 7, 2015.  As discussed above, this revealed that the Executive Defendants' statements on the October 7 conference call concerning an amendment to the Margin Loan agreement were false.

143.  <u>Third</u>, SunEdison also disclosed, by way of a footnote in the November 9, 2015 10-Q and an adjustment in the Company's investor presentation, that it had reclassified the $740 million of debt under the Margin Loan and Exchangeable Notes from non-recourse to recourse debt, meaning that lenders could now recover those loans directly from the Company.

144.  Analysts were dismayed by the Company's disclosures.  On November 11, 2015, Axiom Capital Management ("Axiom") issued a report concerning the Company's November 9, 2015 disclosures, excoriating SunEdison and explaining that these disclosures had shown that SunEdison's management credibility was "impaired."  Concerning the Goldman Sachs Loan, the Axiom analyst stated: "SUNE's decision to borrow $169 million in 1yr paper from Goldman Sachs … at a 15.4% interest rate" – including a $9 million prepayment – pointed to "<u>emergency cash needs</u>," as no borrower would be forced to take out a loan on such terms other than a "<u>distressed company</u>."  Likewise, in a report dated November 13, 2015, UBS recognized the extraordinary terms of the Goldman Sachs Loan when it wrote, "the latest disclosure of a 9.25% second lien term loan of $169 Mn from GS for a tenor of just 1-year issued on August 11th (SUNE was at ~$14/sh), with a 5.3% origination cost. We note the limited liquidity raised for such a short period is unusual" and that the August 11, 2016 maturity date of the loan was "curious … given the short maturity and high coupon/origination fees involved."  UBS also recognized SunEdison's re-classification of its recourse debt as a "salient update[]."  Similarly, in a November 18, 2015 report UBS raised

significant concerns about the Company's financial position, lowering its price target 50%, down $3.00 from a previous price target of $6.00 to $3.00 and noting that this lowering included the result of "[A]dding the new term loan: -$0.50/sh for the -$169M Goldman term loan at an expensive 9.25% taken out in August as disclosed in the most recent 10Q."

145.    The market reacted swiftly to SunEdison's disclosures.  Following the Company's partial disclosures concerning its debt and liquidity position, SunEdison shares plunged over 22%, falling from $7.40 per share on November 9, 2015 to close at $5.77 per share on November 10, 2015 on extremely high trading volume.

146.    Nonetheless, the Executive Defendants continued to make materially false and misleading statements, downplaying the Company's true, deteriorating liquidity position, and in the process mitigating the decline in its stock.  For example, in its November 9, 2015 Form 10-Q, the Company stated that it "had access to $1.3 billion in cash and cash equivalents," that "while we continue to incur significant indebtedness to fund our operations and acquisitions and have significant pending obligations, we believe that the sources of liquidity … will be sufficient to support our operations for the next twelve months."  Similarly, on the Company's conference call with investors discussing SunEdison's third quarter 2015 financial results, held on November 10, 2015, Defendants Wuebbels stated, "we have sufficient liquidity at the Devco, with approximately $1.4 billion as of the end of the quarter," and "we feel very comfortable that we have sufficient offtake capital in place for next year."

147.    As discussed herein, these statements were false, in part because the Executive included the Inaccessible Warehouse Facility in this figure.  In fact, the *WSJ* later reported on April 14, 2016 that, at the same time that the Executive Defendants claimed that SunEdison had $1.4 billion in available liquidity, an internal non-public report circulated within SunEdison that day

that showed that the Company had only <u>$90 million</u> in available cash.   According to the *WSJ*, discrepancies between the Company's public statements about its liquidity and its internal figures so troubled senior SunEdison officials that they raised these concerns directly to the Company's Board of Directors.  They told the Board that "<u>SunEdison was running out of money and wasn't being honest with investors about its financial problems</u>."  As the article explained:

> The $1.4 billion figure, the executives argued, included cash dedicated to individual projects for construction or interest payments. It also included a special financing facility that could only be tapped by pledging power projects as collateral [defined above as the "Inaccessible Warehouse Facility"]. Few of SunEdison's projects were good fits for the terms of the facility.

> In short, the executives said, SunEdison was misrepresenting its liquidity, counting cash it knew it couldn't realistically touch. They urged the board to fire Mr. Chatila and try to raise capital. Several SunEdison directors said they would investigate, the people said.

148.   As discussed above, this was in addition to the concerns raised by YieldCo executives Hernandez, Domenech, and Gundin.

149.   Unbeknownst to investors, at this same time, the Company was secretly defaulting on its obligations to make payments on the First Wind acquisition.  As discussed above, even after the First Wind acquisition closed, SunEdison owed $510 million in "earnout" payments as First Wind completed pending projects.  According to a complaint filed by D.E. Shaw Composite Holdings (as representatives for the sellers in the First Wind acquisition), "[d]uring the fall of 2015, SunEdison failed to timely make [e]arnout [p]roject [p]ayments, and indicated that it would not comply with its obligations to timely make payments as and when they came due in the future."  In response to this notification, the sellers issued a letter on November 18, 2015 objecting to SunEdison's stated intent to breach the agreement.  SunEdison never made the required earnout payments to the First Wind sellers.

150.    Notwithstanding the negative disclosures SunEdison made concerning the Goldman Sachs Loan, Margin Loan, and debt categorization, the Executive Defendants' materially false and misleading statements concerning the Company's liquidity reassured analysts.  For example, Oppenheimer, in a report dated November 10, 2015, stated that SunEdison would be able "to generate positive cash flow at the devco level in 1H16," that "SUNE's 2016 capital plan looks to be on solid footing" and that "We see SUNE positioning to become the leading global diversified renewables platform in what we expect will be a robust market for renewable energy.  We believe the recent sell-off belies the profit potential of SUNE's core development engine."  Similarly, in a report dated November 10, 2015 S&P Capital IQ wrote that: "We believe capital needs through 2016 are met, note cash of about $1.4 billion, and positively view operating expense reductions … We think SUNE's growth prospects remain robust and we see significant cash flow potential in the future."  Likewise, Deutsche Bank, in a report dated November 16, 2015 expressed confidence in the Company's liquidity position when it wrote: "We have received a significant number of investor questions on SUNE's liquidity situation following Q3 results. Based on analysis of the recent filings and guidance, we do not foresee any liquidity event and reiterate Buy on weakness."

### G.    The Executive Defendants Issue False Statements During A Deutsche Bank Investor Meeting

151.    In addition to their false statements made during formal investor conference calls, the Executive Defendants sought to influence market opinion through direct meetings with analysts, where they continued to issue materially false and misleading statements.  For example, on November 18, 2015, the Executive Defendants took part in an investor meeting with Deutsche Bank in which SunEdison management answered multiple questions concerning issues that were raising doubt in investors' minds as to management's credibility.

152.   <u>First</u>, Defendants claimed that the Margin Loan "became" a recourse loan when the Company had to post collateral during the third quarter.  Given the critical nature of this classification, and the fact that the Company was always responsible for its payment if TERP stock declined in value, Defendants' explanation actually makes it clear that the Margin Loan was always recourse under the Company's standards and should have been categorized as such. Similarly, their claim to Deutsche Bank that it was a simple "clerical error" to label the Exchangeable Notes as non-recourse was nonsense in light of the highly material and repeated nature of that "clerical error."

153.   <u>Second</u>, in response to the question of "How much cash does the company really have?" SunEdison claimed to have "roughly $1.35b of cash with about $700m of that cash held in project companies earmarked for working capital purposes. Timing of cash movements and the fact that SUNE gets EPC margin from these projects means that the cash can be utilized for other capital needs."  As discussed above, this statement was false.

154.   <u>Finally</u>, in response to the question of why the Company would ever borrow money at a nearly 10% coupon from Goldman Sachs (with an exorbitant initial fee), the Executive Defendants claimed that it "was structured <u>in July</u> as part of the portfolio formation for Global IPO. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects."  As discussed above, the evidence indicates that this was false. Instead, the company used the proceeds from the emergency Goldman Sachs Loan to fund the devastating margin calls it experienced during the third quarter.  Nonetheless, the admission that the Goldman Sachs Loan had been started in July further demonstrates the falsity of the Executive Defendants' statements on August 6, 2015 that the Company did not see the need for any additional financings to achieve its plans.

155.     Given the Executive Defendants' continued false and misleading claims, however, Deutsche Bank concluded, "we continue to believe liquidity concerns are overdone and the execution on pending transactions along with refinancing of margin loan could act as positive catalyst for shares."

### H.     To Avoid Default, SunEdison Overthrows The Board And Management Of Its YieldCos In Order To Loot TerraForm Global Of The Funds Necessary To Pay Off The Margin Loan

156.     While the Margin Loan became mandatorily pre-payable in October, the Company managed to delay full payment until November.  In connection with a November 17, 2015 amendment to the Margin Loan agreement (disclosed November 23), SunEdison paid a total of $328 million in loan payments and transaction fees, further exacerbating the Company's already hobbled cash position.  However, as later detailed in the Global Complaint, "SunEdison had until November 20, 2015 at 3PM to pay the final $100 million balance on the Margin Loan.  If the Company did not make that final payment, the entire Margin Loan balance became immediately due and payable and would cause the cross default of SunEdison's nearly $8 billion in debt."

157.     Scrambling for cash, SunEdison went to the banks.  However, SunEdison was unable to complete such refinancing.  Instead, SunEdison was still faced with its November 20, 2015 deadline or else face a default of cataclysmic proportions.

158.     Unable to get the required financing from the banks, SunEdison turned to the YieldCos – including Domenech and Hernandez, discussed above – for the remaining $100 million balance.  On November 18, 2015, Global's senior management learned that SunEdison needed to obtain cash to repay the Margin Loan, or SunEdison would go into default.  On that day, the YieldCos' Corporate Governance and Conflicts Committee ("Conflicts Committee") assembled to discuss the issue.  Global and TERP each had a three-person Conflicts Committee, comprised of the same three independent directors.  At the time, the Conflicts Committee was made up of Mark

Florian ("Florian"), Mark Lerdal ("Lerdal"), and Hanif Dahya ("Dahya"). The stated purpose of the Conflicts Committee was to review transactions between Global or TERP and SunEdison in order to maintain the YieldCos' independence from SunEdison and protect the interests of the YieldCos' public shareholders.

159.    The Conflicts Committee determined that they could not make the $100 million available to SunEdison. According to the Global Complaint, on November 18, 2015, the Conflicts Committee reviewed with their legal and financial advisors a variety of potential alternatives for making $100 million available to SunEdison. However, the Conflicts Committee concluded it could not execute any of these transactions by the November 20, 2015 default deadline, because SunEdison would not agree to governance changes that would reduce SunEdison's control over the YieldCos as part of any deal.

160.    In response to the Conflicts Committee's rejection, SunEdison took desperate action later referred to as the "Friday Night Massacre." On the very day of the default deadline, November 20, 2015, Defendant Chatila, Wuebbels and Martin H. Truong ("Truong"), the Company's Senior Vice President, General Counsel and Corporate Secretary, seized control of SunEdison's affiliates by reconstituting the YieldCos' boards.

161.    On November 19, 2015, SunEdison's Board of Directors called for meetings on November 20 of the YieldCos' Boards of Directors in order to fire the YieldCos' CEO and CFO, and to replace all of the members of the Conflicts Committee. SunEdison replaced the Conflicts Committee members with Director Defendant Blackmore, who resigned from the SunEdison Board of Directors after a nine-year tenure in order to take the leadership role at Global and TERP; Christopher Compton; and Jack F. Jenkins-Stark, who was CFO of Imergy Energy Systems, a company with which SunEdison had significant business interests.

162.    Defendant Chatila also called meetings of the YieldCos' reconstituted Boards for November 20 at 2pm.  He did not circulate an agenda, and he did not invite the secretaries for the YieldCos, who also acted as general counsels to the YieldCos.

163.    According to the Global Complaint, early on November 20, SunEdison executives – including Defendant Wuebbels and Truong – "provided a false, misleading and one-sided recitation" of the SunEdison's purpose in reconstituting the YieldCos' Management and Boards to Blackmore, Compton, and Jenkins-Stark, who were about to be appointed to the YieldCo Boards.  They did not advise the new directors of their efforts to negotiate a transaction with Global management that would allow SunEdison to make its payment on the Margin Loan.  Instead, the Executive Defendants told the directors that SunEdison needed a new Conflicts Committee in order to make a decision on the Vivint Transaction (which the former Conflicts Committee purportedly was unable to make), and that Global needed to prepay its planned purchase of the India Projects, or the projects "would be lost."

164.    SunEdison then: (i) reconstituted the Conflicts Committee with Blackmore, Compton, and Jenkins-Stark; (ii) terminated Domenech as CEO of the YieldCos; (iii) terminated Hernandez as CFO of the YieldCos; and (iv) appointed Defendant Wuebbels as the YieldCos' CEO.  In response, Gundin immediately resigned, as did former Conflicts Committee members Lerdal and Florian.

165.    SunEdison was running out of time – and it needed to act fast.  Beginning at 2:00 p.m. on November 20, 2015, just one hour before the default deadline, the newly constituted YieldCo boards and Conflict Committees met in rapid succession to approve the firing of Domenech and Hernandez – the senior executives who had raised concerns about Chatila's and

Wuebbels' public statements just weeks prior – and to approve Defendant Wuebbels' appointments as the CEO of YieldCos.

166.    With the YieldCos' senior management out of the way, the Executive Defendants could then convince the new Conflicts Committee, unaware of the real reason the Company needed Global's cash, to approve the transaction purportedly to purchase the India Projects.  Between approximately 2:15 and 2:40 pm, just twenty minutes before the default deadline, the newly appointed Conflicts Committee met telephonically to discuss the "India Projects." Defendant Wuebbels led the discussion, explaining to the new directors that the $100 million transaction from Global to SunEdison was essential funding for the continued development of the India Projects. During the meeting, Wuebbels told the Conflicts Committee that, if the funding did not occur immediately, SunEdison would lose the India Projects altogether, and Global would not have any opportunity to acquire the India Projects.  The Conflicts Committee did not have their own legal counsel or a financial advisor.  Truong "purported to act as [the meeting's] secretary and led [the new Conflicts Committee] to believe that he was acting as the Committee's Counsel, including by purporting to offer legal advice in response to a question from the Committee regarding Delaware law."

167.    The SunEdison representatives at this meeting — Wuebbels and Truong — did not disclose SunEdison's imminent default on the Margin Loan to the Conflicts Committee.  Instead, according to SunEdison's own subsidiary and Director Defendant Blackmore in the Global Complaint, Defendant Wuebbels "made the intentionally misleading statement that Global's advancement of the $231 million India project purchase price was essential to secure – and would secure – Global's ability to acquire those assets."

80

168.    Wuebbels, Truong, and Parikh provided the Conflicts Committee with a summary of a draft of a purchase and sale agreement ("PSA") that Parikh had previously prepared in anticipation of this meeting.  The draft PSA contemplated that the $231 million pre-payment would be split into two parts: a first installment of $150 million, and a second of $81 million to be paid within three business days.  Truong also provided the Committee with a summary presentation that showed, among other things, a schedule providing that SunEdison would "drop down" the India assets to Global in the near term, with the total value of the assets being almost $600 million. Truong's presentation forecasted that even under the most conservative assumptions, each of the assets would generate an internal rate of return of at least 9% – a very lucrative return.

169.    SunEdison's coup was successful.   The Conflicts Committee, based on SunEdison's pretextual reason for the transaction and its failure to disclose its desperate liquidity crisis, agreed to buy the India Projects from SunEdison for $231 million.  With the votes of the SunEdison-appointed directors, Global's Board agreed that Global would make an immediate upfront payment of $150 million on the transaction, even though material terms of the agreement were still being negotiated and the agreement was subject to cancellation if the agreement could not be reached.

170.    Minutes after the Conflicts Committee approved the transaction, Defendant Wuebbels emailed SunEdison personnel, including Defendant Chatila and Truong, stating that "we are approved by the Independent Cmte."  Wuebbels then caused $150 million to be wired from Global's bank account to SunEdison. SunEdison used the funds extracted from Global, not for the India Projects, but to pay off the Margin Loan <u>mere minutes</u> before the 3PM default deadline.  In addition to paying down the Margin Loan, SunEdison also used the Global money to pay a

$760,000 American Express bill and $7 million bill to SunEdison's lawyers (and now bankruptcy counsel) Skadden, Arps, Slate, Meagher & Flom LLP.

171.    In his resignation letter later made public (though not at the time), Lerdal wrote:

I am resigning from the Board of Directors of both the above referenced companies effective immediately. The respective Conflicts Committees, as constituted before today, together with independent advisors, had been working hard and in good faith to protect the interests of the stockholders of the two companies. As a result of today's actions of each of the Boards, I don't believe I will be able to do so going forward and therefore resign.

172.    Similarly, Florian wrote:

I am resigning from the Board of Directors of both TerraForm Power and TerraForm Global effective immediately. As an independent director, I have been working hard and in good faith to protect the interests of the stockholders. As a result of the Board's actions today, I do not believe I will be able to do so going forward and therefore resign.

173.    Notably, TERP's shareholders later sued in the Delaware Court of Chancery to enjoin the closing of the Vivint transaction (the "TERP Derivative Suit").  As revealed during a February 16, 2016 oral argument in the TERP Derivative Suit discussing internal confidential TERP and SunEdison documents from November 2015, the shareholder attorneys noted that, by November 19, 2015, SunEdison was "actively exploring bankruptcy" and that TERP's financial advisor, Lazard, told TERP that "there was a real insolvency risk" if SunEdison did not obtain the funds from the YieldCos to pay off the Margin Loan.  Indeed, members of the TERP board of directors believed at the time that they had a strong position to re-negotiate the unfavorable Take-Pay portion of the Vivint Transaction.  According to minutes from a November 17, 2015 TERP Conflicts Committee meeting, read into the record during the Chancery Court oral argument:

This discussion made clear the importance of understanding the liquidity situation of SunEdison and the impact o[n] [TERP] of an insolvency. . . The directors observed that depending on the facts, the Committee may have more or less negotiating leverage against SunEdison, but they suspected that the Committee did have some real leverage to get meaningful concessions from SunEdison to benefit [TERP].

In the Executive Defendants' public statements on November 10, 2015 – just days before these discussions – and in the days following this meeting, did not disclose, and in fact actively concealed, that SunEdison was "actively exploring bankruptcy" or that "there was a real insolvency risk."

174.    After the overthrow of the YieldCos, SunEdison and the Executive Defendants went on a public relations offensive to portray their actions as a positive "win-win" for SunEdison shareholders.  The Executive Defendants' public statements made in support of this effort were materially misleading.  First, in two separate announcements on November 23 and 24, 2015, SunEdison announced that it had prepaid all but $5 million of the Margin Loan.  SunEdison did not disclose the highly material information concerning the desperate and deceitful maneuvers the Executive Defendants undertook to obtain the funds in order to make this early prepayment, or that SunEdison had been under an obligation to mandatorily prepay the loan since October.

175.    Second, on November 23, 2015, SunEdison and the Executive Defendants, as well as Director Blackmore (who has since sued SunEdison for fraud), announced the management changes at the YieldCos as a positive step to "drive organizational alignment."  In the press release announcing the change, Blackmore claimed, "The changes we announced today will both streamline our operations from a management perspective and create checks and balances at the board level."  Nowhere in any of these partial disclosures did the Executive Defendants provide the actual reason for the SunEdison-manipulated corporate reorganization: that SunEdison, teetering on the brink of default, used its power over the YieldCos to loot Global of its cash in order pay down the Margin Loan, with only minutes to spare before triggering default.

176.    Third, the Executive Defendants issued yet another press release on November 24 touting the agreement with Global to buy the India Projects.  In the press release, Defendant

Wuebbels stated that "[w]e are pleased to be able to add these accretive assets with 20 year contracted cash flows to TerraForm Global's portfolio and believe they are critical to achieving our 2016 dividend guidance."   In that same press release, Defendant Chatila stated: "This agreement is a win-win for both SunEdison and TerraForm Global shareholders. This transaction provides accretive [dividend-per-share] to TerraForm Global shareholders."  This statement was false and misleading because, as Global would later learn, the India Projects were far from complete and ready to be dropped down to provide accretive dividends-per-share – indeed, TerraForm Global would be forced to invest another $73 million just to obtain the India projects.

177.    The Executive Defendants' public relations campaign worked.  SunEdison's stock price shot up 46%, from a close of $2.82 on November 20, 2015 to close at $4.12 on November 24, 2015.  Analysts wrote favorably about the series of announcements.  J.P. Morgan, in a report dated November 23, 2015 stated in response to SunEdison's management re-organization of its YieldCos: "SUNE, TERP and GLBL announced leadership changes that appear to streamline operations at the executive level across the three companies, while preserving governance checks and balances to some extent. At this point, we believe the changes signal a commitment to a back-to-basics GP/YieldCo business model, with focus on organic growth at a prudent pace."  In regards to SunEdison's statements concerning its $243 million payment of the Margin Loan on November 17, 2015, RBC Capital Markets was reassured by the Company's statements and in no way understood that the payment was a result of the Company's tripping the Margin Value Trigger or defrauding its own YieldCo.  In a report dated November 23, 2015, RBC Capital Markets stated: "We believe the filing demonstrates certain progress that SUNE has made in negotiating and restructuring certain obligations to improve its liquidity position."  And as to the Company's $95 million payment on the Margin Loan on November 20, 2015, analysts were also reassured by the

Executive Defendants statements, with Deutsche Bank, in a report dated November 24, 2015, stating: "We view these announcements as a positive for SUNE and TERP shareholders as it removes the margin loan overhang, which had caused technical pressure over the last several months.  Furthermore, the sale of ~425MW of Indian assets suggests that SUNE is effectively leveraging its GLBL yieldco to free up cash and deleverage the balance sheet."  Likewise, RBC Capital Markets, in a report dated November 24, 2015, also believed the Executive Defendants' statements concerning the payment of the Margin Loan and the project sales to Global as positive for the Company, stating: "We expect investors to react positively to the announcements as the Margin Loan was among several concerns investors had on the liquidity position, and the sales of Indian projects help to boost cash position."

178.    Following the events described above, the newly constituted Conflicts Committee also undertook to consider the renegotiation of the Vivint Transaction over a series of meetings. As set forth in Delaware Court of Chancery Vice Chancellor Bouchard's February 25, 2016 oral opinion in the TERP Derivative Action, SunEdison continued to exert a secret and improper role on those considerations.  Specifically, the Conflicts Committee retained an attorney, Andrew Hulsh, to advise the committee beginning around November 20, 2015.   Even as Hulsh was advising the Committee, "Hulsh appears to have been collaborating with SunEdison, communicating about the committee's process with Rik Gadhia, vice president of corporate development and M&A at SunEdison, in what seems to have been an attempt to build professional goodwill with Gadhia for Hulsh's personal benefit but to the detriment of his client."  According to Vice Chancellor Bouchard, "[t]his conduct was inexcusable.  Indeed, the parties do not dispute that this behavior was unacceptable[.]"  Vice Chancellor Bouchard reiterated that "[e]qually troubling are the circumstances surrounding the involvement of Mr. Hulsh in this process, who

actively participated in the new committee's meetings while appearing to pursue a personal agenda that was at odds with his obligations to his client."  By December 9, 2015, with the "tainting presence" of Hulsh at the majority of the committee meetings, TERP and SunEdison signed the amended agreement for the Vivint Transaction.  As set forth below, SunEdison's liquidity constraints were so dire that even this renegotiated deal was insufficient and SunEdison would not be able to close the Vivint Transaction.

## I.   Due To Its Liquidity Shortfall, SunEdison Fails To Make Payments and Abandons Or Delays Projects, The Executive Defendants Mislead Investors And Lenders About The Company's Cash In a Company Presentation, And The Company Issues Additional Debt

179.   SunEdison's liquidity problems were not resolved by the emergency payments on the Margin Loan or the raiding of Global's coffers.  SunEdison was forced to abandon or significantly modify numerous acquisitions to account for the Company's continuing cash shortfalls. For example, on December 2, 2015, SunEdison announced that it had abandoned its deal to buy an approximately 16% stake in Renova Energia S.A. ("Renova") from Light Energia S.A. This resulted in the termination of another agreement between Global and Renova pursuant to which Global had committed to acquire twelve Brazilian wind and hydro-electric projects between 2016 and 2020.  Similarly, on December 9, 2015, SunEdison announced revised terms to the Vivint Transaction.  Under the new terms, SunEdison's price for the deal was reduced by 38.4% from the original $16.50 to $10.1.16 per Vivint share.  As the Company admitted, these renegotiated terms served to "help improve liquidity for SunEdison."

180.   The abandonment or delay of these projects could not, however, solve the Company's liquidity crisis, and, during December 2015, the Company was in dire need of financing.  Accordingly, in December 2015, SunEdison sought to borrow additional money.  In order to do so, as the *WSJ* later reported, Defendants Chatila and Wuebbels misled potential

financers – and the Company's investors – concerning the Company's prospects for its Services Business.  According to the April 14, 2016 *WSJ* article discussed above, Defendant Chatila and Wuebbels showed to potential lenders presentations that touted financial projections that differed sharply from figures prepared by senior Company managers just a few weeks earlier.

181.    Indeed, as the *WSJ* reported, a 2016 internal budget prepared in mid-November for SunEdison's Services Business projected a $21 million profit on $133 million in revenue, a margin of about 16%.  In contrast, the figures in the presentation to lenders – later posted on SunEdison's website and made available to investors – called for a profit for those businesses of $99 million on $238 million in revenue with a 42% margin.  SunEdison posted even more optimistic forecasts for its Services Business on its website on December 24, 2015 as a "Business Update Presentation." In that document, SunEdison called for a 2016 profit of $235 million on revenue of $443 million – a margin of 53%.  That slide is set forth below:

## Services Business Valuation Forecasts

| ($ in millions) | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 2016 |
|---|---|---|---|---|---|
| O&M Revenue | 21 | 22 | 24 | 24 | 92 |
| IPP PPA Revenue | 34 | 34 | 34 | 33 | 134 |
| SLB PPA Revenue | 18 | 18 | 18 | 18 | 72 |
| 3rd Party O&M Revenue | 23 | 30 | 41 | 52 | 146 |
| **Total Revenue** | **96** | **104** | **116** | **128** | **443** |
| O&M Costs | 15 | 16 | 17 | 17 | 64 |
| IPP Costs | 6 | 6 | 6 | 6 | 22 |
| SLB Costs | 12 | 12 | 12 | 12 | 47 |
| 3rd Party Costs | 9 | 16 | 21 | 29 | 74 |
| **Total Costs** | **41** | **49** | **55** | **63** | **208** |
| *% of sales* | *43%* | *47%* | *47%* | *49%* | *47%* |
| O&M Profit | 6 | 7 | 7 | 7 | 28 |
| IPP Gross Profit | 28 | 28 | 28 | 28 | 112 |
| SLB Gross Profit | 6 | 6 | 6 | 6 | 24 |
| 3rd Party Gross Profit | 14 | 14 | 20 | 24 | 71 |
| **Total Gross Profit** | **54** | **55** | **61** | **65** | **235** |
| *% margin* | *57%* | *53%* | *53%* | *51%* | *53%* |
| OpEx | (3) | (3) | (3) | (3) | (12) |
| *% of sales* | *3%* | *3%* | *3%* | *2%* | *3%* |
| **EBITDA** | **51** | **51** | **58** | **62** | **223** |
| *% margin* | *54%* | *50%* | *50%* | *49%* | *50%* |

**Comps' 2016 median EBITDA multiple: 11.5x**

**Valuation multiple for Services business: 10.0x**

**Enterprise value: $2,231m**

Note: Comps multiples based off market data as of 12/9/2015
Services EBITDA does not include standalone corporate costs

P. 11

SunEdison®

182.    SunEdison's false financial figures were successful in helping the Company obtain $725 million in funding.  Even though the Company was able to secure this financing, it was only able to do so by significantly diluting current shareholders.

183.    Analysts were dismayed by this news, as it was seen by investors as confirmation of the Company's liquidity crisis and typical of the SunEdison's overly complex financial engineering that offered little true insight to investors.  For example, in a report dated January 7, 2016, JP Morgan commented on the transactions, noting the high price SunEdison paid for the debt as, "[T]he refinanced debt carries a high LIBOR+ 10% interest rate and shareholders are being diluted in exchange for debt relief," while also noting the Company's poor liquidity position as the "[t]ransactions result in a projected low-point of $619mm in available cash as of 4Q15," $563

million of which was already committed for project construction."   Indeed, a Seeking Alpha commentator stated: "the details of today's transaction clearly show SunEdison's desperation."

184.     The market reacted swiftly and negatively to the disclosures.  As a result of this news, the price of SunEdison's common stock plunged approximately 39%, to close at $3.34 on January 7, 2016, down $2.17 from the prior day's close of $5.51 on heavy trading volume.

**J.      Latin American Power Sues SunEdison And The Court Determines That Latin American Power's Claims Established A Likelihood Of Success On The Merits**

185.     On February 10, 2016, shareholders of Latin America Power BC (as defined above as "LAP"), sued SunEdison in the Supreme Court of the State of New York.  LAP alleged that the Company "willfully breached its share purchase agreement to buy LAP for approximately $733 million … after SunEdison's stock price plummeted due to its failed business strategies and lack of liquidity."  LAP sought an order attaching assets and property in the amount of $150 million, and an injunction and temporary restraining order forbidding the concealment, transfer, or removal of any assets accounts or other property, as LAP pursued its claim against SunEdison in arbitration for $150 million.

186.     The LAP complaint detailed the behind-the-scenes facts behind SunEdison's abandonment of the LAP deal.  Although on the Company's October 7, 2015 conference call Defendant Chatila attributed the collapse of the deal to LAP's failure to satisfy the terms of the deal, the LAP complaint alleged that that it was SunEdison's then-undisclosed liquidity problems that were the problem.  Further, the LAP complaint alleges that in October 2015, SunEdison was manipulating its financial obligations to "burnish" its third quarter financial statements.  As set forth in the LAP complaint, pursuant to the purchase agreement entered into by LAP and SunEdison on May 19, 2015, SunEdison was to buy LAP for $733 million, an amount that was broken down into several payments.  The *WSJ* had reported on October 6 that SunEdison owed an

upfront payment of $400 million at closing on September 30, 2015.  However, even though by September 30, 2015, SunEdison had signed all of the closing documents, the Company failed to make a single payment to LAP and never closed the deal.

187.    Between the date of the purchase agreement in May 2015 and the scheduled date of the closing on September 30, 2015, SunEdison continued to conceal its ailing liquidity from LAP, as the Company likewise did with its investors, and reassured LAP that it would make all payments to LAP and close the deal.  For example, during a meeting held at SunEdison's offices in Bethesda, Maryland, on August 25, 2015, the Executive Defendants reassured LAP that they were committed to closing the deal and that they had the funds ready and available to close the deal.  Likewise, in numerous meetings, phone calls, and emails thereafter, the highest levels of SunEdison's management, including Defendant Chatila and Defendant Wuebbels, reassured LAP that closing was to proceed as scheduled.  On September 8, 2015, SunEdison informed LAP that the purchase agreement was "in good shape and that there was no risk on our side to not close."

188.    By this time, the Company's liquidity position was so weak that SunEdison requested from LAP an extension on its payment schedule in order to delay disclosure of that weakness to investors.  Specifically, on September 21, 2015, "in an apparent attempt to burnish the Company's third quarter end 2015 balance sheet," SunEdison requested that it could delay paying the full amount of the required payments, due on September 30, 2015, and instead defer $125 million of that amount until two days later, on October 2, 2015.  LAP granted SunEdison's request.  In so doing, SunEdison was able to overstate the amount of available cash it had available to investors when filing its Form 10-Q for the third quarter of 2015.  Even after LAP granted this extension, SunEdison still owed approximately $275 million to be paid upfront.  Under the terms of the purchase agreement, SunEdison was required to begin wiring the owed funds on September

24. According to the LAP complaint, as late as September 23, SunEdison confirmed that it would "initiate the wire" the next morning. The next day, no payments arrived. SunEdison's Vice President, Legal, told LAP that, "We are chasing down wire personnel . . .we are pushing this hard on our end." Notwithstanding these assurances, SunEdison never made any payments to LAP. As a result, LAP terminated the agreement on October 1 and initiated litigation thereafter.

189.    Just one day after LAP filed its petition seeking a temporary restraining order, on February 11, 2016, during the trading day, the court issued a temporary restraining order barring SunEdison from making any unusual transfers of its assets. By virtue of the court's granting LAP's request for a temporary restraining order against SunEdison, the court recognized that LAP's claims against the Company including SunEdison's failure to make any payments to LAP under the previous agreement demonstrated a likelihood of success on the merits.

190.    Journalists and analysts following SunEdison credited the temporary restraining order with the drop in the Company's stock that ensued. Indeed, in an article dated February 12, 2016, Business Finance News stated that "Sun Edison Inc … Crashes … as Court Blocks Asset Transfer." Similarly, Seeking Alpha wrote that same day that "SunEdison plunges below $2 in wake of restraining order."

191.    The market reacted swiftly and negatively in response to the LAP lawsuit and the court's approving the temporary restraining order against SunEdison. As a result of this news, the price of SunEdison's common stock plummeted approximately 40%, to close at $1.41 on February 12, 2016, down $0.95 from the February 10, 2016's close of $2.36 on heavy trading volume.

**K.    SunEdison And TerraForm Power Delay Filing Their Financial Results**

192.    On February 29, 2016, after the close of trading, the Company filed a Form NT 10-K stating that it would delay the filing of its Form 10-K for fiscal year ended December 31, 2015. As a reason for the delay, the Company cited "the need to complete all steps and tasks necessary

to finalize the Company's annual financial statements" and other disclosures, and "ongoing inquiries and investigations by the Audit Committee."  For the first time, the Company admitted that an internal investigation by the Audit Committee had been ongoing since at least November 2015.  Indeed, the Company admitted that <u>numerous</u> executives and employees had internally raised concerns regarding "the accuracy of the Company's anticipated financial condition."

193.   <u>First</u>, the Company disclosed that it had "initiated an inquiry in late 2015 based on allegations made by former executives of the Company concerning the accuracy of the Company's anticipated financial condition previously disclosed to the Company's Board of Directors."  As discussed above, numerous senior executives internally raised concerns regarding Defendant Chatila's and Wuebbels' statements to investors.  According to the later-filed Global Complaint, "in or about late October 2015," Domenech, Hernandez, and Perez "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition."  Then, according to the April 14 *WSJ* article, SunEdison's "senior officials" raised concerns to the SunEdison Board after the Company's November 10, 2015 investor presentation, with concerns what "SunEdison was running out of money and wasn't being honest with investors about its financial problems."

194.   <u>Second</u>, SunEdison said the Audit Committee "recently initiated an investigation concerning the accuracy of the Company's anticipated financial position <u>based on certain additional issues raised by a current and a former employee of the Company</u>."  SunEdison stated that if some or all of the allegations raised by the employees are deemed to have merit, management "<u>may be required to reassess the Company's liquidity position</u> as well as the disclosures in the Form 10-K, including whether the Company may require greater liquidity than previously anticipated and/or whether the sources are sufficient to meet its requirements."

195.    On that same day, in a Company press release, SunEdison announced that TERP would also be delaying the filing of its 2015 Form 10-K.  Both SunEdison and TERP had until March 15, 2016 to file their 2015 10-Ks.  The *WSJ* reported on March 2, 2016 that the banks providing bridge loans to SunEdison to fund the Vivint Transaction withdrew their financing commitments in light of the delay in filing SunEdison's financial statements.

196.    Analysts expressed significant concerns over the news.  For example, in a report dated February 29, 2016, Oppenheimer downgraded its rating of SunEdison and removed its price target for the Company's common stock, noting "an unclear liquidity picture and questions about financial controls" and "that either  issue could severely limit SUNE's ability to raise capital – which is core to its business model."  Likewise, on March 1, 2016, Deutsche Bank suspended its coverage of SunEdison and TerraForm, noting that "[I]n light of the recent accounting investigation, we believe the liquidity situation of the company is difficult to assess and as such we are suspending our rating on both SUNE and TERP."  Similarly, analysts commented to *Bloomberg* in a March 1, 2016 article titled "SunEdison's Financial Status Unclear to Investors, Employees" that SunEdison's financial condition, while distressed, was opaque given the Company's inadequate disclosures.  For example, Patrick Jobin of Credit Suisse Group AG stated that "It's frustrating because you can't get a grasp of what's actually happening here. . . .  I have never seen something so strange. The company's in a precarious position."  Similarly, Stifel Nicolaus & Co. analyst Sven Eenmaa told *Bloomberg* that, "[s]ince the meltdown in the stock, there's been a lot of investor questions. . . . It is pretty clear to me that the disclosures to the outside have not been sufficient. It does raise questions of internal controls."  *Bloomberg* noted that Deutsche Bank AG suspended its rating on March 1 because "the liquidity situation of the company is difficult to assess."  Axiom Capital Management Inc. similarly downgraded the

Company, stating that "We don't know for certain everything, because they don't disclose everything. . . But this is a company that's in distress."

197.    The market reacted swiftly and negatively in response to the Company's delayed filing and the disclosures concerning its internal investigation.  As a result of this news, the price of SunEdison's common stock plunged approximately 24%, to close at $1.50 on March 1, 2016, down $0.48 from the prior day's close of $1.98 on heavy trading volume.

### L.    SunEdison Suspends Dividend Payments On Preferred Stock

198.    On March 2, 2016, after the market closed, SunEdison issued a press release announcing that it had suspended payment of quarterly dividends on the Company's Preferred Stock.

199.    Analysts were dismayed by the news and understood that it was the result of the Company's liquidity crisis. In a report dated March 3, 2016, Credit Suisse noted that SunEdison's suspending its dividend payments was a "Lifeline, Disaster or Something In-between."  Likewise, in a report dated March 3, 2016, J.P. Morgan withdrew its price target for SunEdison stock and noted that the Company's suspension of dividend payments was "indicative of the firm's urgent need to retain cash."  In a March 3, 2016 report, J.P. Morgan observed that "we believe the firm's ability to pivot into a DevCo build-to-sell model in 2016 is severely compromised by the lack of liquidity, so we are trimming estimates accordingly."  Similarly, in a reported dated March 2, 2016, Macquarie Capital downgraded its rating of SunEdison from "Out Perform" to "Neutral" and stated that "SUNE's complex financial disclosures make it seemingly impossible for us to accurately assess its liquidity position, but the dividend move signals that SUNE is clearly facing a liquidity crunch."

200.    The market reacted swiftly and negatively in response to the news of the Company's suspension of its dividend program.  As a result of this news, the price of SunEdison's

common stock plunged approximately 15%, to close at $1.52 on March 3, 2016, down $0.27 from the prior day's close of $1.79 on heavy trading volume.

**M.      Defendant Wuebbels Resigns, SunEdison And TERP Once Again Delay Filing Their 2015 Financial Results And Admit To Suffering From Weaknesses In Internal Controls In Financial Reporting, And SunEdison Enters DIP Financing For Its Imminent Bankruptcy**

201.    Throughout March 2016, the troubling news continued to emerge concerning the Company, while failing to disclose the full truth of SunEdison's deteriorated financial condition and the events that led to its deteriorated state.

202.    On March 8, 2016, Vivint filed the Vivint Suit making it clear that, on February 26, 2016, Vivint had satisfied all of the conditions precedent to completing the Vivint Transaction. However, SunEdison "failed to attend closing as it was required to do" and "did not respond" to Vivint's notification that it had satisfied its contractual obligations.

203.    Then, on March 11, 2016, SunEdison announced that its CFO, Defendant Wuebbels, would resign and would be replaced by incoming "chief financial officer designee," Ilan Daskal, effective upon his start with the Company, no later than April 4, 2016.  In connection with this announcement, SunEdison stated that Wuebbels would remain SunEdison's chief financial officer until Daskal and SunEdison agreed to remove the designee title, and Wuebbels would remain President and CEO of TERP and Global.  The Company did not provide a reason for Wuebbels' departure.  However, SunEdison stated that Wuebbels was leaving SunEdison "to focus his fulltime efforts as the president and chief executive officer of TERP and TerraForm Global."  This would not be the case for very long.

204.    On March 16, 2016, SunEdison announced in a press release and Form 8-K dated that day that it would yet again be delaying the filing of its 2015 Form 10-K.  However, in this announcement, the Company reported additional and significantly troubling news.  Specifically,

the Company announced that: "The scope of work required to finalize the Company's financial statements included in the 2015 Annual Report on Form 10-K has expanded due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems." The Company, whose deadline to file its 2015 10-K was previously extended to March 15, could not provide a new target date for filing.

205.    On that same day as SunEdison's announcement, March 16, 2016, TERP announced that, like SunEdison, it too would be delaying the filing of its 2015 10-K. TERP blamed SunEdison for the delay. Specifically, TERP stated:

> Due to our management services arrangement with SunEdison … our financial reporting and control processes rely to a significant extent on SunEdison systems and personnel. As a result, if there are control deficiencies at SunEdison, including with respect to the systems we utilize, it is necessary for us to assess whether those deficiencies could affect our financial reporting and, if so, address them to the extent necessary and appropriate prior to filing our Form 10-K.

206.    In other words, TERP explained that, because SunEdison had been suffering from admitted material weaknesses in its internal controls, and TERP relied on those flawed internal controls, its own financial results could be inaccurate. TERP also admitted that it too had material weaknesses in its internal controls, stating as a reason for the company's delayed filing that "We currently have identified material weaknesses in internal controls over financial reporting primarily due to ineffective controls in relation to our Enterprise Resource Planning (ERP) systems and processes for validating revenue recognition."

207.    Then, on March 22, 2016 news sources released a bombshell report about SunEdison's crippled state of liquidity. That day, Reuters reported that "Troubled solar company SunEdison Inc. is in talks with holders of its second-lien loans to fund a debtor-in-possession ["DIP"] financing facility, Debtwire reported, citing two sources familiar with the matter. The

talks this week have focused on providing the company with about $300 million in new liquidity.…"As a general matter, DIP loan negotiations follow unsuccessful attempts by second-lien lenders to reach an out-of-court solution for the company's cash shortage and debt issues.   In other words, SunEdison had entered DIP negotiations because it could not successfully resolve its liquidity issue with some of it lenders.

208.   In response to the March 22, 2016 news concerning SunEdison's DIP financing, the market reacted swiftly and negatively.   The price of SunEdison's common stock plummeted approximately 26%, to close at $1.49 on March 22, 2016, down $0.52 from the prior day's close of $2.01 on heavy trading volume.

### N.   The SEC Begins Investigating SunEdison Concerning Its Liquidity Representations

209.   As a result of the Executive Defendants' misconduct, SunEdison caught the attention of federal regulators.   On March 28, 2016, after the close of trading, the *WSJ* reported that the SEC was investigating SunEdison's disclosures to investors about how much cash the Company had on hand during 2015.   In this article, titled "SEC Investigating SunEdison's Disclosures to Investors About Its Liquidity," investors learned both that the SEC was investigating the Company and previously undisclosed facts about the Company's financial condition (much of it discussed above).   First, the article reported that, "officials in the SEC's enforcement unit [were] looking into whether SunEdison overstated its liquidity [in the fall of 2015] when it told investors it had more than $1 billion in cash."   Second, the *WSJ* article provided multiple behind-the-scenes facts about the Company's financial condition in the fall of 2015. These facts included, as discussed above, that the Company's announced third quarter 2015 available cash included $500 million from the Inaccessible Warehouse Facility.   According to the article, "[p]eople familiar with the matter said that $1.4 billion figure consisted largely of cash that

SunEdison couldn't access. The company had direct access to only a few hundred million dollars throughout September and October, and by November, the balance had dropped under $100 million."  The *WSJ* article further reported that, "By late 2015, SunEdison had stopped paying some contractors and suppliers and was scrambling internally for ways to raise cash."

210.    Then, the next day, Global announced that it, like SunEdison and TERP before it, would be delaying the filing of its 2015 financial results.   Among other things, Global admitted that it suffered from material weaknesses in its internal controls, stating that: "We currently have identified a material weakness in internal controls over financial reporting primarily due to SunEdison, Inc.'s ineffective controls over accounting consolidation and reporting system that we rely upon."  Significantly, Global reported that, "due to SunEdison's liquidity difficulties, there is a substantial risk that SunEdison will soon seek bankruptcy protection."

211.    The market reacted swiftly and negatively to the after-market March 28, 2016 and the March 29, 2016 news.   As a result of this news, the price of SunEdison's common stock plummeted approximately 55%, to close at $0.57 on March 29, 2016, down $0.69 from the prior day's close of $1.26 on heavy trading volume.

### O.    The DOJ Begins Investigating SunEdison

212.    In the final week of the Class Period, news continued to be disclosed revealing the truth behind SunEdison's dire financial condition.  In joint press releases dated March 30, 2016 and issued by SunEdison, TERP, and Global, the companies announced that Brian Wuebbels had resigned as President and COO of the YieldCos and as a member of the board of both companies. No reason was given for his departure.  The Boards of both YieldCos had formed an office of the chairman to lead the SunEdison affiliates on an interim basis while Wuebbels' replacement could be found.

213.    On March 31, investors learned that the SEC was not the only federal regulator investigating SunEdison in March 2016.  That day, after the close of trading, SunEdison filed a Form 8-K, disclosing that, on March 28, 2016, the Company had received a subpoena from the U.S. Department of Justice ("DOJ") seeking information and documentation relating to, *inter alia*: (i) certain financing activities in connection with the Company's acquisition of Vivint;  (ii) the conduct of a former non-executive employee who was alleged to have committed wrongdoing in connection with the Vivint termination negotiations; (iii) the previously disclosed investigations by the Company's audit committee; and (iv) inter-company transactions involving the Company and both the YieldCos.  In the same Form 8-K, the Company also confirmed that it had previously received an inquiry from SEC covering overlapping areas of inquiry, news that the *WSJ* had previously reported on March 28.  In other words, the DOJ was investigating alleged misconduct by SunEdison dating back to at least July 2015, when the Company first announced the Vivint deal, and, in connection with the Audit Committee's investigation, was focusing on SunEdison's liquidity misrepresentations for fiscal year 2015.

214.    The market reacted swiftly and negatively to the news of the DOJ's subpoenas and confirmation of the SEC investigation.  As a result of the disclosures on March 31, 2016, the price of SunEdison's common stock dropped approximately 20%, to close at $0.43 on April 1, 2016, down $0.11 from the prior day's close of $0.54 on heavy trading volume.

**P.    TerraForm Global Sues SunEdison, Its Own Parent Company, For Fraud**

215.    On the final day of the Class Period, April 4, 2016, news emerged that Global was suing SunEdison, its own parent. On that day, during the course of trading, multiple news outlets, including the *WSJ* and *Bloomberg*, reported that over the weekend, Global had filed a lawsuit in the Court of Chancery for the State of Delaware against SunEdison, Chatila, Truong and Wuebbels, alleging breach of fiduciary duty, breach of contract and unjust enrichment.  Notably,

Director Blackmore – who for years was a member of SunEdison's Board of Directors and, thereafter, was a member of Global's Conflicts Committee – actually voted to file the Complaint against SunEdison and Executive Defendants.

216.    As discussed in detail above in Section IV.H, the Global Complaint described SunEdison's and the Executive Defendants' secret machinations to overthrow the YieldCos' Boards and Management in a desperate attempt to pay the Margin Loan.  In sum, Global – as authorized by Director Blackmore – alleged that SunEdison, Chatila, Wuebbels and Truong breached their fiduciary duties by, among other things, (i) "misrepresenting SunEdison's liquidity"; (ii) "omitting to disclose to Global and its Conflicts Committee material information known to them about SunEdison's liquidity" and (iii) "failing to correct material misstatements made to Global and its Conflicts Committee with respect to SunEdison's liquidity."

217.    The market reacted swiftly and negatively to this news.  As a result of the disclosures on April 4, 2016 concerning Global's lawsuit against SunEdison and its officers, the price of SunEdison's common stock plummeted approximately 51%, to close at $0.21 on April 4, 2016, down $0.22 from the prior day's close of $0.43 on heavy trading volume.

## V.    Post–Class Period Events

218.    On April 21, 2016, SunEdison and twenty-five affiliated entities filed bankruptcy petitions in the Bankruptcy Court of the Southern District of New York, commencing the Bankruptcy Proceeding.  SunEdison said it would use the bankruptcy process to reduce its borrowings, which stood at more than $16 billion, including TERP's and Global's debt.

219.    On May 10, 2016, SunEdison terminated Defendant Wuebbels.  His last day of employment was June 9, 2016.

220.    On May 26, 2016, Defendant Chatila resigned his position as Director from TERP's and from Global's Boards of Directors.

221.    On June 6, 2016, SunEdison made it clear that SunEdison's equity holders – including Class members in this Action – should not expect any recovery in the Bankruptcy Proceeding.  Specifically, in papers filed with the bankruptcy court, SunEdison wrote that "[s]imply put, there is no basis to conclude that there will be any recovery - let alone a 'meaningful' one - for equity holders."

222.    On June 22, 2016, Chatila resigned as CEO and Director of SunEdison.

## VI.    The Executive Defendants' Materially False And Misleading Statements And Omissions During The Class Period

223.    As summarized below, throughout the Class Period beginning on August 7, 2014, Defendants Chatila and Wuebbels each made materially false and misleading statements and omissions concerning, among other things: (i) SunEdison's liquidity, including the sufficiency of SunEdison's cash position and the amount of cash the Company had and was available to the Company; (ii) the effectiveness of the Company's internal controls over financial reporting; and (iii) the classification of the Company's debt as non-recourse as opposed to recourse.

### A.    Second Quarter Of 2014

#### 1.    Adequacy Of SunEdison's Liquidity

224.    On August 7, 2014, the Company filed with the SEC its Form 10-Q for the second quarter of 2014, which was signed by Defendant Wuebbels (the "Second Quarter 2014 10-Q").  In the Second Quarter 2014 10-Q, SunEdison stated:

**Liquidity**

Cash and cash equivalents, plus cash committed for construction projects, at June 30, 2014 totaled $1,130.8 million, compared to $831.5 million at December 31, 2013.

*        *        *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events

occur, or if we are unable to access project capital needed to execute our business plan.

*       *       *

We expect cash on hand, 2014 operating cash flows, project finance debt, the Solar Energy credit facility, the acquisition Facility and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2014 and otherwise meet our capital needs for the remainder of 2014.

225.   That same day, the Company held a conference call with investors and analysts discussing SunEdison's second quarter 2014 financial results.   During this conference call, Defendant Wuebbels stated: "Overall, we remain comfortable with our balance sheet and our liquidity position" and that "[w]e have a solid liquidity position, and remain focused on strengthening our balance sheet, maximizing value, and delivering strong returns to our stakeholders."

226.   The foregoing statements in the Second Quarter 2014 10-Q and by Defendant Wuebbels concerning the Company's liquidity were materially false and misleading because they omitted the material information that, by the second quarter of 2014, the Company was already suffering from a liquidity crisis.  This liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors for basic utilities and necessary services, including telephone and electricity bills and required payments to regulatory entities.  The Company even failed to pay vendors that were irreplaceable and core to its growth model, including critical due diligence vendor Garrad Hassan.  When SunEdison did pay its bills, the Company did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects.   It was widely known within the Company that SunEdison "never had cash" to pay its vendors.  During this time, Defendant Wuebbels, along with Defendant Chatila, led weekly

conference calls with SunEdison management, on which they discussed the Company's cash shortage, and inability to pay key vendors.

227.    Indeed, SunEdison later admitted that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

### 2.    Effectiveness Of Internal Controls

228.    In the Second Quarter 2014 10-Q, Defendants Wuebbels and Chatila falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company.  Specifically, the Second Quarter 2014 10-Q stated:

> We carried out an evaluation as of June 30, 2014 under the supervision and with the participation of our management, including our Chief Executive Officer [Chatila] and Chief Financial Officer [Wuebbels], of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of June 30, 2014.

*        *        *

> There have been no changes in SunEdison's internal control over financial reporting during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.
>
> *       *       *
>
> There have been no significant changes to our critical accounting policies and estimates since December 31, 2013.

229.   Further, in the Company's Second Quarter 2014 10-Q, Defendants Chatila and Wuebbels each personally certified that they had evaluated the effectiveness of SunEdison's internal controls and disclosed any deficiencies or material weaknesses in them.  Specifically, Defendants Chatila and Wuebbels made the following materially false and misleading claims:

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision; to ensure that material information relating to the registrant, including its consolidated subsidiaries is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

230.    In the Second Quarter 2014 10-Q, Defendants Chatila and Wuebbels also each personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report [the Second Quarter 2014 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

231.    The foregoing statements by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading. As former SunEdison employees have explained, throughout the Class Period, SunEdison's internal controls over financial reporting were completely ineffective, such that SunEdison's financial reporting was "the worst part of the business" and the "biggest joke in the world."  Specifically, throughout

the Class Period, including during the second quarter of 2014, SunEdison's internal controls over

financial reporting suffered from material weaknesses because:

- SunEdison never integrated the accounting and financial reporting systems of its acquired companies with its own so that the process for consolidating each project and acquired company's financial results was labyrinthine, a "web of chaos and confusion," onerous, and required manual entry, and was thus subject to massive input errors, leading to "bastardized data;"

- the Company's consolidated financial data was kept and updated on an unsecured Excel spreadsheet, an inappropriate method for reporting financial data as used by SunEdison because Excel does not contain "input controls," meaning that "huge categories" of line items could and did, accidentally or intentionally, go unreported or misrepresented;

- the Excel spreadsheet that housed SunEdison's consolidated financial data had no "access controls," meaning that anyone at the Company, including low-level employees like call-center employees, could review, input, and modify financial data by staggering amounts, either accidentally or intentionally, and SunEdison's access controls were so woefully poor with such "insanely bad data integrity" that "anyone with access could change the economics of a deal," and employees, long after having left the Company, could still use their SunEdison credentials to access SunEdison's financial databases and review and even modify the Company's financial results;

- SunEdison had an extremely high turnover rate of accountants, mostly contractors with no prior familiarity with the Company, its projects or its myriad accounting systems, and these employees were given little to no training on SunEdison's multiple accounting platforms, thus exacerbating SunEdison's existing internal control problems; and

- SunEdison had no way of accurately accounting for its available cash because, at any time, SunEdison employees or affiliated entities could open bank accounts and draw money from SunEdison, as was the case with the 2014 "significant deficiency," which demonstrated that, because there could be "bank accounts around the world" into which SunEdison's funds could be deposited, even SunEdison's Senior Auditor and Accountant and the Company's Assistant Director of Financial Reporting "had no idea what the cash position was."

232. The Company's subsequent admissions corroborate the reports of SunEdison's

former employees. For example, as the Company later admitted in a press release on March 16,

2016, SunEdison's internal controls over financial reporting suffered from multiple material weaknesses such that the Company could not timely file it 2015 10-K, an admission to which the both Global and TERP assented on March 16 and March 29, 2016, respectively, when Global and TERP both delayed the filing of their 2015 10-Ks because the YieldCos' internal controls were directly related to SunEdison's reporting its cash and liquidity position.  Moreover, in a Form 8-K filed with the SEC after the close of the Class Period, on April 14, 2016, the Company announced that SunEdison's Board had determined that SunEdison needed to "strengthen internal controls at both the enterprise and project level to enhance visibility and control over project status and cash availability" and that SunEdison "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]" Among other things, SunEdison admitted that:

- "the Company's cash forecasting efforts lack sufficient controls and processes";

- "certain assumptions underlying the cash forecasts provided to the Board by the Company's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted";

- "the Company's management has not responded appropriately when forecasted targets were not met"; and

- "the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

 In other words, the Company's own directors determined that the Company's internal controls for reporting liquidity required significant remediation.

### 3.    Item 303 Omissions

233.    The Second Quarter 2014 10-Q was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  Item 303 requires the

disclosure of known trends that will affect future revenue, specifically: "known trends … that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues."  GAAP regulation ASC 275-1 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term and particularly calls for disclosure if the volumes of business transacted with particular customers could be severely impacted in the near term.

234.   Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

235.   Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's

Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

236.    As set forth in detail above at ¶¶50-65, both of these conditions were satisfied here. First, the growing trend of constrained liquidity, as evidenced by SunEdison's consistent and systemic late payment of its vendors, was "known" to the Executive Defendants. The facts set forth above establish that this trend was "reasonably likely to have material effects on [SunEdison's] financial condition or results of operations." Second, as a direct result of this trend, SunEdison's near-term cash position, in fact the Company's very solvency, would be dramatically impacted as the Company's business partners and vendors would, and indeed did, cut ties with the Company, and SunEdison's creditors would refuse to lend SunEdison additional money.

237.    Accordingly, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."

*     *     *

238.    As a result of the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's liquidity and available cash, the efficacy of the Company's internal controls, and misrepresentations concerning Item 303 of Regulation S-K, analysts touted the Company's growth and looked favorably onto SunEdison's future prospects.  For example, in a report dated August 7, 2014, Deutsche Bank stated that: "SUNE remains our top pick as Q2 results further reinforce our view that the company is best positioned to benefit from strong demand trends in US/international markets, improving financing costs in OECD markets through the recently launched YieldCo."  SunEdison's stock price leaped 11%, from a close of $19.32 on August 6, 2014, to close at $21.59 on August 7, 2014.

### B. Third Quarter Of 2014

#### 1. Adequacy Of SunEdison's Liquidity

239.    On November 5, 2014, the Company filed with the SEC its Form 10-Q for the third

quarter of 2014, which was signed by Defendant Wuebbels (the "Third Quarter 2014 10-Q").  In

the Third Quarter 2014 10-Q, SunEdison stated:

**Liquidity**

Cash and cash equivalents, plus cash committed for construction projects, at
September 30, 2014 totaled $916.8 million, compared to $831.5 million at
December 31, 2013.

*        *        *

We believe our liquidity will be sufficient to support our operations for the next
twelve months, although no assurances can be made if significant adverse events
occur, or if we are unable to access project capital needed to execute our business
plan.

*        *        *

We expect cash on hand, 2014 operating cash flows, project finance debt, the Solar
Energy credit facility, the TerraForm term loan and project construction facility to
provide sufficient capital to support the acquisition and construction phases of our
currently planned projects for 2014 and otherwise meet our capital needs for the
remainder of 2014.

240.    On November 6, 2014, the Company held a conference call with investors and

analysts discussing SunEdison's third quarter 2014 financial results.  During this conference call,

Defendants Wuebbels made materially false and misleading statements concerning the strength

and availability of the Company's cash.  For example, Defendant Wuebbels stated: "we remain

comfortable with our balance sheet and our liquidity position."

241.    The foregoing statement in the Third Quarter 2014 10-Q and by Defendant

Wuebbels concerning the Company's liquidity were materially false and misleading because they

omitted the material information that, by the third quarter of 2014, the Company was already

suffering from a liquidity crisis.

242.     This liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors for basic utilities and necessary services, including telephone and electricity bills and required payments to regulatory entities.  The Company even failed to pay vendors that were irreplaceable and core to its growth model, including critical due diligence vendor Garrad Hassan.  When SunEdison did pay its bills, the Company did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects.  It was widely known within the Company that SunEdison "never had cash" to pay its vendors.  During this time, Defendant Wuebbels, along with Defendant Chatila, led weekly conference calls with SunEdison management, on which they discussed the Company's cash shortage, and inability to pay key vendors.

243.     Indeed, SunEdison later <u>admitted</u> that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

### 2.     Effectiveness Of Internal Controls

244.     In the Third Quarter 2014 10-Q, the Executive Defendants again falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting,

such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls. Specifically, in the Third Quarter 2014 10-Q, the Executive Defendants repeated substantively the identical materially false and misleading statements they made in the Second Quarter 2014 10-Q, concerning the effectiveness of the Company's disclosure controls and changes to SunEdison's internal controls set forth in full at ¶¶228-230 above, including the Executive Defendants' misrepresentation that "our disclosure controls and procedures were effective as of September 30, 2014."

245.    Further, in the Company's Third Quarter 2014 10-Q, Defendants Chatila and Wuebbels each repeated the substantively identical materially false and misleading SOX certifications, as referenced above in ¶¶229-230, such that they personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report [the Third Quarter 2014 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

246.    The foregoing statements in the Third Quarter 2014 10-Q by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading for the reasons provided above at ¶¶66-94 and 231-232, including the material facts that the Company's financial reporting system consisted of a number of non-compatible programs, reliant on manual entry into a massive unsecured Excel spreadsheet that was rife with errors and subject to exploitation by Company management.

### 3.    Item 303 Omissions

247.    The Third Quarter 2015 10-Q was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  As described above in ¶¶233-

112

235, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."  As summarized above in ¶¶50-65 and 236-237, the Executive Defendants knew that SunEdison was experiencing a growing liquidity crisis, as evidenced by the Company's systematic late payments to vendors and cash shortages. Nevertheless, the Executive Defendants failed to disclose any of this information during the Class Period.

*      *      *

248.    In response to the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's true liquidity position and cash shortage, the effectiveness of its internal controls and the accuracy of the Company's representations, and misrepresentations concerning Item 303 of Regulation S-K, analysts touted the Company's fundamentals.  For example, in a report dated November 6, 2014, Deutsche Bank wrote that: "SUNE appears to be executing ahead of plan … We believe fundamentals/execution remain strong and further details around emerging markets YieldCo could act as a catalyst for shares. Reiterate Buy, $35 price target."  Likewise, in a report on November 6, 2014, Credit Suisse wrote that SunEdison's third quarter 2014 financial reports showed that the Company was "Checking All Boxes with Gusto" and that the "Bottom line [was that] all metrics were solid, clear buying opportunity … We remain encouraged that the value creation engine and cash generation power will become increasingly clear over time[.]" and that "we believe SunEdison … will transition to an equity story with significant cash flow."

**C.     Fourth Quarter Of And Full Year 2014**

**1.     Adequacy Of SunEdison's Liquidity**

249.    On March 2, 2015, the Company filed with the SEC its Form 10-K for fiscal year ended December 31, 2014, which was signed by Defendants Chatila and Wuebbels (the "2014 10-K").   In the 2014 10-K, the Company falsely and misleading misrepresented the strength of SunEdison's liquidity.  For example, the Company stated that:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at December 31, 2014 totaled $1,074.4 million, compared to $831.5 million at December 31, 2013.

*             *             *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*             *             *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the TerraForm term loan and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

250.    The foregoing statements by the Executive Defendants concerning the Company's liquidity and available cash were materially false and misleading because, by this time, the Company was already suffering from a liquidity crisis.  This liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors for basic utilities and necessary services, including telephone and electricity bills and required payments to regulatory entities.  The Company even failed to pay vendors that were irreplaceable and core to its growth model, including critical due diligence vendor Garrad Hassan.  When SunEdison did pay its bills, the Company did so by improperly shuffling around cash from dedicated project funds, further

jeopardizing the success of those projects.  In addition, by this time, as the Company later told the bankruptcy court, the Company was experiencing significant "liquidity challenges." It was widely known within the Company that SunEdison "never had cash" to pay its vendors.  During this time, Defendant Wuebbels, along with Defendant Chatila, led weekly conference calls with SunEdison management, on which they discussed the Company's cash shortage, and inability to pay key vendors.

251.    Indeed, SunEdison later <u>admitted</u> that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

## 2.    Effectiveness Of Internal Controls

252.    In the 2014 10-K, the Executive Defendants falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls.  Specifically, in the 2014 10-K, the Executive Defendants repeated the substantively identical materially false and misleading statements they made in the Second Quarter 2014 10-Q and the Third Quarter 2014 10-Q,

concerning the effectiveness of the Company's disclosure controls and changes to SunEdison's internal controls set forth in full at ¶¶228-230 and 244-45, including the Executive Defendants' misrepresentation that "<u>our disclosure controls and procedures were effective as of December 31, 2014</u>."  Moreover, the Executive Defendants also materially misstated that:

> As of December 31, 2014, management conducted an assessment of the effectiveness of our internal control over financial reporting based upon the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)*. Based on management's assessment utilizing these criteria, <u>our management concluded that, as of December 31, 2014, our internal control over financial reporting was effective</u>.

253.    Further, in the Company's 2014 10-K, Defendants Chatila and Wuebbels each repeated the substantively identical materially false and misleading SOX certifications, as referenced above in ¶¶229-230 and 245, such that they personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "<u>information contained in the Report [the 2014 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company</u>."

254.    The foregoing statements in the 2014 10-K by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading for the reasons provided above at ¶¶66-94 and 231-232, including the material facts that the Company's financial reporting system consisted of a number of non-compatible programs, reliant on manual entry into a massive unsecured Excel spreadsheet that was rife with errors and subject to exploitation by Company management.

### 3.    Item 303 Omissions

255.    The 2014 10-K was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  As described above in ¶¶233-235, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within

the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."   Moreover, as described above in ¶¶50-65, the Executive Defendants themselves admitted that by this time, the Company was already experiencing a liquidity crisis. Nevertheless, the Executive Defendants failed to disclose any of this information during the Class Period.

*       *       *

256.    In response to the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's true liquidity position, the effectiveness of the Company's internal controls, and misrepresentations concerning Item 303 of Regulation S-K, analysts touted the Company's execution of its yieldco model and SunEdison's ability to generate cash.  For example, in a report dated March 6, 2015, RBC Capital Markets increased its Price Target to $33.00, up $5.00 from its previous Price Target of $28.00, and saw a purportedly hidden and additional upside to what the Company reported when it wrote that: "we believe that a significant amount of cash earnings power is buried in the GAAP financial statements" and that "We believe the fast cash earnings growth is mainly due to the [yieldco] structure."

### D.    First Quarter Of 2015

257.    On May 7, 2015, the Company filed with the SEC its Form 10-Q for the first quarter of 2015 (the "First Quarter 2015 10-Q"), which was signed by Defendant Wuebbels.  The First Quarter 2015 10-Q contained a number of materially false and misleading statements concerning the Company's financial strength, liquidity, and debt.

#### 1.    Adequacy Of SunEdison's Liquidity

258.    In the First Quarter 2015 10-Q, SunEdison stated:

Liquidity

Cash and cash equivalents, plus cash committed for construction projects, at March 31, 2015 totaled $919 million, compared to $987 million at December 31, 2014.

*     *     *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*     *     *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

259.    The foregoing statements in the First Quarter 2015 10-Q concerning the Company's liquidity were materially false and misleading because they omitted the material information that, the Company was already suffering from a liquidity crisis.  This liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors for basic utilities and necessary services, including telephone and electricity bills and required payments to regulatory entities.  The Company even failed to pay vendors that were irreplaceable and core to its growth model, including critical due diligence vendor Garrad Hassan.  When SunEdison did pay its bills, the Company did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects.  In addition, by this time, as the Company later told the bankruptcy court, the Company was experiencing significant "liquidity challenges." It was widely known within the Company that SunEdison "never had cash" to pay its vendors.  During this time, Defendant Wuebbels, along with Defendant Chatila, led weekly conference calls with SunEdison management, on which they discussed the Company's cash shortage, and inability to pay key vendors.

260.    Indeed, SunEdison later admitted that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

### 2.    Misclassification Of The Company's Debt

261.    As discussed above, on January 29, 2015, SunEdison completed the $2.4 billion acquisition of First Wind.  Funding for the acquisition included the $410 million Margin Loan and the $337 million of Exchangeable Notes.

262.    In the Company's First Quarter 2015 10-Q, the Executive Defendants falsely and misleadingly classified over $700 million of the Company's debt, including the $410 million under the Margin Loan and $336 million in Exchangeable Notes.  Specifically, the Executive Defendants reported that these liabilities were "Non-recourse to SunEdison," as set forth in the table below excerpted from the First Quarter 2015 10-Q under the category "DEBT AND CAPITAL LEASE OBLIGATIONS":

119

B. DEBT AND CAPITAL LEASE OBLIGATIONS

Debt (including consolidated VIEs) and capital lease obligations outstanding consists of the following:

| In Millions | Weighted Average Annual Interest Rate | Total | Current and Short-Term | Long-Term | Total | Current and Short-Term | Long-Term |
|---|---|---|---|---|---|---|---|
| | | As of March 31, 2015 | | | As of December 31, 2014 | | |
| Renewable Energy Development Segment debt: | | | | | | | |
| Margin loan due 2017[a] | 6.25% | 410 | - | 410 | - | - | - |
| Exchangeable notes due 2020[a] | 3.75% | 336 | - | 336 | - | - | - |
| Total debt outstanding | | $9,161 | $1,414 | $7,747 | $6,993 | $1,078 | $5,915 |

(a)  Non-recourse to SunEdison

263. The Executive Defendants made identical misrepresentations concerning the classification of these liabilities as "Non-Recourse Obligations" in the Company's presentation for its first quarter 2015 financial results, issued in connection with its first quarter 2015 conference call, dated May 7, 2015, as reflected below:



264.   The foregoing statements by the Executive Defendants concerning the classification of Company's debt were materially false and misleading because, as the Company later admitted on November 9, 2015, its classification of the Margin Loan and the Exchangeable Notes as being "non-recourse" was false.  In fact, both the Margin Loan and the Exchangeable Notes were actually recourse debt – meaning that lenders could recover these loans directly from the Company and that these amounts counted as "recourse debt" for purposes of the Company's debt covenants.   As investors later learned, SunEdison falsely categorized both the Margin Loan and the Exchangeable Notes, escalating the amount of recourse debt carried by the Company dramatically.   Had the Company properly categorized this debt, it would have increased the amount of debt with recourse to the Company and applicable to its credit facility covenants in the first quarter by 119%.

### 3.     Effectiveness Of Internal Controls

265.    In the First Quarter 2015 10-Q, the Executive Defendants falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls.  Specifically, in the First Quarter 2015 10-Q, the Executive Defendants repeated the substantively identical materially false and misleading statements they made in the Second Quarter 2014 10-Q, the Third Quarter 2014 10-Q, and the 2014 10-K concerning the effectiveness of the Company's disclosure controls and changes to SunEdison's internal controls, set forth in full at ¶¶228-230, 244-245, and 252-253 above, including the Executive Defendants' misrepresentation that "our disclosure controls and procedures were effective as of March 31, 2015."

266.    Further, in the Company's First Quarter 2015 10-Q, Defendants Chatila and Wuebbels each repeated the substantively identical materially false and misleading SOX certifications, as referenced above in ¶¶229-230, 245, and 253 such that they personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report [the First Quarter 2015 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

267.    The foregoing statements in the First Quarter 2015 10-Q by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading for the reasons provided above in ¶¶66-94 and 231-232, including the material facts that the Company's financial reporting system consisted of a number of non-compatible programs, reliant on manual entry into a massive unsecured Excel spreadsheet that was rife with errors and subject to exploitation by Company management.

### 4.    Item 303 Omissions

268.    The First Quarter 2015 10-Q was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  As described above in ¶¶233-235, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."  Moreover, as described above in ¶¶50-65, the Executive Defendants themselves admitted that by this time, the Company was already experiencing a liquidity crisis.  Nevertheless, the Executive Defendants failed to disclose any of this information during the Class Period.

*        *        *

269.    In response to the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's classification of its debt, the effectiveness of the Company's internal controls over financial reporting, and misrepresentations concerning Item 303 of Regulation S-K, analysts praised the Company's execution of its yieldco model and SunEdison's ability to generate cash.  For example, Deutsche Bank, in a May 7, 2015 report wrote that: "Q1 results demonstrate strong execution, both in terms of organic and inorganic growth." Similarly, Morgan Stanley, in a report dated May 7, 2015 expressed confidence in the Company's future outlook when it reiterated its Overweight rating and wrote that: "The growth outlook for SunEdison continues to improve" and that "We believe the company's acquisitions, strong organic growth outlook, and accelerating project retention significantly support our assumed value for Incentive Distribution Rights (IDRs) in the coming years."  Credit Suisse incorporated the Company's representations about its recourse debt into its "sum of the parts" valuation, excluding supposed non-recourse debt (including the Margin Loan and Exchangeable Notes) from its

calculation of the Company's debt in its May 11, 2015 report rating SunEdison "Outperform." The Company's stock price soared nearly 12%, from a close of $24.83 on May 6, 2015 to close at $27.96 on May 7, 2015.

### E.    Second Quarter Of 2015

#### 1.    Adequacy Of SunEdison's Liquidity

270.    On August 6, 2015, the Company filed with the SEC its Form 10-Q for the second quarter of 2015, which was signed by Defendant Wuebbels (the "Second Quarter 2015 10-Q").   In the Second Quarter 2015 10-Q, the Company falsely and misleading misrepresented the strength of SunEdison's liquidity.  SunEdison stated:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at June 30, 2015 totaled $1,998 million, compared to $987 million at December 31, 2014.

*       *       *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*       *       *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015. The Global IPO and related private placement transactions and our recently completed warehouse financing structures have also contributed to our capital resources.

271.    That day, the Executive Defendants held a conference call with analysts and investors to discuss the Company's second quarter 2015 financial results.  During the August 6, 2015 conference call, Defendant Wuebbels made materially false and misleading statements about the adequacy of SunEdison's liquidity.  Specifically, Defendant Wuebbels stated: "If you look at

the capital and the liquidity that's in the business, as well as the dividend forbearance that the parent

has done through 2016 on that, <u>there's sufficient capital within the vehicle to be able to grow that</u>

<u>business for the first 12 to 18 months</u> at its 20% stated dividend rate."

272.    The Executive Defendants also materially misstated SunEdison's amount of

available cash.  During the August 6, 2015, conference call Defendant Wuebbels stated: "Of the

$2 billion in cash at the end of the quarter, roughly $400 million was in TerraForm Power and

$620 million related to TerraForm Global, leaving SunEdison, the development company, with

greater than <u>$1 billion of cash and sufficient liquidity to support the future growth of the platform</u>."

273.    Moreover, the Executive Defendants claimed in an accompanying investor

presentation, dated August 6, 2015, that SunEdison had "<u>Greater than $1 Billion of Cash at DevCo</u>

<u>… Sufficient Liquidity to Grow Platform</u>" as shown below:



274.    The Executive Defendants' statements concerning the supposed $1.3 billion in liquidity and $1 billion in cash held at the DevCo, were materially false and misleading.  As investors later learned in a March 28, 2016 article in the *WSJ* titled "SEC Investigating SunEdison's Disclosures To Investors About Its Liquidity," unbeknownst to investors, that "$1 Billion of Cash at DevCo" consisted "largely of cash that SunEdison couldn't access," including an approximately $500 million warehouse credit facility "whose funds could only be accessed by delivering projects that met certain criteria," but of which SunEdison "had few."  According to the *WSJ*, Defendant Wuebbels and SunEdison improperly included in SunEdison's third quarter 2015 cash balance (disclosed in November 2015) this inaccessible $500 million warehouse facility.  However, as the Company's own "cash walks" for the second and third quarters of 2015 make

clear, this Inaccessible Warehouse Facility also was also improperly incorporated into the Company's calculations of available cash in the second quarter and was then incorporated into the base cash calculations for the third quarter. Indeed, if, as SunEdison insiders told *The Wall Street Journal*, the $500 million warehouse facility was not available to SunEdison in November 2015 because it did not have the necessary projects, it certainly did not meet those standards three months earlier, in August 2015. Without that $500 million warehouse facility, the Company's cash at DevCo was <u>half</u> what the Executive Defendants claimed in August 2015.

275. The foregoing statements by the Executive Defendants concerning the Company's liquidity were also materially false and misleading because by this time, the Company was already suffering from an extreme liquidity crisis. As referenced above in ¶¶50-65, this liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors. Indeed, SunEdison's former Senior Internal Auditor from April 2014 to December 2015, explained that by this time, SunEdison had stopped paying its vendors because it had spent all of its available cash as a result of its dizzying M&A activity. Furthermore, SunEdison's liquidity statements were materially false and misleading because, as the Senior Internal Auditor explained, the A/P audit demonstrated the Company's dire cash flow problem even in April 2015 when Defendant Wuebbels requested the audit. Indeed, the A/P audit not only demonstrated that SunEdison's liabilities vastly eclipsed its revenue, but also that SunEdison was, because of its cash flow shortfalls, by July 2015, "in huge trouble." Likewise, by July 2015, the Contractor/Project Manager recalled that the Company's liquidity situation was so bad that that the Company was in a hiring freeze, notwithstanding its ostensible growth. Moreover, as Director of Asset Management and Operations explained, by August 2015, SunEdison's liquidity was so limited that it was in danger of default. Indeed, SunEdison later <u>admitted</u> that the Company's "cash forecasting

and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Executive Defendants' statements that it "believe[d]" and "expect[ed]" liquidity to be sufficient for the Company's growth plans, and Wuebbels' statement that there was "sufficient capital" for the Company's expected growth false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

276.  Furthermore, the Executive Defendants' August 6, 2015 statements about SunEdison's liquidity were also materially false and misleading because, despite the Executive Defendants' statements about "sufficient capital" for "the remainder of 2015," the Company did not even have the $152 million to pay off the margin call.  Indeed, in order to pay the margin call, SunEdison had to enter into the emergency $169 million Goldman Sachs Loan, which the Company secretly finalized five days later on August 11, 2015 and did not disclose until November 2015.  However, SunEdison never admitted that it relied on the Goldman Sachs Loan to pay the margin call, and for good reason – if investors knew that SunEdison could not pay off the margin call without taking out this exorbitant loan, they would have never believed the Executive Defendants' statements about the Company's liquidity, and to the Executive Defendants' bullish outlook for the business. Indeed, as analysts later recognized when the terms of the Goldman Sachs Loan were revealed, months later in November 2015, the Company's entering into the Goldman

Sachs Loan at an extremely high interest rate of 15%, was a red flag that SunEdison was a "distressed company" with "emergency cash needs."

### 2. Misleading Statements Concerning The Margin Loan

277.    In the Second Quarter 2015 10-Q, SunEdison also misled investors by omitting material information concerning the Margin Loan.  The Company stated:

> The Margin Loan Agreement requires the subsidiary to maintain a loan to value ratio not to exceed 50% (based on the value of the Class A common stock of TerraForm ("TerraForm Class A Common Stock"), which certain of the collateral may be exchanged for). In the event that this ratio is not maintained, the subsidiary must post additional cash collateral under the Margin Loan Agreement and/or elect to repay a portion of the term loans thereunder. In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of TerraForm Class A Common Stock, certain events or extraordinary transactions related to TerraForm and certain events related to SunEdison.

278.    Despite discussing the existence of the Margin Loan, the Executive Defendants knew, and failed to disclose, that SunEdison had already or would likely face a significant margin call on the Margin Loan, which would tax SunEdison's limited sources of liquidity still further. As referenced above, the falling price of SunEdison and TERP shares following the July announcement of the Vivint Transaction prompted a large margin call on the Margin Loan in August 2015.  While SunEdison did not disclose the margin call at the time it occurred, it did confirm on August 25, 2015 that a margin call had already occurred and then, in October, confirmed that at least one margin call took place (in the amount of $152 million) during the third quarter of 2015.  Based only on the 32.2 million TerraForm shares originally pledged on the Margin Loan agreement, and assuming a $410 million loan balance on August 7, 2015, the $25.24 closing price for TERP stock on that date would have equated to a loan-to-value ratio of 50% ($410 million ÷ (32.2 million x $25.24)).  While investors could not know exactly which date that margin call would take place (given the undisclosed value of the additional collateral SunEdison

had offered), TERP's equity value was the significant driving force behind any margin call that occurred.

### 3. Misleading Statements Concerning The Goldman Sachs Loan

279. On the same August 6, 2015 conference call, Defendant Wuebbels also made false and misleading statements concerning SunEdison's need to obtain additional financing. In response to a Robert W. Baird & Co. analyst's question about the different capital raises SunEdison would need to achieve in order to maintain its growth rate, Defendant Wuebbels stated that although the Company might continue to do "one-off construction financing," "as far as corporate financing, we don't see any additional financings to be able to achieve this growth."

280. This statement was false. As referenced above, the Executive Defendants knew that SunEdison had already sought additional financing through the secret Goldman Sachs Loan, which would close four days later. The Executive Defendants used this secret loan to pay down the margin call. The Executive Defendants hid the loan and its onerous terms until November 2015, because it would have demonstrated to investors that SunEdison did not have sufficient liquidity for the remainder of 2015 (certainly not for the next 18 months), that it did not have $1.3 billion in accessible cash, and that it was a "distressed company" with "emergency cash needs."

### 4. Misclassification Of The Company's Debt

281. In the Company's Second Quarter 2015 10-Q, filed with the SEC on August 6, 2015 and signed by Defendant Wuebbels, the Executive Defendants falsely and misleadingly classified over $700 million of the Company's debt, including the $410 million under the Margin Loan and $328 million in Exchangeable notes due in 2020. Specifically, the Executive Defendants reported that these liabilities were "Non-recourse to SunEdison," as set forth in the table below excerpted from the first quarter 2015 Form 10-Q under the category "LONG-TERM DEBT":

B. LONG-TERM DEBT

Debt, including consolidated variable interest entities ("VIEs"), consists of the following:

|  |  | As of June 30, 2015 | | | As of December 31, 2014 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| In Millions | Weighted Average Annual Interest Rate | Total | Current and Short-Term | Long-Term | Total | Current and Short-Term | Long-Term |
| Renewable Energy Development Segment debt: | | | | | | | |
| Margin loan due 2017[a] | 6.25% | 410 | - | 410 | - | - | - |
| Exchangeable notes due 2020[a] | 3.75% | 328 | - | 328 | - | - | - |
| Total debt outstanding | | $10,722 | $1,551 | $9,171 | $6,993 | $1,078 | $5,915 |

_____
(a) Non-recourse to SunEdison

282.   The Executive Defendants made identical misrepresentations concerning the classification of these liabilities as "Non-Recourse Obligations" in the Company's presentation for its second quarter 2015 financial results, issued in connection with its second quarter 2015 conference call, dated August 6, 2015 as reflected below:



283.    The foregoing statements by the Executive Defendants concerning the classification of Company's debt were materially false and misleading because, as the Company later effectively admitted on November 9, 2015, its classification of the Margin Loan and the Exchangeable Notes as being "non-recourse" was false.  In fact, both the Margin Loan and the Exchangeable Notes were actually recourse debt – meaning that lenders could recover these loans, over $700 million, directly from the Company and that these amounts counted as "recourse debt" for purposes of the Company's debt covenants.   As investors later learned, the Executive Defendants falsely categorized both the Margin Loan and the Exchangeable Notes, escalating the amount of recourse debt carried by the Company dramatically.   Had the Company properly

categorized this debt, it would have increased the amount of debt applicable to its credit facility covenants in the second quarter by 131%.

### 5.     Effectiveness Of Internal Controls

284.    In the Second Quarter 2015 10-Q, the Executive Defendants falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls. Specifically, in the Second Quarter 2015 10-Q, the Executive Defendants repeated the substantively identical materially false and misleading statements they made in the Second Quarter 2014 10-Q, the Third Quarter 2014 10-Q, the 2014 10-K, and the First Quarter 2015 10-Q concerning the effectiveness of the Company's disclosure controls and changes to SunEdison's internal controls, as referenced above in paragraphs ¶¶228-230, 244-245, 252-253, and 265-266, including the Executive Defendants' misrepresentation that: "our disclosure controls and procedures were effective as of June 30, 2015."

285.    Further, in the Company's Second Quarter 2015 10-Q, Defendants Chatila and Wuebbels each repeated the substantively identical materially false and misleading SOX certifications, as referenced above in ¶¶229-230, 245, 253, and 266 such that they personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report [the Second Quarter 2015 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

286.    The foregoing statements in the Second Quarter 2015 10-Q by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading for the reasons provided above in ¶¶66-94 and 231-232, including the material

facts that the Company's financial reporting system consisted of a number of non-compatible programs, reliant on manual entry into a massive unsecured Excel spreadsheet that was rife with errors and subject to exploitation by Company management.

### 6.     Item 303 Omissions

287.    The Second Quarter 2015 10-Q was materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  As described above in ¶¶233-235, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."  Moreover, as described above in ¶¶50-65, the Executive Defendants themselves admitted that by April 2015, the Company was already experiencing a liquidity crisis, that the A/P audit demonstrated that, by July 2015, SunEdison's liquidity position was dire, that SunEdison could not even pay off the $152 million margin call and, as a result had to enter into the $169 million Goldman Sachs Loan.  Nevertheless, the Executive Defendants failed to disclose any of this information during the Class Period.

*        *        *

288.    In response to the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's liquidity position and cash supply, the Margin Loan, the Goldman Sachs Loan, the classification of the Company's debt, the purported effectiveness of the Company's internal controls over financial reporting, and the Company's misrepresentations concerning Item 303 of Regulation S-K, analysts praised the Company's growth rate and SunEdison's ability to generate cash.  For example, in a report dated August 6, 2015 Cowen and Company, commenting on SunEdison's liquidity, maintained its Outperform rating and wrote that: "We see the ~$450 mn increase in cash on balance sheet since the end of

2014 plus an additional $704 mn in cash already committed to project construction (compared to only $131 mn committed as of yearend 2014) as key indicators of the company's ability to translate its vast backlog / pipeline to operational assets, according to plan."  In a subsequent report dated that day, Cowen and Company, wrote that: "With ~$1.3 Bn in Consolidated Cash, Resources in Place to Fund Pipeline" and that "current cash levels are sufficient to meet the corporate operations expenses . . . as well as the net cash needs to construct assets[.]"  Likewise, UBS, in an August 6, 2015 report, expressed confidence in SunEdison's liquidity position when it wrote that: "With addt'l liquidity of ~$1 from warehouse, $178 mn from w/c facility, and $750 Mn from future equity revolver, addt'l liquidity stands at ~$2 Bn. Relative to 2016, total w/c cash needs are stated at $383 Mn, suggesting mgmt can fully execute on plan as it stands."

### F.    August 18, 2015 Preferred Offering

289.    On August 17, 2015, SunEdison announced that it intended to conduct an offering of 500,000 shares of convertible preferred securities to raise funds "for general corporate purposes," including "funding working capital and growth initiatives." (defined above as the "Preferred Offering").  On August 18, the Company filed the Offering Documents.

290.    The Offering Documents incorporated by reference SunEdison's 2014 Form 10-K, the Company's First Quarter 2015 10-Q and Second Quarter 2015 10-Q.  Accordingly, the Preferred Offering Prospectus incorporated all of the materially false and misleading statements and omissions concerning: (i) SunEdison's liquidity; (ii) the Margin Loan; (iii) the Goldman Sachs Loan; (iv) the misclassification of over $700 million of SunEdison's recourse debt; (v) the purported effectiveness of the Company's internal controls over financial reporting; and (vi) the Item 303 misrepresentations, as specified in ¶¶249, 252-253, 255, 258, 262, 265-266, 268, 270, 277,  281, 284-285, and 287.

135

### 1. Misleading Statements Concerning The Goldman Sachs Loan

291.    Significantly, the Offering Documents also misled investors by omitting to disclose the highly material Goldman Sachs Loan – which had closed seven days before the Preferred Offering – while purporting to disclose material relationships with the Underwriters Defendants and material "Recent Events."  For example, the Offering Documents stated:

> Certain of the underwriters and their respective affiliates have provided, from time to time in the past, and may in the future provide, investment banking, financial and other services to us. They receive customary fees and commissions for these services. The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage, tax equity financing and other financial and non-financial activities and services. Certain of the underwriters and their affiliates have provided, and may in the future provide, a variety of these services to us and to persons and entities with relationships with us, for which they received or will receive customary fees and expenses.

> In addition, certain of the underwriters or their respective affiliates are parties to the bridge financing commitments entered into in connection with the First Wind Acquisition and lenders under the $410 million margin loan secured by a portion of our equity stake in TerraForm that we incurred on January 29, 2015. Also, certain of the underwriters or their respective affiliates are parties to the senior secured letter of credit facility with us in an aggregate principal amount up to $750 million as of July 31, 2015. We have also entered into a commitment letter with Goldman Sachs Bank USA for a $500 million secured term loan facility, and TerraForm Operating has entered into a debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility pursuant to which certain of the underwriters or their affiliates will be lenders. The funding of the term facility and bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. We have also entered into a $150 million four-year term loan with Deutsche Bank in connection with our joint venture with Dominion for Four Brothers. In addition, certain investment funds managed by Goldman, Sachs & Co. (collectively, the "GS Funds") have entered into agreements with us to form a new warehouse for the construction and acquisition of utility-scale solar and wind projects (the "Warehouse"). Subject to certain conditions, the GS Funds have agreed to contribute up to $300 million of equity to the Warehouse, and a syndicate of banks, including certain of the underwriters or their respective affiliates, have agreed to provide debt financing to the Warehouse of up to $700 million in senior secured credit facilities.

Additionally, investment funds managed by an affiliate of MCS Capital Markets, LLC, are existing equity holders in our common stock and in our 0.25% Convertible Notes due 2020.

292.    The Executive Defendants' disclosure of these lending agreements was materially false and misleading.  While listing numerous lending agreements, including at least two with Goldman Sachs, one of which the Company had entered into only the day before, on August 17, 2015, the Executive Defendants failed to disclose both the existence of and the onerous terms of the Goldman Sachs Loan, which the Company entered into on August 11, 2015.  The Executive Defendants' (and the Underwriter Defendants') failure to disclose the emergency Goldman Sachs Loan is all the more alarming given that Goldman Sachs itself served as one of the lead underwriters of the Preferred Stock Offering and thus suffered from a significant potential conflict of interest.  Indeed, Goldman Sachs undertook to sell the largest number of shares of Preferred Stock of all of the Underwriter Defendants and earned over $5 million in fees for its services.  However, notwithstanding the fact that the Offering Documents discussed numerous lending agreements referenced above, the Offering Documents did not disclose anything concerning the Goldman Sachs Loan.

293.    The Offering Documents also included materially false and misleading statements about how SunEdison would allocate the proceeds of the August 2015 Preferred Offering.  Under the heading "USE OF PROCEEDS," the Company stated in the Offering Documents that:

> We estimate that the proceeds from this offering, after deducting the underwriters' discounts and commissions and estimated offering expenses payable by us, will total approximately $626.1 million.

> We expect to use the net proceeds of this offering for general corporate purposes, which we expect to include funding working capital and growth initiatives. At this time, we have not specifically identified a large single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us. As a result, our management will retain broad discretion over the use of the net proceeds from this offering.

294.    This explanation for how SunEdison would use the net proceeds of the August 2015 Preferred Offering was materially false and misleading.  Indeed, SunEdison was planning to use the proceeds of the August 2015 Preferred Offering to address its ongoing liquidity crisis. Together with the other representations made in connection with the August 2015 Preferred Offering, this statement created the misleading impression that SunEdison was raising capital to preserve its flexibility to take advantage of future opportunities as they arose, and not to meet existing liabilities and immediate needs, which was the true purpose of the August 2015 Preferred Offering.

295.    The Offering Documents, issued on August 18, 2015, were also materially false and misleading because they failed to disclose that on August 7, 2015, the Company had likely breached the debt covenants under the Margin Loan, triggering the margin call on August 7, 2015, requiring the Company to post at least an additional $159 million in cash collateral on the Margin Loan.

**G.    Defendant Chatila's September 2, 2015 Statements To The Press**

296.    On September 2, 2015, in an article titled, "SunEdison CEO Promises Cash Flows to Calm Investors by 2016," *Bloomberg* reported Defendant Chatila's materially false and misleading statements concerning the Company's cash.  Specifically, *Bloomberg* reported that, Defendant Chatila had sought to reassure investors by stating that: "The cash is coming." Defendant Chatila went on to state that: "The most important question for investors is when do we start generating cash for a living.  I have said it's at the end of 2016 or early 2017.  But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015."

297.     Defendant Chatila's September 2, 2015 statements were materially false and misleading.  As the *WSJ* reported on April 14, 2016: "Days earlier, an internal presentation to SunEdison's board [of which Chatila was a member] showed the company wouldn't have positive

cash flow until at least the second quarter of 2016."  Indeed, in response to Chatila's September 2, 2015 statements, "Senior [SunEdison] executives read the Bloomberg story agape."

### H.   October 7, 2015 Conference Call And Business Update

#### 1.   Adequacy Of SunEdison's Liquidity

298.   On October 5, 2015, the Company issued a press release titled "SunEdison Announces Global Initiative To Optimally Position The Company For Long Term Profitable Growth," and announced that  the Company was embarking on a restructuring effort "to optimize business operations" and "accelerate cash flow positive operations."  Defendants Chatila and Wuebbels held a conference call with investors on October 7, 2015 to discuss the Company's new plan.

299.   During the October 7, 2015 conference call, Defendant Wuebbels misstated the amount of available cash SunEdison had.  Specifically, Defendant Wuebbels stated: "Excluding the cash from TerraForm and Global, the cash available at the standalone DevCo, was standing at approximately $1.4 billion at the end of the quarter, up from $900 million at the end of the second quarter."

300.   The Executive Defendants also misstated the amount of available cash it had in the Company's October 7, 2015 Business Update, maintaining that it had over $1.3 billion in available cash at the end of the third quarter, as reflected below:



301.   This statement was materially false and misleading.   Defendant Wuebbels materially overstated the amount of cash available to SunEdison because, as discussed above in ¶¶105, 134, and 274, this figure consisted in part of a $500 million credit facility that SunEdison could not access.   Thus, SunEdison's ending cash was, at most, $800 million, not $1.38 billion.

302.   During the October 7, 2015 conference call, Defendant Chatila made further materially false and misleading statements about the Company's liquidity.   Specifically, Defendant Chatila stated: that "the Company remains well capitalized with adequate liquidity and the new optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the business, including acquisitions and converts."

303.    Defendant Chatila's October 7, 2015 statements concerning SunEdison liquidity were also false because Defendant Chatila failed to disclose the $439 million under the Margin Loan that had, by this time, become mandatorily prepayable.  As noted above, SunEdison later admitted that all of the covenants under the Margin Loan were tripled in September, causing the Margin Loan to become mandatory prepayable in October.  This occurred before the October 7 conference call.  Throughout the month of October 2015, the share price of TERP stock never fell below the closing price on October 6 (the day before SunEdison held its conference call).  Thus, the terms for the mandatory prepayment – which SunEdison itself states was keyed off of TERP's stock price – must have taken place before the October 7 conference call.  However, the Executive Defendants never disclosed this mandatory prepayment <u>or</u> that the Company's cash reserves were "drained" or that its financial outlook was "fundamentally changed" – as the Company itself admitted on April 21, 2016 in connection with the Bankruptcy Proceeding.

304.    Defendant Chatila's statement concerning the Company's liquidity and available cash was also materially false and misleading because SunEdison's business fundamentals were not strong and the Company was not well capitalized and did not have adequate liquidity. Further, by this time, SunEdison's (i) systemic inability to pay its vendors was ongoing and the Company had instituted a hiring freeze because it could not afford new employees; (ii) the A/P audit conducted from April to July 2015 demonstrated that, because of the Company's cash flow shortfalls, that SunEdison was "in huge trouble"; (iii) in connection with the Bankruptcy Proceeding, SunEdison, on April 22, 2016, admitted that its liquidity crisis had been ongoing since at least April 2015; (iv) in order to pay off the margin call, SunEdison was forced to borrow $169 million from Goldman Sachs at 15% interest, which showed that SunEdison was a "distressed company" with "emergency cash needs"; and (v) the Company's August 2015 internal report,

referenced by the *WSJ* in an article dated April 14, 2016, indicated that the Company would not be able to have a positive cash flow until at least the second quarter of 2016.

305.    Moreover, during this October 7, 2015 conference call, even though the Executive Defendants disclosed the $152 million margin call, Defendant Wuebbels falsely reassured investors that there would not be a further margin call forthcoming, stating that: "we did complete an amendment with the existing bank group on the loan to adjust the triggers to a point that is significantly below the current market price."

306.    This statement was false.  As investors later learned on November 10, 2015, SunEdison had suffered (at least) another margin call of $91 million.  However, between the time that Defendant Wuebbels made his statement and before the Company admitted to a further margin call on November 10, the price of TERP stock never dipped below the price of $17.88 that TERP had closed at on October 6 (with the single negligible exception of October 27, 2015, when it closed at $17.64).  Indeed, the low of TERP's stock before the conference call occurred on September 29, 2015, seven days before the call, when TERP's stock closed at $14.16 per share.  Thus, either the Company did not "adjust the triggers to a point that is significantly below the current market price [of TERP stock]" or it had already suffered the second margin call and failed to disclose that fact on the October 7, 2015 call.  Moreover, even though the Executive Defendants announced the margin call, the Executive Defendants failed to disclose that they used the proceeds from the Goldman Sachs Loan to pay for the margin call, which would have alerted investors to the fact that SunEdison was a "distressed company" with "emergency cash needs."  Finally, critically, by this time the Margin Loan had become "mandatorily prepayable" and had "fundamentally altered" the Company's financial outlook – highly material facts that Defendant Wuebbels hid from investors.

### 2. Reasons For Terminating The LAP Deal

307. During the October 7, 2015 conference call, Defendant Chatila also made materially false and misleading statements concerning the LAP deal. In response to a J.P. Morgan analyst's question concerning an article published in the *WSJ* on October 6 disclosing that SunEdison had failed to make a $400 million upfront cash payment necessary to close the deal and positing whether that failure was a reason for the deal's failing through, Defendant Chatila rejected that claim. Instead, Defendant Chatila stated: "we're really disappointed with the result. We're still committed to Latin America. … The seller there did not satisfy the condition's precedent, the closing of the share purchase agreement. So instead of trying to fix it, remedying it, we're saying that the agreement is terminated."

308. Defendant Chatila's statement concerning the LAP deal was false and omitted material information concerning the true circumstances underlying the collapse of the deal, thereby misleading investors. The reason the deal fell through was not because LAP failed to satisfy a condition precedent but because SunEdison failed to make a single payment to LAP, including the initial closing payment, forcing LAP to walk away from the deal.

\*        \*        \*

309. In response to the Executive Defendants' materially false and misleading statements and omissions concerning SunEdison's liquidity position and cash supply and the purported reasons for the termination of the LAP acquisition, analysts touted the Company's growth rate and SunEdison's ability to generate cash. For example, in a report dated October 8, 2015, Macquarie Research responded to SunEdison's reassurances about its liquidity when it wrote that: "With US$1.4bn on the balance sheet, a 23% reduction to opex/watt guidance, and the promise of significantly clearer financial reporting coming soon, we are optimistic that market sentiment towards SUNE should improve considerably." SunEdison's stock price shot up

143

following the conference call, from a close of $8.69 on October 6, 2015, to close at $9.72 on October 7, 2015 – an increase of over 11%.

## I. Third Quarter Of 2015

### 1. Adequacy Of SunEdison's Liquidity

310. On November 9, 2015, the Company filed its Form 10-Q for the third quarter of 2015 (the "Third Quarter 2015 10-Q"), which was signed by Defendant Wuebbels. In that filing and in the conference call with analysts the next day, the Executive Defendants continued to falsely and misleadingly misrepresent the strength of SunEdison's liquidity position. Indeed, in the Third Quarter 2015 10-Q, the Company stated:

> As of September 30, 2015, on a consolidated basis, SunEdison had $2.4 billion of cash and cash equivalents of which $1.1 billion was held by GLBL, $636 million was held by TERP and $207 million was held by foreign subsidiaries not part of TERP and GLBL. As of September 30, 2015, SunEdison had access to $1.3 billion in cash and cash equivalents, including cash committed for construction projects.

> \*     \*     \*

> As of September 30, 2015, we had positive working capital of $655 million, compared to a working capital deficit of $356 million as of December 31, 2014. Our working capital is impacted by short-term borrowings and trade accounts payable used to construct renewable energy systems as well as the current portion of our long-term debt. For renewable energy systems that we intend to retain on our balance sheet, we intend to refinance these short-term construction borrowings with permanent capital, generally when these systems achieve commercial operations, which may include issuing long-term, non-recourse debt. Our working capital can also fluctuate significantly from period to period as a result of the timing of cash inflows and outflows associated with our development and construction activities.

> While we continue to incur significant indebtedness to fund our operations and acquisitions and have significant pending obligations, we believe that the sources of liquidity described below will be sufficient to support our operations for the next twelve months, although various factors could affect our liquidity position, including changes in the anticipated timing and terms of pending and completed acquisitions and the availability of project capital. Accordingly, no assurances can be made that we will not require additional sources of liquidity to execute our business plan. Management continues to regularly monitor our ability to finance the needs of operating, financing and investing activities within the dictates of prudent balance sheet management as our long-term growth will require additional

capital. Our ability to meet our debt service obligations and other capital requirements, including capital expenditures and acquisitions, will depend on various factors, including our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control.

311.    In addition to the statement above materially overstating the amount of cash SunEdison had, the Executive Defendants reiterated elsewhere in the Third Quarter 2015 Form 10-Q that: "Total liquidity as of September 30, 2015 was approximately $1.3 billion, comprised of cash and cash equivalents" and that "The Renewable Energy Development segment's liquidity as of September 30, 2015 was $1.3 billion, comprised of cash and cash equivalents and cash committed for construction projects."

312.    Similarly, during the Company's November 10, 2015 conference call, Defendant Wuebbels stated: "we have sufficient liquidity … with approximately $1.4 billion as of the end of the quarter."

313.    Likewise, in connection with SunEdison's issuing its third quarter 2015 financial results, the Executive Defendants materially misstated it available cash in a Company presentation dated November 10, 2015.  Specifically, the Executive Defendants stated that SunEdison had "$1.4 billion Cash at parent" as reflected below:



314.    These statements were materially false and misleading.  The Executive Defendants materially overstated the amount of cash available to SunEdison because, as discussed above in ¶¶105, 134, and 274, this figure consisted in part of a $500 million credit facility that SunEdison could not access.   Indeed, an internal non-public report circulated within SunEdison that same day showed that the Company had only <u>$90 million</u> in available cash.

315.    Indeed, by this time: (i) SunEdison had triggered a margin call payment of $152 million on the Margin Loan, an amount which SunEdison could not afford to pay; (ii) although disclosing the $152 million and $91 million payments under the Margin Loan as a result of a least two margin calls, the Executive Defendants failed to disclose that as a result of the payments under the Margin Loan, the Company's cash reserves were "drained" and that its financial outlook was

"fundamentally changed" – as the Company itself admitted on April 21, 2016 in connection with the Bankruptcy Proceeding; (iii) in order to pay off the margin call, SunEdison was forced to borrow $169 million from Goldman Sachs at 15% interest, which showed that SunEdison was a "distressed company" with "emergency cash needs"; (iv) as later revealed in the TERP Derivative Suit, by November 19, 2015, SunEdison was "actively exploring bankruptcy" and that TERP's financial advisor, Lazard, told TERP that "there was a real insolvency risk" if SunEdison did not obtain the funds from the YieldCos to pay off the Margin Loan; (v) the Company's August 2015 internal report referenced by the *WSJ* in an article dated April 14, 2016 indicated that the Company's would not be able to have a positive cash flow until at least the second quarter of 2016; (vi) in connection with the Bankruptcy Proceeding, SunEdison, on April 22, 2016, admitted that its liquidity crisis had been ongoing since at least April 2015; and (vii) SunEdison's its systemic problem of being able to pay its vendors was ongoing.

316.    Further, SunEdison later <u>admitted</u> that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, <u>including extensions of accounts payable</u>[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position false or, at minimum, misleading in light of the true underlying facts.  Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

317.    In the Company's Third Quarter 2015 10-Q, the Company, for the first time in the

Class Period, disclosed the Goldman Sachs Loan.  Specifically, in describing the Goldman Sachs

Loan, the 10-Q stated:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs"), providing for a term loan maturing on August 11, 2016, in an aggregate principal amount of $169 million. As of September 30, 2015, the current interest rate on the Term Loan is 9.25% … We paid fees of $9 million upon entry into the Second Lien Term Loan which were recognized as deferred financing costs.

318.    The Executive Defendants disclosure of the Goldman Sachs Loan was materially

false and misleading because, although the Company disclosed for the first time the loan's onerous

terms, the Company failed to disclose that SunEdison had entered into the loan agreement to pay

down the Margin Loan, triggered by the August 2015 margin call.

## 2.    False And Misleading Reasons For Terminating The LAP Deal

319.    In the Third Quarter 2015 10-Q, the Executive Defendants also made materially

false and misleading statements concerning the failed LAP deal.  The Executive Defendants stated

about the deal:

> On October 1, 2015, Holdings received a notice from the sellers purporting to terminate the Share Purchase Agreement. Following receipt of such notice, Holdings exercised its right under the Share Purchase Agreement to terminate the agreement based on the failure by the sellers to satisfy certain conditions precedent to closing and the transaction not closing prior to September 30, 2015.  As a result of such termination, Holdings will not acquire the Peru projects.

> On November 6, 2015, Holdings received a request for arbitration naming SunEdison, Holdings and TERP as respondents. In the request for arbitration, the claimants request, among other things, damages in an amount not less than $150 million. SunEdison and TERP believe their positions are well-founded and intend to defend themselves vigorously. However, SunEdison and TERP are in the preliminary stages of reviewing the request for arbitration and, as a result, are unable to provide reasonable estimates as to any potential liability.

320.    The Executive Defendants' statements concerning the LAP deal were false and

misleading because they omitted the material information that the reason the deal fell through was

not because LAP failed to satisfy certain conditions precedent but because SunEdison failed to make <u>a single payment to LAP</u>, including the initial closing payment, forcing LAP to walk away from the deal.

### 3.    Effectiveness Of Internal Controls

321.    In the Third Quarter 2015 10-Q, the Executive Defendants falsely and misleadingly represented that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls.  Specifically, in the Third Quarter 2015 10-Q, the Executive Defendants repeated the substantively identical materially false and misleading statements they made in the Second Quarter 2014 10-Q, the Third Quarter 2014 10-Q, the 2014 10-K, the First Quarter 2015 10-Q, and the Second Quarter 2015 10-Q concerning the effectiveness of the Company's disclosure controls and changes to SunEdison's internal controls, as referenced above in ¶¶228-230, 244-245, 252-253, 265-266, and 284-285, including the Executive Defendants' misrepresentation that: "<u>our disclosure controls and procedures were effective as of September 30, 2015</u>."

322.    Further, in the Company's Third Quarter 2015 10-Q, Defendants Chatila and Wuebbels each repeated the substantively identical materially false and misleading SOX certifications, as referenced above in ¶¶229-230, 245, 253, 266, and 285, such that they personally certified that they had evaluated the effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "<u>information contained in the Report [the Third Quarter 2015 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company</u>."

323.    The foregoing statements in the Third Quarter 2015 10-Q by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially

false and misleading for the reasons provided above in ¶¶66-94 and 231-232, including the material facts that the Company's financial reporting system consisted of a number of non-compatible programs, reliant on manual entry into a massive unsecured Excel spreadsheet that was rife with errors and subject to exploitation by Company management.

### 4. Item 303 Omissions

324. The Third Quarter 2015 Form 10-Q was also materially false and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  As described above in ¶¶233-235, pursuant to Item 303, the Executive Defendants were required to disclose: (i) the existence of trends within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."  Indeed, by this time: (i) SunEdison had triggered margin call payments of $152 million and $91 million on the Margin Loan, an amount which SunEdison could not afford to pay; (ii) although disclosing the $152 million and $91 million payments under the Margin Loan as a result of at least two margin calls, the Executive Defendants failed to disclose that as a result of the payments under the Margin Loan, the Company's cash reserves were "drained" and that its financial outlook was "fundamentally changed" – as the Company itself admitted on April 21, 2016 in connection with the Bankruptcy Proceeding; (iii) in order to pay off the margin call, SunEdison was forced to borrow $169 million from Goldman Sachs at 15% interest, which showed that SunEdison was a "distressed company" with "emergency cash needs"; (iv) in connection with the Bankruptcy Proceeding, SunEdison, on April 22, 2016, admitted that its liquidity crisis had been ongoing since at least April 2015; (v) SunEdison's systemic problem of being able to pay its vendors was ongoing; and (vi) the Company's August 2015 internal report referenced by the *WSJ*  in an article date April 14, 2016 indicated that the Company's would not be able to have a positive cash flow until at least the second quarter of 2016.

**J.**     **November 18, 2015 Deutsche Bank Investor Meeting**

325.     On November 18, 2015, the Executive Defendants took part in an investor meeting with Deutsche Bank in which SunEdison management answered multiple questions concerning issues that were raising doubt in investors' minds as to management's credibility, the Company's liquidity, and the sudden reclassification of over $700 million the Company's debt, which SunEdison reclassified as "recourse" for the first time in the Company's November 9, 2015 Form 10-Q.

326.     During the November 18, 2015 Deutsche Bank meeting, the Executive Defendants continued to misrepresent its liquidity and available cash.  Specifically, in response to the question "How much cash does the company really have?" the Executive Defendants told Deutsche Bank that:

> SUNE has roughly $1.35b of cash with about $700m of that cash held in project companies earmarked for working capital purposes. Timing of cash movements and the fact that SUNE gets EPC margin from these projects means that the cash can be utilized for other capital needs.

327.     The Executive Defendants' statement was materially false and misleading, as SunEdison did not have $1.3 billion of cash.  The Executive Defendants materially overstated the amount of cash available to SunEdison because, as discussed above in ¶¶105, 134, and 274, this figure consisted in part of a $500 million credit facility that SunEdison could not access.  Indeed, an internal non-public report circulated within SunEdison on November 9, 2015 that showed that the Company had only $90 million in available cash.

328.     Investors were also concerned about the terms of the recently-disclosed Goldman Sachs Loan and the reasons why SunEdison took out a loan at such a high interest rate, to which the Executive Defendants stated: "The Goldman loan was structured in July as part of the portfolio

formation for GLBL IPO. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects."

329.    The Executive Defendants' statement was materially false and misleading because, as referenced above in ¶¶112-115, 141, and 276, SunEdison entered into the loan because, in August 2015, as a result of the plummeting price of TERP stock, the terms of the Margin Loan were tripped, triggering a margin call – an amount which, because of SunEdison's poor liquidity position, the Company could not afford to pay down without taking out a loan, even one with such onerous terms.

330.    Investors were also concerned about the sudden reclassification of over $700 million of the Company's debt from non-recourse to recourse and the reasons for the Company's reclassification, to which the Executive Defendants stated:  "For the $410m margin loan, SUNE had to post cash collateral in Q3 due to the sharp decline in TERP shares.  Because of this cash trigger the company had to reclassify the loan from non-recourse to recourse. The interest payment on $337m exchangeable notes was always SUNE's obligation and the classification as non-recourse in prior quarter was due to clerical error."

331.    The Executive Defendants' statements were materially false and misleading because, while SunEdison claimed that the Margin Loan "became" a recourse loan when the Company had to post collateral during the third quarter, given the critical nature of this classification, and the fact that the Company was always responsible for its payment if TERP stock declined in value, the Executive Defendants' explanation actually makes it clear that the Margin Loan was always recourse under the Company's standards and should have been categorized as such.  Similarly, their claim to Deutsche Bank that it was a simple "clerical error" to label the

Exchangeable Notes as non-recourse was nonsense in light of the highly material and repeated nature of that misstatement, which could not be dismissed as a mere one-time "clerical error."

**K.      November 23 And 24, 2015 Forms 8-K And Press Releases**

332.    In a series of press releases and SEC filings on November 23 and 24, 2015, the Executive Defendants misled investors concerning the corporate reorganization of the YieldCos and the acquisition of the India Projects.

333.    First, in two separate Forms 8-K dated November 23 and 24, 2015, SunEdison announced that it had prepaid all but $5 million of the Margin Loan.  In the Form 8-K dated November 23, 2015, the Executive Defendants stated that: "approximately $307 million … was prepaid by [SunEdison] under the Margin Loan Agreement, which included payment of the principal and accrued but unpaid interest."  In the Form 8-K dated November 24, 2015, the Executive Defendants stated that in connection with a payment of $95 million made on November 20, 2015, "[A]pproximately $5 million of principal amount remain outstanding under the Margin Loan Agreement, which is cash collateralized."

334.    These statements were materially misleading because the Executive Defendants did not disclose the highly material information concerning the desperate and deceitful maneuvers the Executive Defendants undertook to obtain the funds in order to make this payment, or that SunEdison had been under an obligation to mandatorily prepay the loan since October 2015.  These material omissions mislead investors into believing that the Company has had adequate liquidity to repay the loan in a timely fashion, without the disparate measures that revealed it to be an effectively bankrupt Company.

335.    Second, in a Form 8-K dated November 23, 2015 and an attached press release dated that day, SunEdison announced the reconstitution of the Yieldco boards, the removal of the YieldCos' officers, and the appointment of Defendant Wuebbels as CEO of the YieldCos.  In the

press release announcing the change, titled "SunEdison Announces Changes To Drive Organizational Alignment And Effectiveness," SunEdison claimed that the management changes were implemented to "improve the alignment and effectiveness of its operating structure" and "drive operational efficiency."

336.    These statements were materially false and misleading because the Executive Defendants omitted the true reason for the SunEdison-manipulated corporate reorganization: that SunEdison was originally refused by Global the $100 million it so desperately needed by November 20, 2015, and SunEdison, teetering on the brink of default, used its power over the YieldCos to shuffle its affiliates' boards and Conflict Committees in order to loot Global of its cash in order pay down the Margin Loan.

337.    Third, in a press release dated November 24, 2015, the Executive Defendants also made materially false and misleading statements touting the agreement with Global concerning the India Projects.  In a press release dated November 24, 2015, Defendant Wuebbels stated that "[w]e are pleased to be able to add these accretive assets with 20 year contracted cash flows to TerraForm Global's portfolio and believe they are critical to achieving our 2016 dividend guidance."   In that same press release, while never mentioning how SunEdison was able to sell these projects to Global, Defendant Chatila stated: "This agreement is a win-win for both SunEdison and TerraForm Global shareholders. This transaction provides accretive [dividends per share ("DPS")] to TerraForm Global shareholders."

338.    This statement was materially false and misleading.  As Global would later learn, the India Projects were far from complete and ready to be dropped down – indeed, Global would be forced to invest another $73 million just to obtain the India projects.  Thus, the transaction announced on November 24 – in which Global paid $231 million – did not provide accretive DPS

to Global shareholders and could not contribute to the 2016 dividend guidance. Instead, as set forth in Section IV.H above, Global was deceived and the money diverted to pay the margin call, an American Express bill, and SunEdison's attorneys' fees.

339. Analysts credited the Executive Defendants' false and misleading statements. In a report dated November 24, 2015, J.P. Morgan stated that in regards to SunEdison's paying down the Margin Loan, "We believe this is a positive for both SUNE and TERP, removing some of the technical trading that has weighed on both stocks" and that in regards to the Indian project sales to Global, "We believe the sale is a positive for SUNE, providing liquidity …" Likewise, in a report dated November 24, 2015, Deutsche Bank stated that in regards to the Margin Loan pay down and the project sales to Global, "We view these announcements as a positive for SUNE and TERP shareholders as it removes the margin loan overhang, which had caused technical pressure over the last several months. Furthermore, the sale of ~425MW of Indian assets suggests that SUNE is effectively leveraging its GLBL yieldco to free up cash and deleverage the balance sheet."

## L.   December 29, 2015 Business Update

340. On December 29, 2015, the Executive Defendants provided investors and analysts with SunEdison's December 2015 Business Update, which was published on the Company's website in the "Investors" part of the website on December 24, 2015. As referenced above, slides from this presentation were previously distributed to lenders in November 2015 in an effort to fund the Company's continuing operation. As part of this effort, the Executive Defendants issued materially false and misleading statements concerning the Company's Services Business, its business segment devoted to operations and maintenance, asset management and monitoring services to its YieldCos, warehouses, and third party projects. Specifically, the Company reported that its Services Business would generate profit of $235 million on $443 million in revenue with a 53% margin. The relevant slide from the December 24, 2015 Business Update is reflected below:

## Services Business Valuation Forecasts

| ($ in millions) | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 2016 | |
|---|---|---|---|---|---|---|
| O&M Revenue | 21 | 22 | 24 | 24 | 92 | |
| IPP PPA Revenue | 34 | 34 | 34 | 33 | 134 | |
| SLB PPA Revenue | 18 | 18 | 18 | 18 | 72 | |
| 3rd Party O&M Revenue | 23 | 30 | 41 | 52 | 146 | |
| **Total Revenue** | **96** | **104** | **116** | **128** | **443** | Comps' 2016 median EBITDA multiple: 11.5x |
| O&M Costs | 15 | 16 | 17 | 17 | 64 | |
| IPP Costs | 6 | 6 | 6 | 6 | 22 | |
| SLB Costs | 12 | 12 | 12 | 12 | 47 | |
| 3rd Party Costs | 9 | 16 | 21 | 29 | 74 | |
| **Total Costs** | **41** | **49** | **55** | **63** | **208** | Valuation multiple for Services business: 10.0x |
| % of sales | 43% | 47% | 47% | 49% | 47% | |
| O&M Profit | 6 | 7 | 7 | 7 | 28 | |
| IPP Gross Profit | 28 | 28 | 28 | 28 | 112 | |
| SLB Gross Profit | 6 | 6 | 6 | 6 | 24 | |
| 3rd Party Gross Profit | 14 | 14 | 20 | 24 | 71 | |
| **Total Gross Profit** | **54** | **55** | **61** | **65** | **235** | Enterprise value: $2,231m |
| % margin | 57% | 53% | 53% | 51% | 53% | |
| OpEx | (3) | (3) | (3) | (3) | (12) | |
| % of sales | 3% | 3% | 3% | 2% | 3% | |
| **EBITDA** | **51** | **51** | **58** | **62** | **223** | |
| % margin | 54% | 50% | 50% | 49% | 50% | |

Note: Comps multiples based off market data as of 12/9/2015
Services EBITDA does not include standalone corporate costs

P. 11

SunEdison®

341.     These statements were materially false and misleading, because these figures were not what the Company itself was actually internally projecting.  According to an article dated April 14, 2016 in the *WSJ*, the figures shown to potential lenders touted financial projections that differed sharply from figures prepared by senior managers just a few weeks earlier.  Specifically, a 2016 budget prepared in mid-November for SunEdison's Services Business projected a $21 million profit on $133 million in revenue, a margin of about 16%.

342.     In the December 2015 Business Update, the Executive Defendants once again materially misstated SunEdison's available cash, representing that it began the third quarter 2015 with over $1.3 billion in cash, as reflected below:



343.    The Executive Defendants' statement were materially false and misleading, as SunEdison did not have $1.3 billion of cash.  The Executive Defendants materially overstated the amount of cash available to SunEdison because, as discussed above in ¶¶105, 134, and 274, this figure consisted in part of a $500 million credit facility that SunEdison could not access.  Indeed, an internal non-public report circulated within SunEdison on November 9, 2015 that showed that the Company had only $90 million in available cash.

## VII.    Summary Of Scienter Allegations

344.    Defendants Chatila and Wuebbels each acted with scienter in that each knew or recklessly disregarded that the public statements regarding SunEdison's liquidity, categorization of debt as non-recourse, the Margin Loan, and the other topics discussed above were materially

false and misleading when made.  The information in this section is a summary of the allegations detailing the Executive Defendants' scienter that are set forth more fully above.

345.   <u>First</u>, Defendants Chatila's and Wuebbels' scienter is supported by the fact that their public statements were, in many instances, directly contradicted by internal information that they had, but that was not available to investors.  For example, Defendants Chatila's and Wuebbels' presentation to investors on November 9, 2015 touted $1.4 billion in available cash at the DevCo, when a contemporaneous confidential Company document showed only $90 million in available cash.  Moreover, from August 2015-December 2015, the Executive Defendants repeatedly claimed that the Company had access to the Inaccessible Warehouse Facility of approximately $500 million, when that cash was in fact not available to the Company.  Further, Defendants Chatila's and Wuebbels' scienter is supported by the fact that they were on regular weekly internal calls in which long-overdue vendor invoices were discussed, including the material impact the failure to pay those critical vendor invoices was having on the Company.  This included a January 2015 "all-hands" conference call, in which Defendant Chatila berated a SunEdison manager for raising concerns about vendor invoices, stating that the Company's inability to pay its bills was the price of its rapid growth.  As the Company was eventually forced to admitted at the end of the Class Period, SunEdison's practice of extending (and not paying) its accounts payable constituted a material weakness in its internal controls, notwithstanding Defendant Chatila's and Wuebbels' repeated certifications to the contrary.

346.   <u>Second</u>, Defendant Chatila's and Wuebbels' scienter is supported by the numerous internal whistleblower complaints that were raised to their (and the SunEdison Board's) attention related to concerns about the accuracy of the Executive Defendants' public statements and the accuracy of SunEdison's liquidity problems, including its pattern of not paying its bills.  These

reports began no later than late October 2015, when the YieldCo senior-most executives "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition."  Then, in mid-November 2015, according to the April 14 *WSJ* article, SunEdison's "senior officials" raised concerns to the SunEdison Board with concerns that "SunEdison was running out of money and wasn't being honest with investors about its financial problems."  Further, in January or February 2016, SunEdison's Audit Committee initiated an investigation "concerning the accuracy of the Company's anticipated financial position based on certain additional issues raised by a current and a former employee of the Company."  Finally, the Company's own subsidiary (Global) and a former longstanding member of the Company's Board of Directors (Director Blackmore) have accused Defendants Chatila and Wuebbels of fraud and deception and, according to the *WSJ*, caused Wuebbels to be ousted from Global after it was discovered.

347.   Third, Defendant Chatila's and Wuebbels' scienter is supported by their direct involvement in the desperate overthrow of the YieldCos' Conflicts Committee and management in order to obtain the cash necessary to pay the Margin Loan – cash they knew the Company did not otherwise have.  The fact that they were personally involved in these events establishes their personal knowledge concerning the Margin Loan and SunEdison's true state of liquidity, and also definitively establishes their knowledge of the true material facts concerning the restructuring and the purchase of the India Projects that were omitted from the Company's subsequent public statements.

348.   Fourth, the Executives Defendants' shifting explanations for how the Company mischaracterized the Margin Loan as "non-recourse" further support a strong inference of scienter.  At first, Defendants told Deutsche Bank in a November 18, 2015 investor meeting that,

once SunEdison had to post additional cash collateral for the Margin Loan, it then had to "reclassify the loan from non-recourse to recourse."  While this explanation makes little sense, it is contradicted by the explanation that the Executive Defendants later settled upon.  Later, the Executive Defendants implied that it was the late September 2015 amendment to the Margin Loan – over a month after SunEdison first had to post additional cash collateral – that changed the loan from non-recourse to recourse.  Neither explanation holds water, and the Executive Defendants' changing and contradictory explanations supports the inference of their scienter.  These same Defendants attempted to excuse the failure to properly disclose the related $337 million in Exchangeable Notes as recourse debt as a "clerical error," an explanation that cannot possibly be credited as true given the importance of that categorization to the Company's debt levels and liquidity.

349.  <u>Fifth</u>, Defendants Chatila's and Wuebbels' scienter is supported by the fact that they fired the whistleblower YieldCo senior executives who "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition."

350.  <u>Sixth</u>, Defendants Chatila and Wuebbels were directly involved in negotiating and agreeing to the terms of the emergency Goldman Sachs Loan.  The Director of Asset Management and Operations at SunEdison from December 2014 to December 2015 confirmed that, given the size of the loan, Defendant Wuebbels would have had to sign off on the loan in consultation with Defendant Chatila.  Therefore, they knew that the Company desperately needed these funds, borrowed them at an unusually high interest rate, and had not disclosed the terms of the loan in either the August 6, 2015 communications with investors, in the August 2015 Offering Documents, or in the early October 2015 communications with investors.

351.   Seventh, Defendants Chatila's and Wuebbels' scienter is supported by the fact that they consistently spoke to investors on these topics, as set forth above.  Indeed, on every earnings conference call during the Class Period, at least one (if not both) of the Executive Defendants spoke to analysts and fielded questions about the Company's available cash and debt categorization.  For example, throughout 2014, Defendant Wuebbels assured analysts on quarterly conference calls that "we remain comfortable with our balance sheet and our liquidity position."  Further, for every investor presentation during the Class Period, the Executive Defendants included a clear guide setting forth the categorization of its debt, falsely placing the Margin Loan and Exchangeable Notes into the "recourse" category.  In August 2015, one of the principal headlines to the Executive Defendants' earnings call presentation to analysts was the false representation that there was "[g]reater than $1 Billion of Cash at DevCo."  For the remainder of the Class Period, given the extraordinarily heightened focus on the Company's cash position, the Executive Defendants were repeatedly called upon to comment on the Company's cash and debt position.  They were therefore aware of and sensitive to the highly material nature of this information, and held themselves out as knowledgeable about this topic.  Therefore, investors reasonably expected them to have knowledge about the truth or falsity of their statements.

352.   Eighth, Defendants Chatila's and Wuebbels' scienter is supported by the critical importance of the topics that were the subjects of their misstatements to the financial success of the Company and investors' interest in the Company.  SunEdison's liquidity and the categorization of its debt were directly related to the financial health of the Company and its ability to execute on its aggressive growth plan.  Moreover, as SunEdison's counsel informed the Bankruptcy Court, SunEdison's outside vendors played a unique and critical role in the success of SunEdison's business.  Thus, as substantiated by the Executive Defendants' personal involvement in the regular

internal calls discussing overdue accounts payable, discussed above, these Executive Defendants knew, or were reckless in not knowing, that SunEdison did not have the necessary funds to pay these key vendors.

353.   Ninth, the consistent and endemic nature of the Company's inability to pay its core key vendors due to a lack of funds further supports the Executive Defendants' scienter.  As set forth above, numerous former employees from all levels of the corporate hierarchy – from the Senior Auditor and Accountant to the Executive Assistant to the CFO of TERP – confirmed that, as early as the summer of 2014, SunEdison was internally facing desperate cash shortages and could not pay its bills.  As a result, from even before the beginning of the Class Period, the Company repeatedly could not pay relatively small electricity bills – putting the operations of several of its key plants in danger – as well as, among other core vendors, the bills of a key due diligence partner, Garrad Hassan.  The consistent and widespread nature of these accounts supports the strong inference that the Executive Defendants knew, or were reckless in not knowing, that SunEdison's liquidity position was far from "comfortable."

354.   Similarly, the widespread knowledge throughout the Company that its internal controls over financial reporting were "a web of chaos and confusion" supports a strong inference of scienter as to the Executive Defendants' repeated certifications of SunEdison's internal controls. The Executive Defendants never ensured that, as SunEdison acquired other companies in the years leading up to the Class Period, the disparate financial reporting systems from the different companies could be integrated and could work together with SunEdison's own basic reporting structure.  Instead, as set forth in detail above, the backbone of SunEdison's critical financial reporting apparatus was a massive Excel spreadsheet with thousands of manual entries and few access controls, and was rife with errors.  These employees reported that the Executive Defendants

– in particular Defendant Wuebbels as CFO – were aware of these systemic issues and that the executive team had communicated to SunEdison employees that fixing these issues purportedly was "priority number 1," but the problems were not remedied.

## VIII.  Loss Causation

355.    The Executive Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased SunEdison common stock, the Preferred Stock, publicly traded call options and/or sold publicly traded put options on SunEdison common stock (collectively, the "SunEdison Securities") at artificially inflated prices and were damaged thereby when the price of SunEdison Securities declined when the truth was revealed. The price of SunEdison Securities significantly declined (causing investors to suffer losses) when the Executive Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Executive Defendants materialized.

356.    Specifically, the Executive Defendants' materially false and misleading statements misrepresented, *inter alia*, the Company's liquidity position, debt levels and categorization, and corporate structure. When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of SunEdison securities declined. As a result of the disclosure of the truth of the Executive Defendants' fraud, SunEdison's common stock price declined over 99%, from a closing price of $21.59 per share on August 7, 2014 to a closing price of $0.21 per share on April 4, 2016.  Similarly, the price of the Preferred Stock declined over 97%, from an offering price of $1000.00 per share on August 18, 2015 to a closing price of $23.00 per share on April 4, 2016.

357.   The disclosures that corrected the market prices of SunEdison's securities to reduce the artificial inflation caused by the Executive Defendants' materially false and misleading statements and omissions are detailed below and summarized in the following chart, which identifies each corrective disclosure event, the price declines in SunEdison common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 08/25/15 | UBS downgraded SunEdison to "Neutral" and disclosed that a margin call had been made on the Margin Loan. | $8.80 | **-18%** | -1% |
| 11/9/15 **(11/10/15)** | SunEdison disclosed: (i) the terms of the Goldman Sachs Loan; (ii) that it had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015; and (iii) that it had reclassified over $700 million of the Company's debt as "recourse." | $5.77 | **-22%** | -1% |
| 01/07/16 | SunEdison issued $725 million in highly dilutive debt. | $3.34 | **-39%** | -2% |
| 02/10/16- 02/12/16 **(2/12/16)** | Shareholders of Latin American Power file a detailed complaint against SunEdison for willfully breaching its share purchase agreement, and the New York Supreme Court issues a temporary restraining order against SunEdison. | $1.41 | **-40%** | 1% |
| 02/29/16 **(3/1/16)** | SunEdison announced: (i) that it would delay filing its 2015 Form 10-K; (ii) that it had initiated an inquiry in late 2015 based on former executives of the Company raising allegations concerning SunEdison's financial condition; (iii) that the Audit Committee had initiated an investigation concerning the accuracy of the Company's anticipated financial position based on additional issues raised by a current and former employee of SunEdison; and (iv) that TERP would be delaying the filing of its 2015 Form 10-K. | $1.50 | **-24%** | -1% |
| 03/02/16 **(3/3/16)** | SunEdison announced that it had suspended payment of quarterly dividends on the Company's Preferred Stock. | $1.52 | **-15%** | 0% |
| 03/22/16 | Reuters, in addition to other media outlets, reported that SunEdison was in the process of negotiating DIP financing. | $1.49 | **-26%** | 0% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 03/28/16-03/29/16 **(3/29/16)** | The *WSJ* reported that the SEC was investigating SunEdison's disclosures concerning the Company's available cash, specifically whether SunEdison had overstated that it had more than $1 billion in cash in the fall of 2015; Global announced that it would be delaying the filing of its 2015 Form 10-K, citing material weaknesses in internal controls over financial reporting and noting that "due to SunEdison's liquidity difficulties," there was a substantial likelihood that SunEdison would be filing for bankruptcy. | $0.57 | **-55%** | 1% |
| 03/31/16 **(4/1/16)** | SunEdison disclosed that the DOJ was investigating SunEdison and had issued subpoenas to the Company and confirmed that the SEC had been investigating the Company. | $0.43 | **-20%** | 0% |
| 04/04/16 | It became public that Global had filed a highly detailed damning complaint against SunEdison in the Court of Chancery for the State of Delaware. | $0.21 | **-51%** | 0% |
| *\*Date of stock price drop in parentheses* | | | | |

358.    Accordingly, as a result of their purchases of SunEdison's publicly traded SunEdison common stock, the Preferred Stock, publicly traded call options and/or sales of publicly traded put options on SunEdison common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## IX.    Presumption Of Reliance

359.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Executive Defendants are predicated upon omissions of material fact that there was a duty to disclose.

360.    Plaintiffs are also entitled to a presumption of reliance on the Executive Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    SunEdison common stock was actively traded in an efficient market on the NYSE;

(b)     SunEdison common stock traded at high weekly volumes, with an average of over 127,215,967 shares traded each week during the Class Period. The average weekly turnover as a percentage of shares outstanding was approximately 43.9% (median of 26.4%), well surpassing the higher 2% threshold level of average weekly trading volume indicative of an efficient market;

(c)     SunEdison publicly-traded options were listed and actively traded on the Chicago Board of Options and other national options exchanges, highly efficient markets;

(d)     As a regulated issuer, SunEdison filed periodic public reports with the SEC;

(e)     SunEdison was eligible to file registration statements with the SEC on Form S-3;

(f)     SunEdison and the Executive Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g)     The market reacted promptly to public information disseminated by SunEdison;

(h)     SunEdison securities were covered by numerous securities analysts employed by major brokerage firms, including UBS, Deutsche Bank, Credit Suisse, Morgan Stanley, RBC Capital Markets, Canaccord Genuity, S&P Capital IQ, Cowen & Company, and Piper Jaffrey.  Each of these reports was publicly available and entered the public marketplace;

(i)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of SunEdison securities; and

(j)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired SunEdison securities between the time the Executive Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

361.   Accordingly, the market for SunEdison securities promptly digested current information with respect to SunEdison from all publicly-available sources and reflected such information in the prices of those securities. Under these circumstances, all purchasers of the

Company's publicly traded common stock, Preferred Stock, and call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies. Likewise, all sellers of the Company's publicly-traded put options during the Class Period suffered similarly injury through their transactions at prices that were distorted by the artificially inflated price of SunEdison common stock, and a presumption of reliance applies.

## X.    Inapplicability Of Statutory Safe Harbor

362.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

363.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Executive Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of SunEdison who knew that the statement was materially false or misleading when made.  For example, the Executive Defendants' statements concerning the adequacy of the Company's then-existing liquidity and ability to meet the Company's future capital needs were directly contradicted by the fact that, as the Executive Defendants knew, the Company would immediately have to seek other sources of liquidity, and the Company was able to continue its growth trajectory only by delaying critical payments to vendors, putting the

Company's growth at risk.  Similarly, Defendant Chatila's statement in early September that he expected SunEdison to begin generating cash in "late 2015, early 2016" was directly contradicted by the fact that, as Chatila knew, SunEdison did not project to generate cash until late 2016.  These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XI.   Claims Brought Pursuant To The Exchange Act

**FIRST CLAIM FOR RELIEF**
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**(Against Defendants Chatila And Wuebbels)**

364.   Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

365.   During the Class Period, Defendants Chatila and Wuebbels disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

366.   The Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of SunEdison common and preferred stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Executive Defendants' public statements, concerned, among other things, (i) the strength of SunEdison's liquidity position and its available cash; (ii)

the classification of over $700 million of the Company's recourse debt; (iii) the efficacy of the Company's internal controls over financial reporting; (iv) the Margin Loan; (v) the Goldman Sachs Loan; (vi) the reasons why the LAP deal fell through; and (vii) Item 303 misrepresentations.

367.    The Executive Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, (a) the strength of SunEdison's liquidity position and its available cash; (b) the classification of over $700 million of the Company's recourse debt; (c) the efficacy of the Company's internal controls over financial reporting; (d) the Margin Loan; (e) the Goldman Sachs Loan; (f) the reasons why the LAP deal fell through; and (g) Item 303 misrepresentations; (ii) artificially inflate and maintain the market price of SunEdison stock; and (iii) cause members of the Class to purchase SunEdison securities at artificially inflated prices.

368.    Defendants Chatila and Wuebbels, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these Executive Defendants was able to and did control the content of the public statements disseminated by SunEdison.  These Executive

Defendants had direct involvement in the daily business of the SunEdison and participated in the preparation and dissemination of the false and misleading statements.

369.    In addition, Defendants Chatila and Wuebbels are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

      i.    <u>Chatila:</u> signed the following SEC filings: (i) the Company's September 9, 2013 Shelf Registration Statement; and (ii) the 2014 10-K.  He also made statements in and was directly responsible for other statements made in SunEdison quarterly filings and press releases filed with the SEC on Forms 8-K, including on the following dates: (i) August 7, 2014; (ii) November 5, 2014; (iii) March 2, 2015; (iv) May 7, 2015; (v) August 6, 2015; (vi) August 18, 2015; (vii) November 9, 2015; and (viii) November 24, 2015.  He also made statements during conference calls and conferences and other public statements during the Class Period, including on the following dates: (i) September 2, 2015; and (ii) October 7, 2015.

      ii.    <u>Wuebbels</u> signed the following SEC filings: (i) the Company's September 9, 2013 Shelf Registration Statement; (ii) the Second Quarter 2014 10-Q; (iii) the Third Quarter 2014 10-Q; (iv) the 2014 10-K; (v) the First Quarter 2015 10-Q; (vi) the Second Quarter 2015 10-Q; and (vii) the Third Quarter 2015 10-Q.  He also made statements in and was directly responsible for other statements made in SunEdison annual, quarterly filings, and press releases filed with the SEC on Forms 8-K, including on the following dates: (i) August 7, 2014; (ii) November 5, 2014; (iii) March 2, 2015; (iv) May 7, 2015; (v) August 6, 2015; (vi) August 18, 2015; (vii) November 9, 2015; and (viii) November 24, 2015.  He also made statements during numerous conference calls and conferences during the Class Period, including on the following dates: (i) August 7, 2014; (ii) November 6, 2014; (iii) August 5, 2015; (iv) October 7, 2015; and (v) November 10, 2015.

370.    As described above, these Executive Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

371.    Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for SunEdison securities.  Plaintiffs and the Class would not have purchased SunEdison securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Executive Defendants' misleading statements.

372.     As a direct and proximate result of the Executive Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of SunEdison securities during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Chatila And Wuebbels)

373.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

374.     This Count is asserted against Defendants Chatila and Wuebbels for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

375.     As alleged herein, the Executive Defendants caused SunEdison to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities throughout the Class Period. This conduct was undertaken with the scienter of the Executive Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period. The Company is not named as a defendant only because of its bankruptcy.

376.     During their tenures as officers and/or directors of SunEdison, the Executive Defendants were controlling persons of SunEdison within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of SunEdison, these Executive Defendants had the power and authority to cause SunEdison to engage in the wrongful conduct complained of herein.  As set forth in detail above, the Executive Defendants named in this Count were able to and did control, directly and indirectly, and exert control over SunEdison, including the content of the public statements made by SunEdison during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

377.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Chatila and Wuebbels had direct involvement in the day-to-day operations of the Company and in SunEdison's financial reporting and accounting functions.  Each of these Executive Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by SunEdison during the Class Period.  Further, as detailed above, Defendants Chatila and Wuebbels had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

378.    Defendant Chatila served as SunEdison's President and CEO, and as a director of SunEdison.  In this dual capacity as the senior manager of the Company and member of the Board, Defendant Chatila had ultimate control over the actions of SunEdison.

379.    Defendant Wuebbels served as SunEdison's Executive Vice President, Chief Administrative Officer, and CFO.  In this capacity as a senior manager of the Company, Defendant Wuebbels had ultimate control over the actions of SunEdison.

380.    Defendants Chatila and Wuebbels each personally participated in regular Company calls concerning unpaid vendor invoices.  They also participated in the negotiations of the Margin Loan, Exchangeable Notes, and the Goldman Sachs Loan.

381.    By reason of their positions as officers of SunEdison, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control SunEdison – each of these Executive Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions, these Executive Defendants had access

to adverse nonpublic financial information about the Bank and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  Moreover, each of the Executive Defendants was also involved in providing false information and certifying and/or approving the false statements disseminated by Company during the Class Period.  Each of these Executive Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

382.    As set forth above, the Executive Defendants caused SunEdison to violate Section 10(b) of the Exchange Act by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period. This conduct was undertaken with the scienter of the Executive Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period. The Company is not named as a defendant only because of its bankruptcy.

383.    As a direct and proximate result of these Executive Defendants' conduct, Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of SunEdison securities.

## XII.   Securities Act Claims

384.    In this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶489 below, except that Plaintiffs explicitly disclaim subparts [d] and [h] of ¶491 from these Securities Act allegations).  Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from

Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Preferred Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Preferred Offering.

385.    On August 17, 2015, SunEdison announced that it intended to conduct an offering of 500,000 shares of convertible preferred securities to raise funds "for general corporate purposes," including "funding working capital and growth initiatives." (the " Preferred Offering"). Just one day later, on August 18, the Company announced that it had increased the offering to 650,000 shares, priced at $1,000 per share, to raise $650 million in total.

386.    The Preferred Offering was conducted pursuant to a Shelf Registration Statement filed on Form S-3 dated September 9, 2013 (the "Shelf Registration") and a prospectus supplement dated August 18, 2015, Registration No. 333-191053 (the "Offering Prospectus," and together with the Preferred Offering Prospectus, the "Offering Documents") for the offering of Series A Perpetual Convertible Preferred Stock ("Preferred Stock").

387.    The Offering Documents incorporated by reference SunEdison's 2014 Form 10-K, the First Quarter 2015 10-Q, and the Second Quarter 2015 10-Q.[4]  In addition, the 2014 10-K contained a "Report of Independent Registered Public Accounting Firm" signed by Defendant KPMG, as further described in Section XII.D below.

388.    Accordingly,    the   Offering   Documents   incorporated   numerous   material misstatements and omissions concerning SunEdison's liquidity, the purported effectiveness of the

---

[4] In addition to enumerating by name certain of these SEC filings as having been "incorporated by reference," the Registration Statement also expressly represented that "[a]ll documents [SunEdison] file[s] pursuant to Section 13(a), 13(c), 14, or 15(d) of the Exchange Act … after the date of this prospectus supplement and prior to the termination of the offering under the prospectus supplement."  Here, all of the Company's Forms 10-K and 10-Q were filed pursuant to either Section 13 or Section 15(d) of the Exchange Act.

Company's internal controls over financial reporting, the misclassification of over $700 million of SunEdison's recourse debt, the Margin Loan, the Goldman Sachs Loan and the Item 303 misstatements as specified below.

### A.    Securities Act Defendants

389.    Each of the following Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in the Offering Documents.

### 1.    The SunEdison Defendants

390.    Defendants Chatila and Wuebbels (described above at ¶¶20-21) were each officers of SunEdison and signed the Company's Registration Statement.  Chatila signed the Company's 2014 10-K, and Wuebbels signed the Company's 2014 10-K, as well as the Company's First Quarter 2015 10-Q and Second Quarter 2015-10-Q, all of which were incorporated into the Offering Documents. Defendant Chatila was also a member of the Board at the time of the filing of the Offering Documents.

391.    Defendant Emmanuel Hernandez ("E. Hernandez") was, at all relevant times, the Executive Chairman and Chairman of the Board of SunEdison.  Hernandez has served as Executive Chairman of the Board since November 2015, Chairman of the Board since January 2013, and as a member of the Board since 2009.  During the Class Period, Hernandez also served as a member of the Audit Committee. Among other documents, Hernandez signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

392.    Defendant Antonio R. Alvarez ("Alvarez") was, at all relevant times, a director of SunEdison.  Alvarez has served as a director of SunEdison since October 2012.  During the Class Period, Alvarez also served as a member of SunEdison's Compensation Committee. Among other

documents, Alvarez signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

393.    Defendant Peter Blackmore ("Blackmore") was, at all relevant times, a director of SunEdison. Blackmore became a director of MEMC Electronic Materials, Inc. ("MEMC") the former name of the SunEdison parent company, in February 2006.  He served as a director of SunEdison from February 2006 until November 2015 when he resigned from the Company's Board.  During the Class Period, Blackmore served as chairman of SunEdison's Nominating and Corporate Governance Committee and a member of SunEdison's Compensation and Finance and Investment Committees.  After resigning from SunEdison in November 2015, Blackmore served as Chairman of the Board of TERP and Global from November 2015 through the end of the Class Period and served as Chairman of TERP and Global's Corporate Governance And Conflicts Committee (the "Conflicts Committee") from November 2015 throughout the end of the Class Period.  Blackmore signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  As a member of Global's Conflicts Committee, Blackmore authorized the filing of the Global Complaint against SunEdison.

394.    Defendant Clayton C. Daley, Jr. ("Daley") was, at all relevant times, a director of SunEdison. Daley joined SunEdison as member of its Board of Directors on August 1, 2014.  Daley also served as a member of SunEdison's Audit Committee and Finance and Investment Committee.  Daley was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

395.    Defendant Georganne Proctor ("Proctor") was, at all relevant times, a director of SunEdison. Proctor joined SunEdison as a member of its Board of Directors on October 30, 2013. Proctor also served on SunEdison's Audit Committee, and, in June 2014, was appointed Chairman

of SunEdison's Audit Committee, a position which she held throughout the end of the Class Period. Proctor was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

396.    Defendant Steven V. Tesoriere ("Tesoriere") was, at all relevant times, a director of SunEdison. In October 2012, Tesoriere was appointed to serve as a director of the Board of MEMC, and served on the Board of Directors of SunEdison from that time until his resignation on January 19, 2016.  Tesoriere also served as a member of SunEdison's Audit Committee and served as the Chairman of the Company's Finance and Investment Committee.  Tesoriere also served as a TERP director beginning in May 2014, a Global director beginning in August 2015, and served as a member of the YieldCos' Audit Committees until he resigned as director of the YieldCos on November 20, 2015.  Tesoriere signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

397.    Defendant James B. Williams ("Williams") was, at all relevant times, a director of SunEdison. Williams served as a director of MEMC beginning in 2003 and served as a director of SunEdison from then until the end of the Class Period. Williams also served as Chairman of SunEdison's Compensation Committee and as a member of SunEdison's Nominating and Corporate Governance Committee. Williams signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

398.    Defendant Randy H. Zwirn ("Zwirn") was, at all relevant times, a director of SunEdison.  Zwirn joined MEMC's Board of Directors and served as a director beginning in March 2013 and served as a director of SunEdison until the end of the Class Period.  Zwirn also served as a member of SunEdison's Finance and Investment Committee and Nominating and Corporate Governance Committee.  Zwirn signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.

399.     Defendants Hernandez, Alvarez, Blackmore, Tesoriere, Williams, and Zwirn were each Directors of SunEdison at the time of the filing of the Offering Documents and signed the Company's Registration Statement, as well as the 2014 10-K, which was then incorporated into the Offering Documents.

400.     Defendant Daley and Proctor were directors of SunEdison on at the time of the filing of the Offering Documents.  Daley and Proctor also signed the Company's 2014 10-K, which was incorporated into the Offering Documents.

401.     Defendants Chatila, Wuebbels, Hernandez, Alvarez, Blackmore, Tesoriere, Williams, Zwirn, Daley and Proctor are, for the purposes of Plaintiffs' Securities Act Claims, hereinafter referred to as the "SunEdison Defendants."

### 2.     The Underwriter Defendants

402.     Defendant Goldman, Sachs & Co. ("Goldman") is an investment banking and financial services corporation that served as a co-lead underwriter of the Preferred Offering. In the Preferred Offering, Goldman sold and distributed a total of 138,890 shares of Preferred Stock to the investing public. Goldman was paid at least $5,000,040 for its underwriting services. Goldman's headquarters are located at 200 West Street, New York, NY 10282.

403.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking and financial services corporation that served as a co-lead underwriter of the Preferred Offering.  In the Preferred Offering, Merrill Lynch sold and distributed a total of 129,606 shares of Preferred Stock to the investing public. Merrill Lynch was paid at least $4,665,816 for its underwriting services.  Merrill Lynch's headquarters are located at One Bryant Park, New York, NY 10036.

404.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment banking and financial services corporation that served as co-lead underwriter of the Preferred

Offering.  In the Preferred Offering, Deutsche Bank sold and distributed a total of 129,606 shares of Preferred Stock to the investing public. Deutsche Bank was paid at least $4,665,816 for its underwriting services.  Deutsche Bank's US headquarters are located at 60 Wall Street, 4th Floor, New York, NY 10005.

405.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking and financial services corporation that served as a co-lead underwriter of the Preferred Offering. In the Preferred Offering, Morgan Stanley sold and distributed a total of 129,606 shares of Preferred Stock to the investing public.  Morgan Stanley was paid at least $4,665,816 for its underwriting services.  Morgan Stanley's headquarters are located as 1585 Broadway, New York, NY 10036.

406.    Defendant J.P. Morgan Securities LLC ("JP Morgan") is an investment banking and financial services corporation that served as a co-lead underwriter of the Preferred Offering. In the Preferred Offering, JP Morgan sold and distributed a total of 53,021 shares of Preferred Stock to the investing public. JP Morgan was paid at least $1,908,756 for its underwriting services. JP Morgan's headquarters are located at 270 Park Avenue, New York, NY 10017.

407.    Defendant Macquarie Capital (USA), Inc. ("Macquarie") is an investment banking and financial services corporation that served as a co-lead underwriter of the Preferred Offering. In the Preferred Offering, Macquarie sold and distributed a total of 53,021 shares of Preferred Stock to the investing public.  Macquarie was paid at least $1,908,756 for its underwriting services. Macquarie's headquarters are located at 125 West 55th Street, New York, NY 10019.

408.    Defendant MCS Capital Markets LLC ("MCS") is an investment banking and financial services corporation that served as an underwriter of the Preferred Offering.  In the Preferred Offering, MCS sold and distributed a total of 16,250 shares of Preferred Stock to the

investing public.   MCS was paid at least $585,000 for its underwriting services.   MCS's headquarters are located at 9 West 57th Street, New York, NY 10019.

409.   Defendants Goldman, Merrill Lynch, Deutsche Bank, Morgan Stanley, JP Morgan, Macquarie and MCS are collectively referred to herein as the "Underwriter Defendants."

### 3.   The Auditor Defendant

410.   Defendant KPMG LLP ("KPMG") served as the Company's outside auditor at all relevant times and provided audit and tax services to the Company before and throughout the Class Period. KPMG issued an unqualified audit report on the Company's financial statements and internal controls for the 2014 fiscal year.   KPMG consented to the incorporation by reference of its unqualified audit report on the Company's financial statements and on management's assessment of internal controls in the Offering Documents for the Preferred Offering.   For the 2014 fiscal year ended December 31, 2014, KPMG was paid (a) audit fees of $3,887,000; (b) audit-related fees of $2,413,000; (c) tax fees of $942,000; (d) and unspecified "other fees" of $122,000.

411.   KPMG, the SunEdison Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

### B.   The Offering Documents Included Material Misstatements And Omissions

412.   As referenced above, the Offering Documents incorporated the 2014 10-K, the First Quarter 2015 10-Q, and the Second Quarter 2015 10-Q, and contained material misstatements and omissions concerning: (i) SunEdison's liquidity and available cash; (ii) the Margin Loan; (iii) the Goldman Sachs Loan; (iv) the classification of over $700 million of the Company's recourse debt; (v) the effectiveness of the Company's internal controls over financial reporting; and (vi) Item 303 misrepresentations.

### 1.    Adequacy Of SunEdison's Liquidity

413.    The Offering Documents included materially misstated statements from SunEdison's 2014 10-K, SunEdison's First Quarter 2015 10-Q, and SunEdison's Second Quarter 2015 10-Q.  Specifically, in the 2014 10-K, the Company stated that:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at December 31, 2014 totaled $1,074.4 million, compared to $831.5 million at December 31, 2013.

*        *        *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*        *        *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the TerraForm term loan and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

414.    In the First Quarter 2015 10-Q, the Company stated that:

Liquidity

Cash and cash equivalents, plus cash committed for construction projects, at March 31, 2015 totaled $919 million, compared to $987 million at December 31, 2014.

*        *        *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*        *        *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and

construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

415.    In the Second Quarter 2015 10-Q, the Company stated that:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at June 30, 2015 totaled $1,998 million, compared to $987 million at December 31, 2014.

*        *        *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

*        *        *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015. The Global IPO and related private placement transactions and our recently completed warehouse financing structures have also contributed to our capital resources.

416.    The foregoing statements by SunEdison concerning the Company's liquidity and available cash were materially misstated because, by the time of the 2014 10-K, the Company was already suffering from a liquidity crisis.  This liquidity crisis was exemplified by the Company's systemic and ongoing problems paying its vendors for even basic utilities and necessary services, including telephone and electricity bills and required payments to regulatory entities.  The Company even failed to pay vendors that were irreplaceable and core to its growth model, including critical due diligence vendor Garrad Hassan.  When SunEdison did pay its bills, the Company did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects.

182

417.     Moreover, SunEdison's Senior Internal Auditor from April 2014 to December 2015, explained that by this time, SunEdison had stopped paying its vendors because it had spent all of its available cash as a result of its dizzying M&A activity.  Furthermore, SunEdison's liquidity statements were materially false and misleading because, as the Senior Internal Auditor explained, A/P audit demonstrated the Company's dire cash flow problem even in April 2015 when Defendant Wuebbels requested the audit.  Indeed, her research in connection with the A/P audit not only demonstrated that SunEdison's liabilities vastly eclipsed its revenue, but also that SunEdison was, because of its cash flow shortfalls, by July 2015, "in huge trouble."  Moreover, as the Director of Asset Management and Operations at SunEdison from December 2014 to December 2015 explained, by August 2015, SunEdison's liquidity was so limited that it was in danger of default.

418.     It was widely known within the Company that SunEdison "never had cash" to pay its vendors.  During this time, Defendant Wuebbels, along with Defendant Chatila, led weekly conference calls with SunEdison management, on which they discussed the Company's cash shortage, and inability to pay key vendors.

419.     Indeed, SunEdison later admitted that the Company's "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]"  These fundamental flaws in SunEdison's controls rendered the Company's statements that it "believe[d]" and "expect[ed]" cash on hand to be sufficient for the Company's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with the Company's liquidity position materially misstated or, at minimum, materially misleading in light of the true underlying facts.  Investors understood these statements

to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief.  Since this was not the case – as the Company eventually admitted – these statements were misleading by virtue of omitting the facts contradicting these statements.

420.    Furthermore, the statements in the 2014 10-K, the First Quarter 2015 10-Q, and the Second Quarter 2015 10-Q about SunEdison's liquidity were also materially misstated because, despite the Offering Documents' statements about "sufficient capital" for "the remainder of 2015," the Company did not even have the $152 million to pay off the margin call.  Indeed, in order to pay the margin call, SunEdison had to enter into the $169 million "emergency" Goldman Sachs Loan, which the Company had been negotiating in July and secretly finalized five days after the Second Quarter 2015 10-Q on August 11, 2015, but before the Preferred Offering on August 18, 2015, and did not disclose until November 2015.

## 2.    Material Misstatements Concerning The Goldman Sachs Loan

421.    Significantly, the Offering Documents also omitted to disclose the highly material "emergency" Goldman Sachs Loan, while disclosing material relationships with the Underwriters Defendants and other material "Recent Events."  For example, the Offering Documents stated:

> Certain of the underwriters and their respective affiliates have provided, from time to time in the past, and may in the future provide, investment banking, financial and other services to us. They receive customary fees and commissions for these services. The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage, tax equity financing and other financial and non-financial activities and services. Certain of the underwriters and their affiliates have provided, and may in the future provide, a variety of these services to us and to persons and entities with relationships with us, for which they received or will receive customary fees and expenses.
>
> In addition, certain of the underwriters or their respective affiliates are parties to the bridge financing commitments entered into in connection with the First Wind

Acquisition and lenders under the $410 million margin loan secured by a portion of our equity stake in TerraForm that we incurred on January 29, 2015. Also, certain of the underwriters or their respective affiliates are parties to the senior secured letter of credit facility with us in an aggregate principal amount up to $750 million as of July 31, 2015. We have also entered into a commitment letter with Goldman Sachs Bank USA for a $500 million secured term loan facility, and TerraForm Operating has entered into a debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility pursuant to which certain of the underwriters or their affiliates will be lenders. The funding of the term facility and bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. We have also entered into a $150 million four-year term loan with Deutsche Bank in connection with our joint venture with Dominion for Four Brothers. In addition, certain investment funds managed by Goldman, Sachs & Co. (collectively, the "GS Funds") have entered into agreements with us to form a new warehouse for the construction and acquisition of utility-scale solar and wind projects (the "Warehouse"). Subject to certain conditions, the GS Funds have agreed to contribute up to $300 million of equity to the Warehouse, and a syndicate of banks, including certain of the underwriters or their respective affiliates, have agreed to provide debt financing to the Warehouse of up to $700 million in senior secured credit facilities.

Additionally, investment funds managed by an affiliate of MCS Capital Markets, LLC, are existing equity holders in our common stock and in our 0.25% Convertible Notes due 2020.

422.     Defendants' disclosure of these lending agreements, including at least two with Goldman Sachs, one of which the Company had entered into only the day before, on August 17, 2015, omitted to disclose both the existence of and the onerous terms of the Goldman Sachs Loan, which the Company entered into on August 11, 2015 and had an affective 15% interest rate.  By omitting to disclose the "emergency" Goldman Sachs Loan, the Company did not disclose the material conflict of interest arising from the fact that Goldman was one of the lead underwriters on the offering.  Thus, Goldman had a significant interest in SunEdison having the funds to repay Goldman, while also having an obligation to ensure that SunEdison accurately conveyed its financial condition.

423.    The Offering Documents also included materially misstatements about how SunEdison would allocate the proceeds of the August 2015 Preferred Offering.  Under the heading "USE OF PROCEEDS," the Company stated in the Offering Documents that:

> We estimate that the proceeds from this offering, after deducting the underwriters' discounts and commissions and estimated offering expenses payable by us, will total approximately $626.1 million.

> We expect to use the net proceeds of this offering for general corporate purposes, which we expect to include funding working capital and growth initiatives. At this time, we have not specifically identified a large single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us. As a result, our management will retain broad discretion over the use of the net proceeds from this offering.

424.    Defendants' explanation for how it would use the net proceeds of the August 2015 Preferred Offering omitted to disclose that SunEdison was planning to use the proceeds of the August 2015 Preferred Offering to address its current liquidity crisis and to pay down margin calls on the Margin Loan.  Together with the other representations made in connection with the August 2015 Preferred Offering, this statement created the misimpression that SunEdison was raising capital to preserve its flexibility to take advantage of future opportunities as they arose, and not to meet existing liabilities and immediate needs, which was the true purpose of the Offering.

### 3.    Material Misstatements Concerning The Margin Loan

425.    Defendants also made material misstatements about the Margin Loan in the Offering Documents by discussing the Margin Loan without giving all material information necessary to make those statements not misleading. For example, in the Second Quarter 2015 10-Q, incorporated by reference by the Offering Documents, the Company stated:

> The Margin Loan Agreement requires the subsidiary to maintain a loan to value ratio not to exceed 50% (based on the value of the Class A common stock of TerraForm ("TerraForm Class A Common Stock"), which certain of the collateral may be exchanged for). In the event that this ratio is not maintained, the subsidiary must post additional cash collateral under the Margin Loan Agreement and/or elect

to repay a portion of the term loans thereunder. In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of TerraForm Class A Common Stock, certain events or extraordinary transactions related to TerraForm and certain events related to SunEdison.

426.    Despite discussing the Margin Loan in the Second Quarter 2015 10-Q, Defendants omitted to disclose, that SunEdison had already or would likely soon face a significant margin call on the Margin Loan, which would tax SunEdison's limited sources of liquidity still further.  As referenced above, the falling price of SunEdison and TERP shares following the July announcement of the Vivint Transaction prompted a large margin call on the Margin Loan in August 2015.  While SunEdison did not disclose the margin call at the time it occurred, it did later confirm that a margin call took place before August 25, 2015, and, further, that margin calls occurred in the amount of $152 million during the third quarter of 2015.  Based on the 32.2 million TerraForm shares originally pledged on the Margin Loan agreement, and assuming a $410 million loan balance on August 7, 2015, the $25.24 closing price for TERP stock on that date would have equated to a loan-to-value ratio of 50% ($410 million $\div$ (32.2 million x $25.24)).  While investors could not know exactly which date that margin call would take place (given the undisclosed value of the additional collateral SunEdison had offered), TERP's equity value was the significant driving force behind any margin call that occurred.

### 4.    Misclassification Of The Company's Debt

427.    Defendants also made material misstatements about SunEdison's classification of its recourse debt in the Offering Documents.  In the Company's First Quarter 2015 10-Q, incorporated by reference by the Offering Documents, Defendants misclassified over $700 million of the Company's debt, including the $410 million under the Margin Loan and $336 million in Exchangeable notes due in 2020.  Specifically, Defendants reported that these liabilities were

"Non-recourse to SunEdison," as set forth in the table below excerpted from the First Quarter 2015

10-Q under the category "DEBT AND CAPITAL LEASE OBLIGATIONS":

**B. DEBT AND CAPITAL LEASE OBLIGATIONS**
Debt (including consolidated VIEs) and capital lease obligations outstanding consists of the following:

| | | | As of March 31, 2015 | | | As of December 31, 2014 | |
| In Millions | Weighted Average Annual Interest Rate | Total | Current and Short-Term | Long-Term | Total | Current and Short-Term | Long-Term |
|---|---|---|---|---|---|---|---|
| Renewable Energy Development Segment debt: | | | | | | | |
| Margin loan due 2017[a] | 6.25% | 410 | - | 410 | - | - | - |
| Exchangeable notes due 2020[a] | 3.75% | 336 | - | 336 | - | - | - |
| Total debt outstanding | | $9,161 | $1,414 | $7,747 | $6,993 | $1,078 | $5,915 |

(a) Non-recourse to SunEdison

428.    Similarly, in the Company's Second Quarter 2015 10-Q, incorporated by reference

by the Offering Documents, Defendants falsely and misleadingly classified over $700 million of

the Company's debt, including the $410 million under the Margin Loan and $28 million in

Exchangeable notes due in 2020.  Specifically, Defendants reported that these liabilities were

"Non-recourse to SunEdison," as set forth in the table below excerpted from the first quarter 2015

Form 10-Q under the category "LONG-TERM DEBT":

**B. LONG-TERM DEBT**
Debt, including consolidated variable interest entities ("VIEs"), consists of the following:

| | | | As of June 30, 2015 | | | As of December 31, 2014 | |
| In Millions | Weighted Average Annual Interest Rate | Total | Current and Short-Term | Long-Term | Total | Current and Short-Term | Long-Term |
|---|---|---|---|---|---|---|---|
| Renewable Energy Development Segment debt: | | | | | | | |
| Margin loan due 2017[a] | 6.25% | 410 | - | 410 | - | - | - |
| Exchangeable notes due 2020[a] | 3.75% | 328 | - | 328 | - | - | - |
| Total debt outstanding | | $10,722 | $1,551 | $9,171 | $6,993 | $1,078 | $5,915 |

(a) Non-recourse to SunEdison

429.    The foregoing statements by SunEdison concerning the classification of Company's debt were materially misstated because, as the Company later admitted on November 9, 2015, its classification of the Margin Loan and the Exchangeable Notes as being "non-recourse" was not true.  In fact, both the Margin Loan and the Exchangeable Notes were actually recourse debt – meaning that lenders could recover these loans, over $700 million, directly from the Company and that these amounts counted as "recourse debt" for purposes of the Company's debt covenants.  Had Defendants properly categorized this debt, it would have increased SunEdison's amount of debt applicable to its credit facility covenants in the first and second quarter by 119% and 131%, respectively.

### 5.    Effectiveness Of Internal Controls

430.    In the Offering Documents, Defendants made material misstatements about the Company's internal controls, representing that SunEdison had effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the Company, with its officers personally certifying to the efficacy of SunEdison's internal controls in each and every quarter of the Class Period.  Specifically, in the 2014 10-K, the First Quarter 2015 10-Q and in the Second Quarter 2015 10-Q, incorporated by reference by the Offering Documents, the Company stated:

> We carried out an evaluation as of December 31, 2014 [and March 31, 2015 and June 30, 2015] under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of December 31, 2014 [and March 31, 2015 and June 30, 2015].

*      *      *

As of December 31, 2014, management conducted an assessment of the effectiveness of our internal control over financial reporting based upon the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)*. Based on management's assessment utilizing these criteria, <u>our management concluded that, as of December 31, 2014, our internal control over financial reporting was effective</u>.

*      *      *

<u>There have been no changes in SunEdison's internal control over financial reporting during the quarter ended December 31, 2014 [and March 31, 2015 and June 30, 2015] that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting</u>.

*      *      *

<u>There have been no significant changes to our critical accounting policies and estimates since December 31, 2014</u>.

431.    Further, in the Company's 2014 10-K, the First Quarter 2015 10-Q and Second Quarter 2015 10-Q, Defendants Chatila and Wuebbels each personally certified that they had evaluated the effectiveness of SunEdison's internal controls and disclosed any deficiencies or material weaknesses in them.  Specifically, Defendants Chatila and Wuebbels made the following claims:

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

190

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision; to ensure that material information relating to the registrant, including its consolidated subsidiaries is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's independent registered public accounting firm and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

432.    In the 2014 10-K, the First Quarter 2015 10-Q and the Second Quarter 2015 10-Q,

Defendants Chatila and Wuebbels also each personally certified they had evaluated the

effectiveness of SunEdison's internal controls, disclosed any deficiencies or material weaknesses

in them, and that the "information contained in the Report [the 2014 10-K, the First Quarter 2015

<u>10-Q, and the Second Quarter 2015 10-Q] fairly presents, in all material respects, the financial</u>

<u>condition and results of operations of the Company</u>."

433.    The foregoing statements by Defendants Chatila and Wuebbels concerning the effectiveness of the Company's internal controls were materially false and misleading.  As former SunEdison employees have explained, throughout the Class Period, SunEdison's internal controls over financial reporting were completely ineffective, such that SunEdison's financial reporting was "the worst part of the business" and the "biggest joke in the world."  Specifically, throughout the Class Period, SunEdison's internal controls over financial reporting suffered from material weaknesses because:

- SunEdison never integrated the accounting and financial reporting systems of its acquired companies with its own so that the process for consolidating each project and acquired company's financial results was labyrinthine, a "web of chaos and confusion," onerous, and required manual entry, and was thus subject to massive input errors, leading to "bastardized data;"

- the Company's consolidated financial data was kept and updated on an unsecured Excel spreadsheet, an inappropriate method for reporting financial data as used by SunEdison because Excel does not contain "input controls," meaning that "huge categories" of line items could and did, accidentally or intentionally, go unreported or misrepresented;

- the Excel spreadsheet that housed SunEdison's consolidated financial data had no "access controls," meaning that anyone at the Company, including low-level employees like call-center employees, could review, input, and modify financial data by staggering amounts, either accidentally or intentionally, and SunEdison's access controls were so woefully poor with such "insanely bad data integrity" that "anyone with access could change the economics of a deal," and employees, long after having left the Company, could still use their SunEdison credentials to access SunEdison's financial databases and review and even modify the Company's financial results;

- SunEdison had an extremely high turnover rate of accountants, mostly contractors with no prior familiarity with the Company, its projects or its myriad accounting systems, and these employees were given little to no training on SunEdison's multiple accounting platforms, thus exacerbating SunEdison's existing internal control problems; and

- SunEdison had no way of accurately accounting for its available cash because, at any time, SunEdison employees or affiliated entities could open bank accounts and draw money from SunEdison, as was the case with the 2014 "significant deficiency," which demonstrated that, because there could be "bank accounts around the world" into which SunEdison's funds could be deposited, even SunEdison's Senior Auditor and Accountant and the Company's Assistant Director of Financial Reporting "had no idea what the cash position was."

434. The Company's subsequent admissions corroborate the reports of SunEdison's former employees and confirm that the Offering Documents contain untrue statements. For example, as the Company later admitted in a press release on March 16, 2016, SunEdison's internal controls over financial reporting suffered from multiple material weaknesses such that the Company could not timely file it 2015 10-K, an admission to which the both Global and TERP assented on March 16 and March 29, 2016, respectively, when Global and TERP both delayed the filing of their 2015 10-Ks because the YieldCos' internal controls were directly related to SunEdison's reporting its cash and liquidity position.  Moreover, in a Form 8-K filed with the SEC after the close of the Class Period, on April 14, 2016, the Company announced that SunEdison's Board had determined that SunEdison needed to "strengthen internal controls at both the enterprise and project level to enhance visibility and control over project status and cash availability" and that SunEdison "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]" Among other things, SunEdison admitted that:

- "the Company's cash forecasting efforts lack sufficient controls and processes";
- "certain assumptions underlying the cash forecasts provided to the Board by the Company's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted";
- "the Company's management has not responded appropriately when forecasted targets were not met"; and

- "the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

In other words, the Company's own directors reported that the Company's internal controls for reporting liquidity required remediation.

### 6.    Item 303 Misstatements

435.    The Offering Documents were materially misstated because they failed to disclose the information required by Item 303 of Regulation S-K.  As set forth more fully above at ¶¶233-235, Item 303 requires the disclosure of known trends that will affect future revenue, specifically: "known trends … that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues."  Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

436.    As set forth in detail above at ¶¶55-65 and 416-420, both of these conditions were satisfied here. First, as set forth above at ¶¶55-65, 416-420, the growing trend of constrained liquidity, as evidenced by SunEdison's consistent and systemic late payment of its vendors, was "known" to the Executive Defendants. The facts set forth above establish that this trend was "reasonably likely to have material effects on [SunEdison's] financial condition or results of operations."  Second, as set forth above at ¶¶55-65 and 416-420, as a direct result of this trend, SunEdison's near-term cash position, in fact the Company's very solvency, would be dramatically

impacted as the Company's business partners and vendors would, and indeed did, cut ties with the Company, and SunEdison's creditors would refuse to lend SunEdison additional money.

437.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends and uncertainties within the Company, namely that SunEdison was experiencing extreme liquidity shortages; and the fact that (ii) whether the Company's weakened liquidity position would have a "material…unfavorable impact on…revenues."  As described above in ¶¶40 and 51, Defendants themselves admitted that by April 2015, the Company was already experiencing "liquidity challenges," that SunEdison could not even pay off the $152 million margin call and, as a result had to enter into the "emergency" $169 million Goldman Sachs Loan.  Nevertheless, Defendants failed to disclose any of this information during the Class Period.

*       *       *

438.    As a result of Defendants' misstatements and omissions contained in the Offering Documents, the price of SunEdison preferred stock fell $1022, from an opening price of $1045 on August 18, 2015 to a closing price of $23 on April 4, 2016, a decline of more than 97%.

**C.    Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering**

439.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

440.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1)

195

interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings.  Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

441.    Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

442.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's liquidity, internal controls, the re-classification of the Company's debt, and the Margin Loan.  Goldman Sachs' failure to conduct a reasonable investigation into the accuracy and completeness of the Company's statements is self-evident, as SunEdison, disclosing numerous lending agreements in the Offering Documents, including at least two lending agreements with Goldman Sachs, failed to mention the emergency

Goldman Sachs Loan that the Company entered into on August 11, 2015, which further raised red flags as to SunEdison's liquidity problems at the time of the Preferred Offering.

443.    Moreover, the Underwriter Defendants could not simply rely on the work of SunEdison's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Thus, the Underwriter Defendants must conduct their own, independent (and reasonable) investigation into the accuracy of the Company's financial statements and assessments of internal controls. Had the Underwriter Defendants conducted a reasonable investigation, they would have learned that the Company's liquidity position was weak, it could not access the capital it claimed it could, and its internal controls for financial reporting suffered from material weaknesses.  Had the Underwriter Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning the Company's liquidity position and access to available cash, the efficacy of the Company's internal controls over financial reporting, the re-classification of over $700 million of the Company's "recourse" debt, the Margin Loan, the Goldman Sachs Loan, and the Company's Item 303 misstatements.

444.    Similarly, the SunEdison Defendants who signed the Registration Statement and failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  Had these SunEdison Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning the Company's liquidity position and access to available cash, the efficacy of the Company's internal controls over financial reporting, the re-classification of over $700 million of the Company's "recourse" debt,

the Margin Loan, the Goldman Sachs Loan, and the Company's Item 303 misstatements, as set forth in Section XII.B above.

445.    These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's liquidity, internal controls, the Margin Loan, the Goldman Sachs Loan or its Item 303 misstatements notwithstanding numerous "red flags," including the Company's historic failure to timely pay its vendors, the 2015 A/P audit, the margin call, and the Goldman Sachs Loan, all of which had occurred prior to the Offering (as set forth in Section XII.B above).

**D.      KPMG's 2014 Audit Report And Failure To Comply With GAAS**

446.    Defendant KPMG, who consented to the inclusion of its audit report in the Offering Documents, failed to perform its audit of SunEdison in a reasonable manner and failed to comply with Generally Accepted Auditing Standards ("GAAS").[5]

447.    Specifically, during the Class Period, KPMG issued an unqualified audit report on the Company's financial statements and internal controls for the year ended December 31, 2014. KPMG also consented to the incorporation by reference in the Offering Documents of its unqualified audit report on the Company's financial statements and internal controls for the year ended December 31, 2014.

448.    In its report, KPMG stated that it performed its audit and evaluation in accordance with the standards of the PCAOB, or GAAS.  These statements were materially untrue when made as at the time of the Preferred Offering, KPMG's audit failed to comply with GAAS.  KPMG's report stated:

---

[5] "[T]he standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. All references to GAAS hereinafter include PCAOB standards.

We have audited the accompanying consolidated balance sheets of SunEdison, Inc. and subsidiaries (the Company) as of December 31, 2014 and 2013, and the related consolidated statements of operations, comprehensive loss, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2014. We also have audited the Company's internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

\*       \*       \*

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the consolidated financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

\*       \*       \*

Also in our opinion, SunEdison, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

449.    In certifying SunEdison's financial statements and internal controls, KPMG specifically represented (based on its GAAS audit) that the Company maintained effective internal controls over financial reporting as of December 31, 2014.

450.    Contrary to its statements, KPMG's audit did not constitute a reasonable investigation of whether the Company's management's assessment of internal controls was properly and accurately presented.  Alternatively, to the extent KPMG's statements that it conducted its audit in accordance with GAAS are deemed statements of opinion or belief, those statements were materially misstated statements of opinion or belief when made, as set forth herein.

451.    GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report. AU § 150.02.

452.    KPMG violated General Standard No. 3 by, among other things, disregarding SunEdison's internal control deficiencies as detailed in ¶¶66-94 and 433-434 above.  Had KPMG complied with GAAS, the only reasonable professional conclusion it could have drawn would have been that the Company's internal controls were ineffective and materially inadequate at the end of fiscal year 2014 and throughout the Class Period, as the Company has admitted.  A number of facts support this inference.  Specifically, throughout the Class Period, SunEdison's internal controls over financial reporting suffered from material weaknesses because:

- SunEdison never integrated the accounting and financial reporting systems of its acquired companies with its own so that the process for consolidating each project and acquired company's financial results was labyrinthine, a "web of chaos and confusion," onerous, and required manual entry, and was thus subject to massive input errors, leading to "bastardized data;"

- the Company's consolidated financial data was kept and updated on an unsecured Excel spreadsheet, an inappropriate method for reporting financial data as used by SunEdison because Excel does not contain "input controls," meaning that "huge categories" of line items could and did, accidentally or intentionally, go unreported or misrepresented;

- the Excel spreadsheet that housed SunEdison's consolidated financial data had no "access controls," meaning that anyone at the Company, including low-level employees like call-center employees, could review, input, and modify financial data by staggering amounts, either accidentally or intentionally, and SunEdison's access controls were so woefully poor with such "insanely bad data integrity" that "anyone with access could change the economics of a deal," and employees, long after having left the Company, could still use their SunEdison credentials to access SunEdison's financial databases and review and even modify the Company's financial results;

- SunEdison had an extremely high turnover rate of accountants, mostly contractors with no prior familiarity with the Company, its projects or its myriad accounting systems, and these employees were given little to no training on SunEdison's multiple accounting platforms, thus exacerbating SunEdison's existing internal control problems; and

- SunEdison had no way of accurately accounting for its available cash because, at any time, SunEdison employees or affiliated entities could open bank accounts and draw money from SunEdison, as was the case with the 2014 "significant deficiency," which demonstrated that, because there could be "bank accounts around the world" into which SunEdison's funds could be deposited, even SunEdison's Senior Auditor and Accountant and the Company's Assistant Director of Financial Reporting "had no idea what the cash position was."

453. The Company's subsequent admissions corroborate the reports of SunEdison's former employees and confirm that the Offering Documents contain untrue statements. For example, as the Company later admitted in a press release on March 16, 2016, SunEdison's internal controls over financial reporting suffered from multiple material weaknesses such that the Company could not timely file it 2015 10-K, an admission to which the both Global and TERP assented on March 16 and March 29, 2016, respectively, when Global and TERP both delayed the filing of their 2015 10-Ks because the YieldCos' internal controls were directly related to

SunEdison's reporting its cash and liquidity position.  Moreover, in a Form 8-K filed with the SEC after the close of the Class Period, on April 14, 2016, the Company announced that SunEdison's Board had determined that SunEdison needed to "strengthen internal controls at both the enterprise and project level to enhance visibility and control over project status and cash availability" and that SunEdison "lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable[.]" Among other things, SunEdison admitted that:

- "the Company's cash forecasting efforts lack sufficient controls and processes";

- "certain assumptions underlying the cash forecasts provided to the Board by the Company's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted";

- "the Company's management has not responded appropriately when forecasted targets were not met"; and

- "the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

In other words, the Company's own directors reported that the Company's internal controls for reporting liquidity required remediation.

454.    GAAS Standards of Fieldwork Nos. 2 and 3 require an independent auditor to obtain, through inspection, observation, inquiries and confirmations, competent, sufficient evidential matter to afford a reasonable basis for its opinion.  AU § 150.02.

455.    KPMG violated Standards of Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that SunEdison had effectively consolidated its myriad accounting system platforms into a coherent, effective system which could accurately track, update and reflect the Company's financial data; that SunEdison had remediated the significant deficiency which

KPMG and SunEdison's internal auditors had identified; and that SunEdison's extremely high turnover rate of accountants and auditors did not weaken the Company's internal controls over financial reporting.  Had KPMG complied with GAAS, the only reasonable professional conclusion would have been that SunEdison's internal controls over financial reporting were woefully ineffective and suffered from numerous material weaknesses in internal controls at the end of fiscal year 2014 and during the Class Period, which the Company has now admitted, and were in violation of GAAP.

456.    Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or to state that an opinion cannot be expressed. AU § 150.02.

457.    As a result of KPMG's violations of GAAS set forth above, it also violated Standard of Reporting No. 4 because KPMG had an insufficient basis to express an unqualified opinion on its 2014 audit of SunEdison.

458.    Accordingly, as set forth above, KPMG's public statements that its audits were conducted in accordance with GAAS were materially untrue and contained omissions of material facts when made.

### THIRD CLAIM FOR RELIEF
**For Violations Of Section 11 Of The Securities Act In Connection With
The Offering Against The Securities Act Defendants**

459.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Offering pursuant to the Shelf Registration Statement, which contained untrue statements and omissions of material fact. This Claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief

made in connection with the Preferred Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Preferred Offering. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

460. This claim is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants, including the SunEdison Defendants, the Underwriter Defendants, and the Auditor Defendant, on behalf of Plaintiff ATRS and members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offering and were damaged by the acts alleged herein. This claim is based solely in strict liability and negligence. SunEdison was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents (defined in ¶386 above) of the registered securities set forth below. (SunEdison is not named as a defendant only because of its bankruptcy.)

461. Defendants Chatila, Wuebbels, Hernandez, Alvarez, Tesoriere, Williams and Zwirn each signed the Registration Statement – which formed the Offering Documents – as a senior officer and/or director of SunEdison within the meaning of Section 11 of the Securities Act. Defendants Daley and Proctor were directors of SunEdison at the time that the Offering Documents were filed with the SEC.

462. Defendants Goldman, Merrill Lynch, Deutsche Bank, Morgan Stanley, JP Morgan, Macquarie, and MCS were statutory underwriters for these registered securities, as admitted in the Offering Documents.

463. Defendant KPMG consented to the incorporation of its audit report in the Offering Documents.

464.   The Preferred Stock described in this Count was issued and sold pursuant to the Offering Documents.  All purchases of the registered securities after the issuance of the Offering Documents are traceable to the Offering Documents.

465.   The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

466.   Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

467.   In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

468.   None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

469.   KPMG did not conduct a reasonable audit of SunEdison in compliance with GAAS and did not have reasonable ground to state that KPMG's audit report included or incorporated by reference in the Offering Documents was true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

470.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

471.    As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the Offering Documents.

472.    By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

473.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

**FOURTH CLAIM FOR RELIEF**
**For Violations Of Section 12(a)(2) Of The Securities Act In Connection With The Offerings**
**Against The Underwriter Defendants**

474.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims, and expressly excludes from this Count any allegations of fraud or reckless or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Preferred Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Preferred Offering.

475.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendants Goldman, Merrill Lynch, Deutsche Bank, Morgan Stanley, JP Morgan, Macquarie, and MCS (defined above as the "Underwriter Defendants") on behalf of Plaintiff ATRS and members of the Class who purchased or otherwise acquired SunEdison preferred stock pursuant and/or traceable to the Offering Documents, and were damaged by acts alleged herein.

206

476. By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, the Underwriter Defendants, through public offerings, solicited and sold SunEdison securities to members of the Class.

477. The Offering Documents were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

478. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the August 18, 2015 Prospectus, were accurate and complete in all material respects. Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

479. Members of the Class purchased SunEdison Preferred Stock by means of the materially misstated Offering Documents. At the time they purchased shares in the Preferred Offering, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Documents, including the August 18, 2015 Prospectus.

480. By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

481. Accordingly, members of the Class who purchased or otherwise acquired SunEdison securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to SunEdison and the Underwriter

Defendants.  Members of the Class who have sold their SunEdison securities issued in or traceable to the Preferred Offering are entitled to rescissory damages.

482.     This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Preferred Offering.

<strong><u>FIFTH CLAIM FOR RELIEF</u></strong><br><strong>For Violations Of Section 15 Of The Securities Act In Connection With The Offering<br>Against The SunEdison Defendants</strong>

483.     Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

484.     This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Chatila, Wuebbels, Hernandez, Alvarez, Blackmore Tesoriere, Williams, Zwirn and Daley (defined above as the "SunEdison Defendants") on behalf of members of the Class who purchased or otherwise acquired SunEdison securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.  For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Preferred Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Preferred Offering.

485.     At all relevant times, the SunEdison Defendants were controlling persons of the SunEdison within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions at SunEdison and/or because of their positions on the SunEdison Board, the SunEdison Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

208

486. Specifically, Defendants Chatila and Wuebbels each served as an executive officer of SunEdison.  During the Class Period, Defendant Chatila served the President, CEO and a director of SunEdison.  During the Class Period, Chatila oversaw the acquisition of SunEdison LLC in 2009 and, during the Class Period, developed SunEdison's solar strategy.  Defendant Wuebbels served as SunEdison's Executive Vice President, Chief Administrative Officer, and CFO.  As such, at all times relevant, Defendants Chatila and Wuebbels each participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in SunEdison's business affairs.  Defendants Chatila and Wuebbels also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Preferred Offering.  Because of their positions of control and authority as senior officers of SunEdison, each of these Defendants was able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

487. Similarly, Defendants Hernandez, Alvarez, Blackmore, Tesoriere, Williams, Zwirn, Daley and Proctor served as Directors on SunEdison's Board at the time the Preferred Offering was conducted and/or at the time that the Registration Statement was signed.  As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to SunEdison's financial condition and results of operations.  These Defendants each signed the Registration Statement; signed the 2014 10-K which was incorporated by reference into the Offering Documents; and/or were Directors at the time the Preferred Offering was conducted, the Offering Documents were disseminated to the investing public and the

Registration Statement became effective.  Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

488.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of SunEdison, each of these SunEdison Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Securities Act Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiff ATRS and members of the Class who purchased or otherwise acquired SunEdison securities pursuant to or traceable to the Offering Documents.  As a direct and proximate result of the conduct of these Defendants, Plaintiff ATRS and members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XIII.   Class Action Allegations

489.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SunEdison's securities during the Class Period, August 7, 2014, up to April 4, 2016, and were damaged thereby (the "Class").  Excluded from the Class are (i) SunEdison and its estate in bankruptcy; (ii) Defendants; (iii) members of the immediate family of each Executive Defendant or Director Defendant; (iv) any person who was an officer or director of SunEdison, KPMG, or any of the Underwriter Defendants during the Class Period; (v) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (vi) any person who participated in the wrongdoing alleged herein; and (vii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

490.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, SunEdison's common stock was actively

traded on the NYSE, an efficient market.  As of November 9, 2015, SunEdison had more than 316 million shares of common stock outstanding.  The Company issued 650,000 shares of Preferred Stock in the Preferred Offering.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members in the Class.

491.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

    (a)    Whether Defendants violated the federal securities laws;

    (b)    Whether Defendants misrepresented material facts concerning SunEdison;

    (c)    Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

    (d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)    Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

    (f)    Whether the Offering Documents contained material misstatements or omissions;

    (g)    Whether the SunEdison SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

    (h)    Whether the prices of SunEdison's common stock were artificially inflated; and

    (i)    The extent of damage sustained by Class members and the appropriate measure of damages.

492.    The claims of Plaintiffs are typical of those of the Class.

493.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

494.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIV.  Jurisdiction And Venue

495.    The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

496.    This Court has jurisdiction of the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. § 1331 and 1337.

497.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, SunEdison maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

498.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

## XV.    Prayer For Relief

WHEREFORE, Plaintiffs pray for judgment individually and on behalf of the Class, as

follows:

a)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b)    Awarding Plaintiffs and the Class members damages, including interest;

c)    Awarding Plaintiffs reasonable costs, including attorneys' and experts' fees; and

d)    Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XVI.  Jury Demand

Plaintiffs demand a trial by jury for all issues so triable.

DATED: July 22, 2016                    */s/ Maurice B. Graham*
                                        GRAY, RITTER & GRAHAM, P.C.
                                        Maurice B. Graham (#18029MO)
                                        Don M. Downing (#30405MO)
                                        701 Market Street, Suite 800
                                        St. Louis, Missouri 63101
                                        Telephone: 314-241-5620
                                        Facsimile: 314-241-4140
                                        mgraham@grgpc.com
                                        ddowning@grgpc.com

                                        *Liaison Counsel for Plaintiffs*

213

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

Salvatore J. Graziano (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
Jake Nachmani (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
katiem@blbglaw.com
jake.nachmani@blbglaw.com

*Counsel for Plaintiffs and Lead Counsel for the
Class*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of July 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Maurice B. Graham*

Maurice B. Graham (#18029MO)

215

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Patricia Tarini, on behalf of the court-appointed lead plaintiff Municipal Employees' Retirement System of Michigan ("MERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel of MERS.  I have reviewed the Amended Consolidated Securities Class Action Complaint in this matter and authorize its filing by counsel.

2. MERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. MERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. MERS's transactions in the SunEdison, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. MERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Town of Davie Police Pension Plan v. Pier 1 Imports*, No. 15-cv-3415 (N.D. Tex.)
   *Horowitz v. SunEdison, Inc.*, No. 15-cv-1769 (E.D. Mo.)

6. MERS will not accept any payment for serving as a representative party on behalf of the Class beyond MERS's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of July, 2016.

Patricia Tarini
General Counsel
*Municipal Employees' Retirement System of Michigan*

**Municipal Employees' Retirement System of Michigan**
**Transactions in SunEdison, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 10/1/2014 | 11,490 | $18.2954 |
| Purchase | 11/19/2014 | 201,850 | $20.9846 |
| Purchase | 11/20/2014 | 94,360 | $21.5662 |
| Purchase | 11/21/2014 | 75,590 | $22.8185 |
| Purchase | 11/28/2014 | 31,790 | $21.4893 |
| Purchase | 12/8/2014 | 99,220 | $20.0230 |
| Purchase | 1/13/2015 | 60,130 | $20.6236 |
| Purchase | 1/15/2015 | 19,630 | $21.0948 |
| Purchase | 1/28/2015 | 1,320 | $18.9200 |
| Purchase | 2/24/2015 | 146,020 | $23.4038 |
| Purchase | 4/15/2015 | 2,530 | $26.7490 |
| Purchase | 6/18/2015 | 11,910 | $31.5376 |
| Purchase | 7/16/2015 | 2,070 | $31.1973 |
| Purchase | 8/6/2015 | 36,046 | $20.0097 |
| Purchase | 8/6/2015 | 4,019 | $19.9085 |
| Purchase | 8/7/2015 | 29,160 | $15.4573 |
| Purchase | 8/7/2015 | 6,920 | $15.5684 |
| Purchase | 8/20/2015 | 5,410 | $12.1687 |
| Purchase | 8/20/2015 | 20,460 | $12.9899 |
| Purchase | 8/21/2015 | 32,680 | $11.5753 |
| Purchase | 10/9/2015 | 2,450 | $9.2984 |
| Purchase | 10/22/2015 | 87,770 | $7.7209 |
| Purchase | 10/27/2015 | 38,970 | $7.0084 |
| Purchase | 11/3/2015 | 81,330 | $7.8116 |
| Purchase | 12/15/2015 | 150 | $4.4100 |
| Purchase | 2/4/2016 | 3,210 | $2.9038 |
| Purchase | 3/24/2016 | 1,610 | $1.2500 |
| | | | |
| Sale | 12/23/2014 | (32,102) | $19.2065 |
| Sale | 3/17/2015 | (6,210) | $24.3437 |
| Sale | 5/5/2015 | (38,360) | $25.3218 |
| Sale | 5/29/2015 | (73,040) | $30.1517 |
| Sale | 6/1/2015 | (11,379) | $30.6617 |
| Sale | 6/1/2015 | (9,161) | $30.3894 |
| Sale | 6/25/2015 | (34,350) | $31.5815 |
| Sale | 7/21/2015 | (131,098) | $30.7442 |
| Sale | 11/10/2015 | (203,400) | $5.8619 |
| Sale | 11/11/2015 | (37,370) | $5.3521 |
| Sale | 11/13/2015 | (81,074) | $4.9620 |
| Sale | 11/17/2015 | (82,600) | $4.0571 |
| Sale | 11/17/2015 | (332,011) | $3.8221 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George Hopkins, on behalf of Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Arkansas Teacher. I have reviewed the Amended Consolidated Securities Class Action Complaint in this matter and authorize its filing by counsel.

2. Arkansas Teacher did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Arkansas Teacher is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Arkansas Teacher's transactions in the SunEdison, Inc. Series A Perpetual Convertible Preferred Stock that is a subject of this action are set forth in the chart attached hereto.

5. Arkansas Teacher has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Vocera Communications, Inc. Securities Litigation*, No. 13-cv-3567 (N.D. Cal.)
*In re Francesca's Holdings Corporation Securities Litigation*, No. 13-cv-6882 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Bankrate Inc.*, No. 13-cv-7183 (S.D.N.Y.)
*In re Quality Systems, Inc. Securities Litigation*, No. 13-cv-1818 (C.D. Cal.)
*In re DFC Global Corp. Securities Litigation*, No. 13-cv-6731 (E.D. Pa.)
*Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-226 (N.D. Cal.)
*Rossy v. Merge Healthcare Inc.*, No. 14-cv-318 (N.D. Ill.)
*State-Boston Retirement System v. Infoblox, Inc.*, No. 14-cv-2500 (N.D. Cal.)
*In re The Bancorp, Inc. Securities Litigation*, No. 14-cv-952 (D. Del.)
*In re CommVault Systems, Inc. Securities Litigation*, No. 14-cv-5628 (D.N.J.)
*Haan v. Five Below, Inc.*, No. 15-cv-94 (E.D. Pa.)
*In re Virtus Investment Partners, Inc., Securities Litigation,* No. 15-cv-1249 (S.D.N.Y.)
*In re Vipshop Holdings Ltd. Securities Litigation,* No. 15-cv-3870 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Insulet Corporation*, No. 15-cv-12345 (D. Mass.)
*Kasper v. AAC Holdings, Inc.*, No. 15-cv-923 (M.D. Tenn.)
*In re Extreme Networks, Inc. Securities Litigation*, No. 15-cv-4883 (N.D. Cal.)
*In re Nimble Storage, Inc. Securities Litigation,* No. 15-cv-5803 (N.D. Cal.)

6. Arkansas Teacher has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

*Pio v. General Motors Company,* No. 14-cv-11191 (E.D. Mich.)
*Jahm v. Bankrate, Inc.,* No. 14-cv-81323 (S.D. Fla.)
*Ong v. Chipotle Mexican Grill, Inc.,* No. 16-cv-141 (S.D.N.Y.)

7. Arkansas Teacher has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Arkansas Teacher Retirement System v. DFC Global Corp.,* No. 14-cv-1705 (E.D. Pa.)

8. Arkansas Teacher will not accept any payment for serving as a representative party on behalf of the Class beyond Arkansas Teacher's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 day of July, 2016.

George Hopkins
Executive Director
*Arkansas Teacher Retirement System*

**Arkansas Teacher Retirement System**
**Transactions in SunEdison Series A Perpetual Convertible Preferred Stock**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 8/18/2015 | 840 | 1,000 |
| Sale | 10/28/2015 | (840) | 644.0855 |